**<u>EXHIBIT 1</u>**

MEMBERSHIP INTEREST PURCHASE AGREEMENT

by and between

PGR Lessor K, LLC

as Seller

and

**GSPP Holdco, LLC and GSPP Capital, LLC**

as Buyer

dated as of August 31, 2018

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS AND CONSTRUCTION.......................................................... 1

    Section 1.1    Definitions............................................................................. 1

    Section 1.2    Rules of Construction. ......................................................... 11

Article II SALE AND PURCHASE OF MEMBERSHIP INTERESTS ..................................... 12

    Section 2.1    Transfer of Membership Interests ........................................... 12

    Section 2.2    Project Purchase Price; Construction Liabilities..................... 12

    Section 2.3    Closing Date......................................................................... 12

    Section 2.4    Conditions Precedent to the Obligations of the Parties ........... 13

Article III REPRESENTATIONS AND WARRANTIES REGARDING SELLER .................. 14

    Section 3.1    Organization......................................................................... 14

    Section 3.2    Authority; Enforceability ...................................................... 15

    Section 3.3    Consents and Approvals ........................................................ 15

    Section 3.4    No Conflicts; Consents and Approvals................................... 15

    Section 3.5    Legal Proceedings ................................................................ 15

    Section 3.6    Bankruptcy........................................................................... 16

    Section 3.7    Brokers ................................................................................ 16

    Section 3.8    Compliance with Law ........................................................... 16

Article IV REPRESENTATIONS AND WARRANTIES REGARDING THE PROJECT
        COMPANY......................................................................... 16

    Section 4.1    Organization......................................................................... 16

    Section 4.2    Authority; Enforceability ...................................................... 16

    Section 4.3    Consents and Approvals ........................................................ 17

    Section 4.4    No Conflicts; Consents and Approvals................................... 17

    Section 4.5    Ownership of Membership Interests of Project Company......... 17

    Section 4.6    Project Company Assets ........................................................ 18

    Section 4.7    Bank Accounts ..................................................................... 18

    Section 4.8    Subsidiaries ......................................................................... 18

    Section 4.9    Legal Proceedings ................................................................ 18

    Section 4.10    Compliance with Laws ........................................................ 18

    Section 4.11    Tax Matters ......................................................................... 18

    Section 4.12    ITC Eligibility..................................................................... 18

    Section 4.13    Regulatory Status ................................................................ 19

# TABLE OF CONTENTS
## (Continued)

**Page**

Section 4.14   Material Contracts ........................................................................ 20

Section 4.15   Affiliate Transactions ................................................................... 21

Section 4.16   Real Property ............................................................................... 21

Section 4.17   Permits ......................................................................................... 22

Section 4.18   Environmental Matters ................................................................. 22

Section 4.19   Intellectual Property .................................................................... 23

Section 4.20   Brokers ......................................................................................... 23

Section 4.21   Employees and Labor Matters ..................................................... 23

Section 4.22   Employee Benefits ....................................................................... 23

Section 4.23   Title .............................................................................................. 23

Section 4.24   Bankruptcy ................................................................................... 23

Section 4.25   Casualty ....................................................................................... 23

Section 4.26   Support Obligations ..................................................................... 23

Section 4.27   Liabilities ..................................................................................... 23

Section 4.28   No Other Representations and Warranties .................................... 24

Article V REPRESENTATIONS AND WARRANTIES OF BUYER ...................... 24

Section 5.1   Organization ................................................................................. 24

Section 5.2   Authority; Enforceability ............................................................. 24

Section 5.3   Consents and Approvals ............................................................... 24

Section 5.4   No Conflicts ................................................................................. 24

Section 5.5   Legal Proceedings ....................................................................... 25

Section 5.6   Compliance with Laws ................................................................ 25

Section 5.7   Brokers ......................................................................................... 25

Section 5.8   Securities Law Matters ................................................................ 25

Section 5.9   Financial Resources ..................................................................... 26

Article VI COVENANTS ........................................................................................ 26

Section 6.1   Transfer Taxes ............................................................................. 26

Section 6.2   Tax Matters .................................................................................. 26

Section 6.3   Pre-Closing Period Actions .......................................................... 28

Section 6.4   Inspection Rights; Access to Information .................................... 29

Section 6.5   Public Announcements ................................................................. 29

# TABLE OF CONTENTS
## (Continued)

Page

Section 6.6    Further Assurances...................................................................... 30

Section 6.7    EPC and O&M Matters................................................................ 30

Article VII INDEMNIFICATION, LIMITATIONS OF LIABILITY AND WAIVERS .......... 30

Section 7.1    Survival ....................................................................................... 30

Section 7.2    Indemnification by Indemnitors.................................................. 31

Section 7.3    Indemnification by Buyer ........................................................... 31

Section 7.4    Limitations on Liability .............................................................. 31

Section 7.5    Procedures for Third Party Claims ............................................. 33

Section 7.6    Indemnification Procedures ....................................................... 34

Article VIII PRE-CLOSING TERMINATION RIGHT.............................................. 35

Section 8.1    Termination.................................................................................. 35

Section 8.2    Effect of Termination .................................................................. 36

Article IX MISCELLANEOUS ............................................................................... 36

Section 9.1    Notices ......................................................................................... 36

Section 9.2    Entire Agreement ........................................................................ 37

Section 9.3    Joint Effort .................................................................................. 37

Section 9.4    Expenses ...................................................................................... 37

Section 9.5    Disclosure ................................................................................... 38

Section 9.6    Waiver .......................................................................................... 38

Section 9.7    Amendment .................................................................................. 38

Section 9.8    No Third Party Beneficiary.......................................................... 38

Section 9.9    Assignment; Binding Effect......................................................... 39

Section 9.10   Headings ...................................................................................... 39

Section 9.11   Invalid Provisions ....................................................................... 39

Section 9.12   Counterparts; Facsimile ............................................................. 39

Section 9.13   Governing Law ............................................................................ 39

Section 9.14   Specific Performance and Other Remedies ............................... 40

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of August 31, 2018 (the "**Execution Date**"), is by and among PGR Lessor K, LLC, a North Carolina limited liability company ("**Seller**"), Pine Gate Renewables, LLC, a North Carolina limited liability company ("**Sponsor**"), and GSPP Holdco, LLC and GSPP Capital, LLC, each a New York limited liability company (collectively "**Buyer**").

### RECITALS:

WHEREAS, Seller collectively owns 100% of the issued and outstanding membership interests (the "**Membership Interests**") in Novel Solar One LLC, a Minnesota limited liability company (the "**Project Company**").

WHEREAS, the Project Company is developing an approximately 4.4 MW$_{DC}$ photovoltaic solar energy project to be constructed in St. Cloud, Minnesota (the "**Project**").

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller on the terms and subject to the conditions set forth in this Agreement, 100% of the Membership Interests;

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.1    Definitions. As used in this Agreement, the following capitalized terms have the meanings set forth below:

"**1933 Act**" means the Securities Act of 1933, as amended.

"**Action**" means any legal, administrative, arbitral, mediation or other alternative dispute resolution procedure or other action, proceeding, claim, assessment, audit, inquiry or similar investigation before any court, arbitrator or other Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by Contract or otherwise.

"**Agreement**" is defined in the introduction to this Agreement.

"***Ancillary Agreements***" means the Assignment Agreements and the other documents and agreements to be delivered pursuant to this Agreement.

"***Assets***" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible and wherever situated), including the related goodwill, which assets and properties are operated, owned or leased by such Person, and in the case of the Project Company, includes all Real Property Interests, Permits, and agreements, engineering and construction contracts, components, materials, equipment, other personal property comprising or to be incorporated into any portion of the Project, studies, reports, and all other development rights, interests and assets relating to the Project.

"***Assignment Agreement***" means an assignment and transfer of the Membership Interests, substantially in the form attached hereto as <u>Exhibit B</u>.

"***Bankruptcy***" means, with respect to any Person, the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Code or like provision of law (except if such petition is contested by such Person and has been stayed or dismissed within ninety (90) days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of its Assets; commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates its approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally stayed or dismissed within ninety (90) days.

"***Bankruptcy Code***" means any and all section and chapters of Title 11 of the United States Code, or any similar law of any other jurisdiction, as in effect from time to time.

"***Base Project Purchase Price***" means an amount equal to $2.295 per watt (dc) of the size of the Project set forth on <u>Exhibit A-1</u>.

"***Benefit Plan***" means "employee benefit plan," as such term is defined in Section 3(3) of ERISA.  Benefit Plans do not include any Multiemployer Plans or any Benefit Plans maintained by any ERISA Affiliate.

"***Business Day***" means a day other than Saturday, Sunday or any day on which banks located in the State of Minnesota or the State of New York are authorized or obligated to close.

"***Buyer***" is defined in the introduction to this Agreement.

"***Buyer Group***" is defined in <u>Section 7.2</u>.

"***Casualty Defect***" means any destruction by fire, explosion or other casualty or any taking, or pending or threatened taking, in condemnation or under the right of eminent domain,

of the Project or any portion thereof, in each case that has or could reasonably be expected to have a Material Adverse Effect on the Project.

"***Claim***" means any demand, claim, action, investigation, legal proceeding (whether at law or in equity) or arbitration.

"***Closing***" is defined in <u>Section 2.3</u>.

"***Closing Date***" is defined in <u>Section 2.3</u>.

"***Code***" means the Internal Revenue Code of 1986.

"***Confidentiality Agreement***" means the Mutual Non-disclosure Agreement, dated as of March 27, 2018 between Sponsor and Buyer's parent Affiliate, Green Street Power Partners, LLC.

"***Consent***" means a consent, approval, authorization, waiver, filing, registration, declaration or similar action of, with or by any Person.

"***Construction Lender***" means Solar Construction Lending, LLC.

"***Construction Loan***" means the construction financing for the Project provided by Construction Lender.

"***Contract***" means any written contract, lease, license, evidence of Indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other valid and binding arrangement, but excludes Permits.

"***CSG Program Agreement***" means the Standard Contract for Solar*Rewards Community, between the Project Company and Northern States Power Company, a Minnesota corporation and wholly owned subsidiary of Xcel Energy, Inc., to be executed after the date hereof.

"***Data Site***" means the electronic documentation site established by or on behalf of Seller in connection with the transactions contemplated by this Agreement to which Buyer and its authorized representatives have been given access.

"***Deductible***" is defined in <u>Section 7.4(c)</u>.

"***Default***" means, with respect to any Person, any circumstance, event or condition that would constitute, with or without notice or the passage of time or both, a violation, breach, default, conflict with, or give rise to any right of termination, modification, cancellation, prepayment, suspension, limitation, revocation, purchase, re-purchase or acceleration.

"***Dispute Notice***" is defined in <u>Section 7.6(b)</u>.

"***Disqualified Person***" means (a) the United States, any state or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the

foregoing, (b) any organization which is exempt from Tax imposed by the Code (including any former tax-exempt organization within the meaning of Code Section 168(h)(2)(E) and any tax-exempt controlled entity within the meaning of Code Section 168(h)(6)(F)(iii) if such entity has not made the election provided in Code Section 168(h)(6)(F)(ii)), (c) any Person who is not a United States Person, and (d) any Indian tribal government described in Section 7701(a)(40) of the Code, or (e) any partnership or other pass-through entity, any direct or indirect partner (or other holder of an equity or profits interest) of which is an organization or entity described in clauses (a) – (d); provided, however, that any such Person described in clauses (a) – (d) shall not be considered a Disqualified Person to the extent that (i) the exception under Code Section 168(h)(1)(D) applies with respect to the income from the Project Company for that Person, (ii) the Person is described within clause (c) of this definition, and the exception under Code Section 168(h)(2)(B)(i) applies with respect to the income from the Project Company for that Person, or (iii) another exception applies under the Code and/or Treasury Regulations and a legal opinion reasonably acceptable to the Parties is delivered to the Parties to such effect from nationally recognized Tax counsel reasonably acceptable to the Parties.

"***Environmental Claim***" means any Claim or Loss arising out of or related to any violation of Environmental Law.

"***Environmental Law***" means all applicable Laws pertaining to Hazardous Materials, protection of the environment, and natural resources, including, but not limited to, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) as amended, the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901 et seq.) as amended, the Clean Air Act (42 U.S.C. § 7401 et seq.), the Federal Water Pollution Control Act (also known as the Clean Water Act) (33 U.S.C. §§ 1251 et seq.), Rivers and Harbors Act of 1899, as amended (33 U.S.C. § 403), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), the Endangered Species Act (16 U.S.C. §§ 1531 et seq.), the Migratory Bird Treaty Act (16 U.S.C. §§ 703 et seq.), the Bald and Golden Eagle Protection Act (16 U.S.C. §§ 668 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. §§ 2701 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101 et seq.), the National Environmental Policy Act of 1969 (42 U.S. C. §§4321 to 4370h), the National Historic Preservation Act (16 U.S.C. §§ 470 et. seq.), Federal Aviation Administration regulations, including those at Title 14 Code of Federal Regulations Part 77 and 49 U.S.C. §44718 and any similar or analogous state and local statutes or regulations promulgated thereunder, as each of the foregoing may be amended or supplemented from time to time in the future.

"***Equity Interest***" means any share, capital, stock, partnership, membership or similar interest or indicia of equity ownership (including any option, warrant, profits interest or similar right or security convertible, exchangeable or exercisable therefor) in any Person.

"***EPC Agreement***" means an engineering, procurement and construction agreement between either (i) Novel Construction and the Project Company, or (ii) if Sponsor exercises its right to replace Novel Construction as EPC contractor pursuant to the terms of the foregoing EPC Agreement with Novel Construction, such replacement EPC contractor and the Project Company.

"***Execution Date***" is defined in the Preamble to this Agreement.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***ERISA Affiliate***" means any entity, trade or business that is a member of a group described in Section 414(b) or (c) of the Code or Section 400l(b)(l) of ERISA that includes Seller, or that is a member of the same "controlled group" as Seller pursuant to Section 4001(a)(14) of ERISA; provided, however, that the Project Company will not be considered an ERISA Affiliate of Seller.

"***Escrow Agent***" means Prestige Title Agency, Inc.

"***Escrow Agreement***" means that certain Escrow Agreement, in form and substance reasonably acceptable to Buyer and Seller, to be entered into by Buyer and Seller prior to the Closing Date.

"***Existing Easements and Licenses***" is defined in Section 4.15(a)(iii).

"***Existing Leases***" is defined in Section 4.15(a)(i).

"***Existing Options***" is defined in Section 4.15(a)(ii).

"***Final Order***" means a final order of a court of competent jurisdiction, (a) from which there is no right of appeal to a higher court or (b) with respect to which either (i) all applicable time periods during which an appeal may be made have expired or (ii) a period of 2 months has elapsed from the date on which the order which would otherwise be the subject of the appeal was issued and no appeal has been taken, whichever is the earliest to occur.

"***Final Payment***" has the meaning given in Section 2.2.

"***FPA***" means the Federal Power Act, as amended.

"***Fundamental Representations***" is defined in Section 7.1.

"***GAAP***" means generally accepted accounting principles in the United States of America.

"***Governmental Authority***" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any state, county, city or other political subdivision, or similar governing entity, and including any governmental, quasi-governmental or non-governmental body administering, regulating or having general oversight over natural gas, electricity, power or other markets, in all cases with jurisdiction and authority over the matter or Person in question.

"***Hazardous Material***" means each substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any applicable Environmental Law and any petroleum or petroleum products that have been released into the

environment in concentrations or locations for which remedial action is required under any applicable Environmental Law.

"*IE Report*" means a report prepared by the Independent Engineer setting forth calculations from the Independent Engineer related to the projected production scenarios for a Project, that is reasonably acceptable to Seller and Buyer; provided that a report prepared in accordance with prevailing market standards and with no material deviation, in form or substance, from the reports provided to the Buyer on or prior to the Effective Date, shall be considered reasonably acceptable.

"*Indebtedness*" means any of the following: (a) any indebtedness for borrowed money; (b) any obligations evidenced by bonds, debentures, notes or other similar instruments; (c) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current liabilities arising in the ordinary course of business; (d) any obligations as lessee under capitalized leases; (e) any obligations, contingent or otherwise, under acceptance, letters of credit or similar facilities; (f) any obligations under any swap, hedge, or other derivative transaction, and (g) any guaranty of any obligations of any Person.

"*Indemnified Party*" means a Person entitled to be indemnified by another Person pursuant to the terms of this Agreement.

"*Indemnifying Party*" means a Person required to indemnify another Person pursuant to the terms of this Agreement.

"*Indemnity Amount Payable*" means any Indemnity Claim Amount which has become an Indemnity Amount Payable in accordance with Article VII, plus interest on such Indemnity Claim Amount at the Interest Rate from the date it becomes an Indemnity Amount Payable.

"*Indemnity Cap*" means in the case of any claim for indemnification from the Indemnitors pursuant to Section 7.2 relating to the Project Company or Project, an amount equal to 50% the Project Purchase Price; provided, that with respect to the representations and warranties in Section 4.27, the Indemnification Cap shall be 100%.

"*Indemnity Claim*" means any claim made for indemnification in accordance with Article VII.

"*Indemnity Claim Amount*" means the amount of Losses claimed in any Notice of Claim, which amount, if not finally determined, may be a good faith estimate of the Losses that may be subject to indemnification pursuant to this Agreement.

"*Indemnitors*" means, jointly and severally but without duplication, Seller and Sponsor.

"*Independent Engineer*" means Enertis.

"*Intellectual Property*" means the following intellectual property rights, both statutory and common law rights, if applicable: (a) copyrights, registrations and applications for registration thereof, (b) trademarks, service marks, trade names, slogans, domain names, logos, trade dress, and registrations and applications for registrations thereof, (c) patents, as well as any

reissued and reexamined patents and extensions corresponding to the patents, and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (d) trade secrets and confidential information, including ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable.

"*Interconnection Agreements*" is defined in <u>Section 2.5(c)</u>.

"*Interest Rate*" means a rate of interest per annum equal to 12%.

"*IRS*" means the United States Internal Revenue Service.

"*ITC*" means the federal income Tax credit available under Sections 38(b)(1), 46 and 48(a) of the Code, and any federal grants, credits or other incentives issued or arising in addition to or in lieu thereof.

"*Knowledge*" means, when used in a particular representation in this Agreement with respect to Seller, the actual knowledge of the individuals listed on <u>Schedule 1.1(a)</u>.

"*Laws*" means all laws, statutes, rules, regulations, ordinances, orders, decrees, court decisions, and other pronouncements having the effect of law of any Governmental Authority with jurisdiction over the Seller, the Buyer, the Project Company or the Project, as applicable.

"*Leases*" means all leases, subleases, right to occupy or use and other arrangements with respect to real property, including, in each case, all amendments, modifications and supplements thereto and waivers and Consents thereunder.

"*Liability*" means any debts, liabilities, obligations, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"*Lien*" means any mortgage, pledge, deed of trust, assessment, security interest, charge, lien, option, warranty, purchase right or other agreement or arrangement that has the same or similar effect to the granting of security or of any similar right of any kind.

"*Loss*" means any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, costs, charges, Taxes, obligations, demands, fees, interest, losses and expenses (including court costs and reasonable fees of attorneys, including through all appeals, accountants and other experts in connection with any Third Party Claim). For all purposes in this Agreement, the term "Loss" does not include any Non-reimbursable Damages.

"*Material Adverse Effect*" means any event, circumstance, condition, effect or occurrence that, individually or in the aggregate, materially and adversely affects, or could reasonably be expected to materially and adversely affect, the business or condition (financial or otherwise) of Seller, Sponsor, the Project Company or the Project excluding the following to the extent it does not have a disproportional impact on Seller, Sponsor, the Project Company or the Project compared to other similar solar development companies and solar projects in the

Minnesota region and does not cause material physical damage to or destruction of the Project: (a) any change generally affecting the international, national or regional electric generating, transmission or distribution industry; (b) any change generally affecting the international, national or regional wholesale or retail markets for electric power; (c) any change generally affecting the solar-generated energy business generally; (d) any change in markets for commodities or supplies, including electric power, used in connection with the Project Company; (e) any engagements of hostilities, acts of war or terrorist activities or changes imposed by a Governmental Authority associated with additional security; (f) any change in any Laws or industry standards; (g) any change in the financial condition or results of operation of Seller, a Project Company, or a Project caused by the transfer of the Membership Interests to Buyer from Seller; (h) any change in the financial, banking, or securities markets (including any suspension of trading in, or limitation on prices for, securities on the New York Stock Exchange, American Stock Exchange, or Nasdaq Stock Market) or any change in general national or regional economic or financial conditions; (i) any actions required to be taken pursuant to this Agreement; (j) the announcement or pendency of the transactions contemplated hereby; and (k) any labor strike, work stoppage, slowdown or lockout, request for representation, organizing campaign, or other labor dispute that is not specific to Seller or its Affiliates.

"***Material Contracts***" is defined in Section 4.13(a).

"***Membership Interests***" is defined in the Recitals to this Agreement.

 "***Multiemployer Plan***" means any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA previously or currently covering employees.

"***Non-reimbursable Damages***" is defined in Section 7.4(g).

"***Notice of Claim***" is defined in Section 7.4(a).

"***Novel Construction***" means Novel Energy Construction LLC, a Minnesota limited liability company.

"***NTP Payment***" has the meaning given in Section 2.2.

"***Organizational Documents***" means, with respect to any Person, the articles or certificate of incorporation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, trust agreement, or other organizational documents of such Person, including (a) any shareholder, voting trust or similar Contract and (b) any that are required to be registered or kept in the place of incorporation, organization or formation of such Person and which establish the legal personality or governance of such Person.

"***Party***" or "***Parties***" means each of the Buyer and the Seller, and collectively, Buyer and Seller.

"***Permits***" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents and orders issued or granted by a Governmental Authority.

"***Permitted Lien***" means any of the following:  (a) any Lien for Taxes not yet due and payable or that may thereafter be paid or that is being contested in good faith by appropriate proceedings, provided that Seller has provided security therefor reasonably satisfactory to Buyer; (b) any Lien arising in the ordinary course of business by operation of Law with respect to a Liability that is not yet due or delinquent or that is being contested in good faith by Seller or a Project Company; (c) imperfections or irregularities of title and other Liens that would not, in the aggregate, reasonably be expected to materially detract from the value of the affected property or impair the use thereof for solar generation; (d) the terms and conditions of the Material Contracts and the Permits listed on Schedule 4.13; and (e) during the period prior to the Closing, the Liens listed on Schedule 1.1(b).

"***Person***" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

"***Pre-Closing Period***" means the period commencing with the Execution Date and ending upon the consummation of the Closing.

"***Pre-Transfer Return***" is defined in Section 6.2(a).

"***Production Adjustor***" means the amount calculated in accordance with Exhibit A-2.

"***Project***" is defined in the Recitals to this Agreement.

"***Project Company***" is defined in the Recitals to this Agreement.

"***Project Mechanical Completion***" shall have the meaning given to such term in the EPC Agreement.

"***Project Purchase Price***" means an amount equal to the sum of (a) $2.295 per watt (dc) of the final installed size of the Project as set forth in the IE Report, plus or minus, as applicable, (b) the Production Adjustor, PPA Rate Adjustor and/or PPA Escalation Adjustor, if applicable.

"***Project Substantial Completion***" shall have the meaning given to such term in the EPC Agreement.

"***PPA Escalation Adjustor***" means the amount calculated in accordance with Exhibit A-3.

"***PPA Rate Adjustor***" means the amount calculated in accordance with Exhibit A-4.

"***Real Property Interests***" means the Existing Leases, and Existing Easements and Licenses, individually or collectively as the context requires.

"***Release***" means any release, spill, emission, leaking, pumping, injection, deposit, disposal or discharge of any Hazardous Materials into the environment.

"***Representatives***" means, as to any Person, its officers, directors, partners, members, and employees, accountants, financial advisors and consultants.

"***Schedules***" means the disclosure schedules for this Agreement.

"***Seller***" is defined in the introduction to this Agreement.

"***Seller Group***" is defined in Section 7.3.

"***Sponsor***" is defined in the introduction to this Agreement.

"***Straddle Period Return***" is defined in Section 6.2(a).

"***Subscription Agreement***" means each community solar subscription agreement, power purchase agreement and other electricity offtake arrangement for the Project set forth in Exhibit C, but excluding the CSG Program Agreements.

"***Subsidiary***" means, with respect to any Person of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of the Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership or association, or other business entity if such Person or Persons will be allocated a majority of limited liability company, partnership or association or other business entity gains or losses or will be or control any managing member or general partner of such limited liability company, partnership, association or other business entity.

"***Support Obligations***" means, collectively, each guaranty, letter of credit, indemnity, performance or surety bond or similar credit support arrangement issued by or for the account of Seller, a Project Company or any of their Affiliates, in relation to the Project.

"***Tax***" or "***Taxes***" means any federal, state, local or foreign income, gross receipts, ad valorem, sales and use, employment, social security, disability, occupation, property, severance, value added, transfer, capital stock, excise, withholding, premium, occupation or other taxes, levies or other like assessments, customs, duties, imposts, charges surcharges or fees imposed by or on behalf of any Governmental Authority, including any interest, penalty thereon or addition thereto.

"***Tax Return***" means any report, form, claim for refund, return, statement or other information (including any amendments) required to be supplied to any Person with respect to Taxes, including information returns, any amendments thereof or schedule or attachment thereto.

"***Third Party Claim***" is defined in Section 7.5(a).

"*Transfer Taxes*" means all transfer, sales, use, goods and services, value added, documentary, stamp duty, gross receipts, excise, transfer and conveyance Taxes and other similar Taxes, duties, fees or charges.

Section 1.2    Rules of Construction.

(a)    All article, section, subsection, schedule and exhibit references used in this Agreement are to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified. The exhibits and schedules attached to this Agreement constitute a part of this Agreement and are incorporated in this Agreement for all purposes.

(b)    If a term is defined as one part of speech (such as a noun), it has a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender will include the feminine and neutral genders and vice versa. The words "includes" or "including" mean "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not any particular Section or Article in which such words appear.  The term "will" and "shall" have the same meaning. The conjunction "or" is to be deemed to be exclusive unless the context indicates otherwise.

(c)    Any reference to a Law includes any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, in each case as of the date of this Agreement.

(d)    Any reference to a Contract will be to that Contract as it may be amended, modified, supplemented or restated and in effect as of the date of this Agreement.

(e)    Currency amounts referenced in this Agreement are in U.S. Dollars.

(f)    Whenever this Agreement refers to a number of days, such number refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day. For determining any period of time, "from" means "including and after," "to" means "to but excluding" and "through" means "through and including."

(g)    Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement will not be applicable to the construction or interpretation of this Agreement.

(h)    All accounting terms used herein and not expressly defined herein will have the respective meanings given such terms under GAAP.

(i)       Whenever this Agreement provides for the consent of another Party for purposes of this Agreement, unless otherwise expressly provided herein, such consent may not be unreasonably withheld, delayed or conditioned.

(j)       Whenever this Agreement states that any document has been "made available," unless otherwise expressly provided herein, that means the document was posted in the Data Site or otherwise delivered to Buyer or any of its Affiliates.

## ARTICLE II

## SALE AND PURCHASE OF MEMBERSHIP INTERESTS

Section 2.1       Transfer of Membership Interests.  On the terms and subject to the conditions set forth in this Agreement, including Section 2.4, upon the Closing Date, Seller will assign, transfer and deliver to Buyer, and Buyer agrees to accept from Seller, 100% of the Membership Interests in the Project Company by mutual execution and delivery of the Assignment Agreement.

Section 2.2       Project Purchase Price; Construction Liabilities.

(a)       The Project Purchase Price shall be paid as follows: (i) 10% of the Base Project Purchase Price (the "***NTP Payment***") shall be paid within five (5) Business Days following the execution and delivery of this Agreement, and (ii) the remainder of the Project Purchase Price (the "***Final Payment***") shall be paid at the Closing.  The Final Payment shall be delivered, in part to Seller and in part to the Escrow Agent to hold in an escrow account pursuant to the terms and conditions of the Escrow Agreement, which shall provide for the express payment instructions set forth on Exhibit D.  Seller shall apply the proceeds from the Project Purchase Price in accordance with the guidelines set forth on Exhibit D.

(b)       After the NTP Payment is paid to Seller, it shall be non-refundable to Buyer except in the event this Agreement is terminated by Buyer pursuant to Sections 8.1(c) or 8.1(d), in which event the Seller shall refund the NTP Payment within 5 Business Days of demand from Buyer.

Section 2.3       Closing Date.

(a)       Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement for the Project (the "***Closing***") will take place on the date on which all conditions in Section 2.4 have been satisfied or waived in writing by the Party entitled to the benefit of such conditions, as applicable, with at least five (5) Business Days' notice to Buyer that all such conditions have been satisfied, or at such other place and time as Seller and Buyer may agree in writing (the "***Closing Date***"). Notwithstanding the foregoing, provided all conditions in Section 2.4 have been satisfied or waived in writing, and subject to Section 2.3(b) below, the Closing Date may be delayed by either party until the earlier of (a) February 28, 2019, or (b) the date which is

thirty (30) days prior to the date that the utility has confirmed its interconnection "witness testing" will be performed at the Project.

(b)      The parties acknowledge that, as of the Execution Date, the utility has not definitively scheduled a date for its interconnection "witness testing" for the Project. While current information from the utility suggests such testing will occur in the first quarter of 2019, it is possible that such testing may be able to be performed by the utility at an earlier date.  If the utility notifies Seller that it is able to schedule interconnection "witness testing" at an earlier date, the parties agree to use commercially reasonable efforts to advance the Closing Date (provided all conditions precedent in Section 2.4 have been satisfied or waived as provided in Section 2.4(a)) to the date that is five (5) Business Days prior to the scheduled date of such testing (the "Accelerated Closing Date").  If the parties are unable to consummate a Closing by the Accelerated Closing Date, then Seller shall coordinate with the utility to reschedule the interconnection "witness testing" to a later date and the provisions of Section 2.3(a) shall apply.

Section 2.4    Conditions Precedent to the Obligations of the Parties. The obligation of each Party to consummate the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any or all of which may be waived in whole or in part in writing by the Party entitled to the benefit of such conditions, as applicable):

(a)      Project Mechanical Completion.  The Project shall have achieved Project Mechanical Completion as set forth in the EPC Contract and is prepared to commence interconnection testing with the applicable utility or interconnection authority.

(b)      Material Agreements.  Subscriptions Agreements representing 100% subscribed capacity, CSG Program Agreement, Real Property Interests and Interconnection Agreement for the Project shall be in full force and effect.

(c)      FERC. The Project Company shall have filed with the Federal Energy Regulatory Commission a Notice of Self-Certification (Form 556) as a QF, which Notice shall have been accepted for filing and shall have been assigned a docket number by FERC, and each such Notice that is filed or is to be filed shall be factually accurate as of the date filed, valid, and in full force and effect.

(d)      Offtake Financials.  The financial statements for each counterparty to the Subscription Agreements for the Project shall have been provided to and approved by Buyer in its reasonable discretion; provided that the financial statements for such Subscription Agreement counterparties identified on Exhibit C as of the date of this Agreement are hereby approved by Buyer and that financial statements for similar counterparties to future Subscription Agreements that are substantial similar in substance to the financial statements identified on Exhibit C shall be deemed reasonable.

(e)      Representations and Warranties.  Each of the representations and warranties of (i) Seller in Articles III and IV, and (ii) Buyer in Article V, in each case, shall be true and correct in all material respects (other than representations and warranties that are qualified by materiality or Material Adverse Effect, in which case such

representations and warranties shall be true and correct in all respects, as so qualified) as of the Closing Date.

(f)     Assignment Agreement.  Each Party shall have delivered to the other Party a duly executed counterpart of the Assignment Agreement.

(g)     Good Standing Certificate.  (i) Buyer shall have delivered to Seller a certificate of good standing of Buyer and (ii) Seller shall have delivered to Buyer a certificate of good standing of Seller and the Project Company, in each case, issued as of a recent date within ten (10) days prior to Closing; provided that articles of formation of a Buyer within such 30 day period shall suffice for this requirement.

(h)     Secretary's Certificate.  Each Party shall have delivered to the other Party a secretary's certificate of such Party certifying as to resolutions authorizing the transactions contemplated in this Agreement and the Ancillary Agreements to which it is a party and certifying as to the incumbency and authorization of the officers executing documents in connection therewith.

(i)     Resignations.  Seller shall have delivered to Buyer written resignations of all managers, members of the board of directors or governors or other officers of the Project Company.

(j)     Non-Foreign Certificate.   The Seller shall have delivered to Buyer a certification of non-foreign status in the form prescribed by Treasury Regulation Section 1.1445-2(b) with respect to such Seller.

(k)     No Litigation or Proceeding.  No Action by any Governmental Authority or other Person shall have been instituted that challenges the validity of, or seeks to enjoin, the consummations of the transactions contemplated by this Agreement in any material respect.

(l)     Material Adverse Effect.  No fact or circumstance exists which would reasonably be expected to have a Material Adverse Effect on the Membership Interests or the Project.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller hereby represents and warrants to Buyer as of the Execution Date as follows:

Section 3.1     Organization. Seller is a limited liability company validly existing and in good standing under the Laws of the State of North Carolina.  Seller is duly qualified or licensed to do business in each other jurisdiction where the actions to be performed by it under this Agreement make such qualification or licensing necessary, except in those jurisdictions where the failure to be so qualified or licensed would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement.

Section 3.2      Authority; Enforceability. Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and the Ancillary Agreements to which Seller is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which Seller is a party, and the performance by Seller of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary action on behalf of Seller. This Agreement has been, and each Ancillary Agreement to which Seller is a party has been, duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles.

Section 3.3      Consents and Approvals. Seller has obtained all material Consents required to be obtained from, or made to, third parties or Governmental Authorities by Seller in order to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the purchase and sale of the Membership Interests.

Section 3.4      No Conflicts; Consents and Approvals. The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which Seller is a party and the performance by Seller of its obligations under this Agreement and the Ancillary Agreements to which Seller is a party do not:

(a)      result in a violation of or a breach of any of the terms, conditions or provisions of the Organizational Documents of Seller;

(b)      assuming all required Consents are obtained or made, as applicable, result in a violation or Default under any Contract to which Seller is a party, except for any such violations or Defaults which would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Seller is or will be a party; and

(c)      assuming all required Consents are obtained or made, as applicable, (i) result in a violation or breach of any term or provision of any Law applicable to Seller, except as would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Seller is a party or (ii) require any Consent of any Governmental Authority under any applicable Law, other than such Consents which, if not made or obtained, would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Seller is a party.

Section 3.5      Legal Proceedings. Seller has not been served with notice of any Claim, and to Seller's Knowledge no Claim is pending and none is threatened in writing against Seller, which seeks a writ, judgment, order, injunction or decree restraining, enjoining or otherwise prohibiting or making illegal the execution or delivery of, the performance of Seller's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Seller is a party.  Seller is not a party to, subject to or bound by any agreement or any judgment,

order, writ, prohibition, injunction or decree of any court or other Governmental Authority that would prevent the execution or delivery of, the performance of Seller's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Seller is a party.

Section 3.6    Bankruptcy. No event of Bankruptcy has occurred with respect to the Sponsor, Seller, PGR Fund K, LLC, or PGR Manager K, LLC.

Section 3.7    Brokers. Seller does not have any Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer or the Project Company could become liable or obligated.

Section 3.8    Compliance with Law.  Seller is not in violation of or in default under any Law applicable to Seller or its Assets the effect of which, in the aggregate, would reasonably be expected to hinder, prevent or delay Seller from performing its obligations under this Agreement or any Ancillary Agreements to which Seller is a party.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES REGARDING THE PROJECT COMPANY

Seller hereby represents and warrants to Buyer as of the Execution Date with respect to the Project Company as follows:

Section 4.1    Organization.

(a)    The Project Company (i) is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Minnesota and (ii) has all requisite organizational power and authority to carry on its respective business as it is currently conducted and to own, lease and operate its properties where such properties are now owned, leased or operated.

(b)    The Project Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensure necessary.

Section 4.2    Authority; Enforceability. The Project Company has all requisite limited liability company power and authority to execute and deliver each Ancillary Agreement to which it is a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby.  The execution and delivery by the Project Company of each Ancillary Agreement to which it is a party, and the performance of the Project Company of its obligations thereunder, have been duly and validly authorized by all necessary action on behalf of the Project Company.  Each Ancillary Agreement to which the Project Company is a party has been duly and validly executed and delivered by the Project Company and constitutes the valid and binding obligation of the Project Company enforceable against the Project Company in accordance with its terms, except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of

creditors generally, or by general equitable principles.

Section 4.3    Consents and Approvals.  No Consent is required to be obtained from, or made to, third parties or Governmental Authorities by the Project Company in order to authorize the execution and delivery of this Agreement and the Ancillary Agreements and the purchase and sale of the Membership Interests.

Section 4.4    No Conflicts; Consents and Approvals. The execution and delivery by the Project Company of the Ancillary Agreements to which it is a party, the performance by the Project Company of its obligations thereunder and the consummation of the transactions contemplated thereby and the taking of any action contemplated to be taken by the Project Company thereunder does not:

(a)    result in a material violation or breach of any of the terms, conditions or provisions of the Organizational Documents of the Project Company;

(b)    assuming all required Consents are obtained or made, as applicable, result in a material violation or Default under any Material Contract, Real Property Interest or Permit;

(c)    assuming all required Consents are obtained or made, as applicable, (i) result in a material violation or breach of any term or provision of any Law applicable to the Project Company or any of its material Assets; (ii) require the Consent of any Governmental Authority under any applicable Law other than Permits required for the Project, which are separately addressed in Sections 4.16 and 4.17; or (iii) result in the imposition or creation of any Lien on any Asset of the Project Company or on the Membership Interests.

Section 4.5    Ownership of Membership Interests of Project Company.

(a)    Seller is the direct owner, holder of record and beneficial owner of 100% of the Membership Interests of the Project Company free and clear of all Liens, other than (i) Permitted Liens and (b) those arising pursuant to or as described in this Agreement.

(b)    The Membership Interests constitute all of the Equity Interests of the Project Company.

(c)    The Membership Interests are duly authorized and validly issued.

(d)    No membership interest certificates or similar documents or instruments have been issued by the Project Company evidencing the Membership Interests.

(e)    Neither the Seller, the Project Company nor any of their Affiliates has granted to any Person any agreement or option, or any right or privilege capable of becoming an agreement or option, for the purchase, subscription, allotment or issue of any Equity Interest in the Project Company.

Section 4.6      Project Company Assets.  The Project Company has good and valid title to, or rights by Contract or other agreement to use, all of its material Assets free and clear of all Liens (except for Permitted Liens).

Section 4.7      Bank Accounts. Schedule 4.7 sets forth a list of the names and locations of banks, trust companies and other financial institutions at which the Project Company maintains accounts of any nature or safe deposit boxes and the names of all persons authorized to draw thereon, make withdrawals therefrom or have access thereto.

Section 4.8      Subsidiaries. The Project Company does not have any subsidiaries or own any Equity Interest in any Person.

Section 4.9      Legal Proceedings. No Claim is pending against the Project Company, and to Seller's Knowledge, the Project Company has not been threatened in writing with being made a party to any action, suit or proceeding that, in either case, could reasonably be expected to result in a Material Adverse Effect.

Section 4.10     Compliance with Laws. The Project Company is in compliance in all material respects with all Laws applicable to its operations or Assets. The representations and warranties contained in this Section 4.10 do not apply to Tax matters (which are governed exclusively by Section 4.11), environmental matters (which are governed exclusively by Section 4.17) or intellectual property matters (which are governed exclusively by Section 4.18).

Section 4.11     Tax Matters.

(a)      The Project Company has filed all material Tax Returns, if any, required to be filed with Tax authorities, and all Taxes required to be paid or withheld by the Project Company have been paid or withheld as and when required by Law.

(b)      The Project Company is and to Seller's Knowledge has at all times been treated as a disregarded entity for U.S. federal and state income tax purposes, and no election has been or prior to the Closing will be filed with respect to the Project Company so as to cause it to be treated as an association taxable as a corporation for U.S. federal income tax purposes.

(c)      Seller is not currently the beneficiary of or subject to any extension of time within which to file any Tax Returns or for the assessment or collection of any Tax with respect to the Project Company or the Project owned by the Project Company.

(d)      The Project Company is not a party to a tax allocation or tax sharing agreement or tax indemnity or similar arrangement.

(e)      The Project has not benefited from or applied for, any government grants, tax-exempt financing, subsidized energy financing or other federal tax credits within the meaning of Section 45(b)(3) of the Code.

Section 4.12     ITC Eligibility.

(a)     No federal production tax credit, ITC or grant in lieu of any such credit pursuant to Section 45 or Section 48 of the Code has been or will be claimed or applied for by the Seller or any of its Affiliates (including the Project Company at any time prior to the Closing) or direct or indirect partners, shareholders, or members with respect to the Project Company or its assets.

(b)     To Seller's Knowledge, there are no facts that would cause the Project to be incapable of qualifying for, and producing or giving rise to, the federal Tax credits or other Tax benefits (such as the ITC and accelerated depreciation) associated with the construction, ownership, production, or sale of electricity from the Project and associated assets of the Project Company.

(c)     None of the assets of the Project Company will have been "placed in service" prior to the Closing Date for purposes of Sections 48, 167 or 168 of the Code.

(d)     No Project is comprised of any property that has been used by any Person prior to being placed in service as part of the Project (other than in connection with the construction, start up, testing and commissioning of the Project).

(e)     No portion of the basis of the Project is or will be attributable to "qualified rehabilitation expenditures" within the meaning of Section 47(c)(2)(A) of the Code.

(f)     No proceeds of any issue of state or local government obligations have been used to provide financing for the Project the interest on which is exempt from Tax under Code Section 103.

(g)     None of the assets of the Project Company are treated as leased to a tax-exempt entity (within the meaning of Section 168(h)(2) of the Code).

(h)     Seller is not a Disqualified Person and is not an entity disregarded as separate from a Disqualified Person for federal income tax purposes.

(i)     The Project is not comprised of any property that is imported property of the kind described in Section 168(g)(6) of the Code to which Section 168(g)(1)(D) applies.

Section 4.13   <u>Regulatory Status</u>.  Prior to the commencement of commercial operation, the Project will obtain qualifying facility status.  The Project Company has made and maintained all such filings and certifications with any Governmental Authority as required to obtain and maintain Qualifying Facility status.

Section 4.14    Material Contracts.

(a)    Schedule 4.13 sets forth a true, correct and complete list of the following Contracts to which the Project Company is a party or by which its Assets are bound (the "***Material Contracts***"):

(i)    all Subscription Agreements and contracts for capacity or ancillary services, electricity transmission agreements and electricity interconnection agreements;

(ii)    all material engineering agreements, construction agreements, balance of plant agreements, warranty agreements or service agreements;

(iii)    any Contract under which the Project Company is obligated to sell or lease any of its respective real or personal property having a monetary value of more than $25,000;

(iv)    any Contract under which the Project Company has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) any Indebtedness, including for the Indebtedness of any other Person;

(v)    any Contract that provides for the Project Company to provide any surety, pledge, guarantee, letter of credit or other credit support;

(vi)    any Contract between or among Seller or any of Seller's Affiliates or Representatives, on the one hand, and the Project Company, on the other hand;

(vii)    any Contract establishing any joint venture, strategic alliance, partnership or other collaboration;

(viii)    any Contract requiring a capital expenditure or known payment by the Project Company or any other Person on behalf of or for the benefit of the Project Company in excess of an aggregate of $150,000 or more during a calendar year (other than those Contracts set forth in the foregoing Sections 4.13(a)(i) through (vii); and

(ix)    any amendment relating to any of the foregoing.

(b)    Seller has made available to Buyer copies of all Material Contracts and those copies are complete and correct in all material respects.

(c)    Each of the Material Contracts is in full force and effect in all material respects and constitutes a valid and binding obligation of the Project Company that is a party thereto and, to Seller's Knowledge, the other parties thereto, except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles.

(d)     The Project Company is not in breach or default, in any material respect, under any Material Contract. None of Seller or the Project Company has received written notice from a counterparty to any Material Contract (i) alleging any material breach or default by the Project Company under such Material Contract or (ii) alleging termination, rescission, invalidity or unenforceability of such Material Contract, in each case, except for any which has been cured or waived.

Section 4.15   Affiliate Transactions.   Except for the possibility of Sponsor or its Affiliate replacing the contractor under the existing EPC Contracts with Novel Construction as described in Section 6.5, the Project Company is not a party to or otherwise bound by any Contract with Seller or any of its Affiliates or has any outstanding Indebtedness or Liability to Seller or any of its Affiliates.

Section 4.16   Real Property.

(a)     Schedule 4.15 sets forth a list of the following Real Property Interests:

(i)     all Leases of real property to which the Project Company is a party or by which the Project is bound, including solar leases under which the Project Company is lessee for purposes of creating a leasehold interest, electrical transmission line easement or access easement or right-of-way in favor of the Project Company (collectively, the "*Existing Leases*"); and

(ii)     all separate easements and licenses other than the Existing Leases and Existing Options to which the Project Company is a party or by which the Project is bound (collectively, the "*Existing Easements and Licenses*").

(b)     Seller has made available to Buyer copies of all the Existing Leases, Existing Options, and Existing Easements and Licenses, and those copies are complete and accurate in all material respects.  Except for the Real Property Interests set forth in Schedule 4.15, the Project Company does not have any fee, leasehold or other interest (including any easement, license or similar interest) in any real property.

(c)     The Project Company is not in breach or default of any Real Property Interests in any material respect.  None of Seller or the Project Company has received written notice from a counterparty to any Contract relating to any Real Property Interest (i) alleging any breach or default by the Project Company under such Contract or (ii) alleging termination, rescission, invalidity or unenforceability of such Contract, in each case, except for any which has been cured or waived.

(d)     Other than amounts payable pursuant to Existing Leases, and applicable federal, state, and local taxes, there are no rents, royalties, fees, taxes or other amounts payable by or to the Project Company in connection with the Real Property Interest or any portion thereof or interest therein.

(e)     There are (a) no zoning or other land use proceedings, either instituted or planned to be instituted, and (b) no appropriation, condemnation or like proceeding, in each case that would affect the construction or operation of the Project.

Section 4.17    Permits.   Schedule 4.16 sets forth all Permits held by the Project Company in connection with its Project which have been filed by the Project Company in connection with its Project.  Except as set forth on Schedule 4.16, the Project Company is in compliance in all material respects with the Permits set forth on Schedule 4.16 that have been issued to the Project Company, and such Permits are validly issued, final and in full force and effect and not subject to any current legal proceeding, any unsatisfied condition to their effectiveness or any appeal period that has not expired.  The representations and warranties in this Section 4.16 are Seller's sole representations and warranties regarding Permits except for Permits required by Environmental Laws (which are governed exclusively by Section 4.17).

Section 4.18    Environmental Matters.

(a)    Except as set forth on Schedule 4.17(a):

(i)    the Project Company is in compliance in all material respects with all applicable Environmental Laws and Permits obtained by the Project Company pursuant to Environmental Laws;

(ii)    except as set forth on Schedule 4.17(b), the Project Company has obtained, maintained and complied in all material respects with all Permits necessary under any applicable Environmental Law for the Project as currently conducted, each of which Permits is set forth on Schedule 4.17(b), and such Permits are validly issued, final and in full force and effect and not subject to any current legal proceeding, any unsatisfied condition to their effectiveness or any appeal period that has not expired;

(iii)    the Project Company has not been served with written notice of any Environmental Claims that are currently outstanding, and, to Seller's Knowledge, no Environmental Claims are pending or threatened in writing against the Project Company by any Governmental Authority under any Environmental Laws; and

(iv)    Project Company has not handled or stored any Hazardous Material in violation of any Environmental Law, and there have been no Releases of Hazardous Materials to or from the Project or Project Site in violation of Environmental Laws that would reasonably be expected to result in a material Liability for investigation, removal or remediation of Hazardous Materials.

(b)    In addition to the Permits identified above, Schedule 4.17(b) contains a true and complete list of all studies and reports relating to Environmental Laws or Hazardous Materials with respect to the Project, and a true and correct copy of each such report, including any amendments thereto, has been made available to Buyer.

The representations and warranties set forth in this Section 4.17 are Seller's sole and exclusive representations and warranties concerning environmental matters, including Environmental Laws, Environmental Claims and Permits.

Section 4.19    Intellectual Property.

(a)    The Project Company owns, or has the license or right to use for the Project, all material Intellectual Property currently used in the Project.

(b)    To Seller's Knowledge, as of the date of this Agreement, the Project Company has not received from any third party a claim in writing that it is infringing the Intellectual Property of such third party.

The representations and warranties set forth in this Section 4.18 are Seller's sole and exclusive representations and warranties concerning Intellectual Property matters.

Section 4.20    Brokers. The Project Company has no Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

Section 4.21    Employees and Labor Matters. The Project Company does not have and has never had any employees.

Section 4.22    Employee Benefits. The Project Company has not sponsored, maintained or contributed to any Benefit Plan, any Multiemployer Plan, or any Benefit Plan maintained by any ERISA Affiliate.

Section 4.23    Title. The Project Company is the sole owner of the Project owned by it and all of the Project Company's Assets, free and clear of all Liens other than Permitted Liens.

Section 4.24    Bankruptcy. No event of Bankruptcy has occurred with respect to the Project Company.

Section 4.25    Casualty. There is no Casualty Defect (regardless of whether covered by insurance) in existence with respect to the Project owned by the Project Company.

Section 4.26    Support Obligations. Schedule 4.26 sets forth a list, to the Knowledge of Seller, of all Support Obligations that must be established and maintained or provided by the Buyer and/or the Project Company for its own benefit or the benefit of the Project following the Closing Date, or that are reimbursable to Novel Construction under the EPC Contract and other agreements between Project Company, Seller and/or Novel Construction.

Section 4.27    Liabilities.    Other than the Support Obligations there are no other monetary Liabilities of the Project Company relating to, or incurred during the period prior to the Closing, including any monetary obligations that are not to be paid until after Closing, that will not be paid at Closing or that will otherwise survive Closing.  The Project Company does not have any liabilities owing to Novel Energy Solutions, L.L.C. or MN Community Solar LLC under that certain Membership Interest Purchase Agreement, dated as of February 2, 2018, among Novel Energy Solutions, L.L.C., MN Community Solar LLC and Pine Gate Renewables, LLC.

Section 4.28    No Other Representations and Warranties.  Except for the representations and warranties contained in Article III and Article IV (including the related portions of the Schedules), none of Seller, the Project Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, or the Project Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Project Company or the Project furnished or made available to Buyer and its Representatives, any information, documents or material made available to Buyer in the Data Site, in management presentations or in any other form or manner in expectation of the transactions or as to the future revenue, profitability or success of the Project Company or the Project, or any other representation or warranty of any kind, express or implied, arising under any Law.

### ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF BUYER

Each Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

Section 5.1    Organization. Buyer is a limited liability company, validly existing and in good standing under the Laws of the State of New York.  Buyer is duly qualified or licensed to do business in each other jurisdiction where the actions to be performed by it under this Agreement makes such qualification or licensing necessary, except in those jurisdictions where the failure to be so qualified or licensed would not have a material adverse effect on its ability to perform such actions.

Section 5.2    Authority; Enforceability. Buyer has all requisite power and authority to enter into this Agreement and the Ancillary Agreements to which Buyer is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party have been duly and validly authorized by all necessary action on behalf of Buyer. This Agreement and each Ancillary Agreement to which Buyer is a party has been duly and validly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

Section 5.3    Consents and Approvals. Buyer has obtained all material Consents required to be obtained from, or made to, third parties or Governmental Authorities by Buyer in connection with the execution and delivery of this Agreement and the Ancillary Agreements to which Buyer is a party and the purchase and sale of the Membership Interests.  All Consents required prior to the transfer of the Membership Interests in the Project Company from Seller have been obtained by Buyer as of the Execution Date.

Section 5.4    No Conflicts. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of its

obligations under this Agreement and the Ancillary Agreements to which Buyer is a party do not:

(a)   result in a violation of or a breach of any of the terms, conditions or provisions of the Organizational Documents of Buyer;

(b)   assuming all required Consents are obtained or made, as applicable, result in a violation or Default under any Contract to which Buyer is a party, except for any such violation or Default which would not have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Buyer is or will be a party; or

(c)   assuming all required Consents are obtained or made, as applicable, (i) result in a violation or breach of any term or provision of any Law applicable to Buyer, except as would not have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Buyer is a party or (ii) require any Consent of any Governmental Authority under any applicable Law, other than such Consents which, if not made or obtained, would not have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Buyer is a party.

Section 5.5    Legal Proceedings. Buyer has not been served with notice of any Claim, and to Buyer's knowledge no Claim is pending and none is threatened in writing against Buyer, which seeks a writ, judgment, order, injunction or decree restraining, enjoining or otherwise prohibiting or making illegal the execution or delivery of, the performance of Buyer's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Buyer is a party.  Buyer is not a party to, subject to or bound by any agreement or any judgment, order, writ, prohibition, injunction or decree of any court or other Governmental Authority that would prevent the execution or delivery of, the performance of Buyer's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Buyer is a party.

Section 5.6    Compliance with Laws. Buyer is not in violation of or in default under any Law applicable to Buyer or its Assets the effect of which, in the aggregate, would reasonably be expected to hinder, prevent or delay Buyer from performing its obligations under this Agreement or any Ancillary Agreements to which Buyer is a party.

Section 5.7    Brokers. Buyer does not have any Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or a Project Company could become liable or obligated.

Section 5.8    Securities Law Matters. Buyer acknowledges that the Membership Interests are not registered pursuant to the 1933 Act and that none of the Membership Interests may be transferred, except pursuant to an applicable exception under the 1933 Act. Buyer is an "accredited investor" as defined under Rule 501 promulgated under the 1933 Act.

Section 5.9    Financial Resources. Buyer has or will have available funds sufficient to pay the amounts payable by Buyer to Seller pursuant to Section 2.2(a) at the time such payments are due.  Buyer knows of no circumstance or condition that could reasonably be expected to prevent the availability of such funds as of either the date of the NTP Payment or as of the Closing Date.

## ARTICLE VI

## COVENANTS

Section 6.1    Transfer Taxes. Seller shall pay any Transfer Taxes imposed on Buyer, Seller or the Project Company in connection with the sale of the Membership Interests. Accordingly, if either Party (or its Affiliates) is required by Law to pay any such Transfer Taxes, the Seller will promptly reimburse the Buyer for any such Transfer Taxes. The Party required by Law to file a Tax Return relating to Transfer Taxes in connection with the sale will do so within the time period required by Law and provide the other Party with a copy of the return, but will alert the other Party of the need to file such a return first in writing in case there is any disagreement about whether Transfer Taxes are owed and work in good faith to resolve any disagreement.

Section 6.2    Tax Matters.  Except as provided in Section 6.1 relating to Transfer Taxes:

(a)    Seller will cause any Tax Return for an event or period ending before the Execution Date (a "**Pre-Transfer Return**") to be prepared in a manner consistent with practices followed in prior tax periods, except as required by changes in fact. The Parties will work in good faith to resolve any disagreements and, thereafter Seller will reimburse Buyer for the amount of Tax shown on the Tax Return as required by Section 6.2(b), and Buyer will file the Tax Return and provide Seller with a copy of the final Tax Return as filed.  Buyer will cause any Tax Return for a period that begins on the Closing Date (a "**Straddle Period Return**") to be prepared in a manner consistent with practices followed in prior tax periods, except as required by Law or changes in fact, and deliver the draft Tax Return to Seller at least 15 days before the due date (including extensions) for Seller's review and comment. The Parties will work in good faith to resolve any disagreements and, thereafter, Seller will reimburse Buyer for the pre-Transfer share of Tax shown on the Tax Return as required by Section 6.2(b), and Buyer will file the Tax Return and provide Seller with a copy of the final Tax Return as filed.

(b)    Seller will be responsible for and indemnify Buyer against, and be entitled to all refunds of or credits for, any Tax that was paid or should have been paid on a Pre-Transfer Return or that was paid or should have been paid on a Straddle Period Return and relates to the period prior to the Closing Date. Seller will not be liable or indemnify Buyer for any Taxes (i) that are paid by Seller directly to the Tax authorities, (ii) that are recoverable from a third party, or (iii) to the extent the Taxes relate to transactions or actions taken by Buyer after the Closing Date.  The Parties will determine pre-transfer share of Tax shown on any Straddle Period Return by an interim closing of the books of the Project Company as of the Closing Date, except for franchise Taxes based solely on capital, ad valorem Taxes and property Taxes which will be prorated on a daily basis

through the Closing Date. For this purpose, any franchise Tax will be allocated to the tax period for which payment of the Tax provides the right to engage in business, regardless of the tax period during which the income, operations, assets or capital that is the base for the Tax is measured. In determining the extent to which a property Tax is attributable to the period through the Closing Date, any property Tax that is based on the assessed value of assets, property or other rights as of a lien date or other specified valuation date will be attributed to the tax period specified in the relevant property Tax bill.

(c)     Buyer will be responsible for and indemnify Seller against, and Buyer will be entitled to all refunds and credits of, all Taxes relating to any event or period (or portion thereof) beginning on or after the Closing Date.

(d)     With respect to any Tax (or portion thereof) for which Seller is responsible to indemnify Buyer pursuant to this Agreement, Seller will have the right, at its sole cost and expense, to control (in the case of a Pre-Transfer Return) or participate in (in the case of a Straddle Period Return) the prosecution, settlement or compromise of any proceeding involving the Tax, including the determination of the value of property for purposes of real and personal property ad valorem Taxes. Buyer will (and will cause the Project Company to) take such action in connection with any such proceeding that Seller reasonably requests, including the selection of counsel and experts and the execution of powers of attorney. Notwithstanding the foregoing, Buyer will be entitled to participate in any proceeding involving a Pre-Transfer Return, and Seller will not settle any proceeding with respect to any issue that could materially and adversely affect Buyer or the Project Company in a future tax period (or portion thereof) after the Execution Date without Buyer's prior written consent, not to be unreasonably withheld, conditioned or delayed. Buyer will (and will cause the Project Company to) inform Seller promptly, and send Seller copies promptly upon receipt, of any notice of an audit, examination, claim or assessment for any Tax for which Seller is responsible and keep Seller informed of progress in the proceedings and allow Seller to attend any meetings and scheduled calls with the Tax authorities to the extent Seller is not controlling the proceedings. Seller will have an obligation to keep Buyer similarly informed about proceedings that it controls. Failure to give any notice or keep the other Party informed will reduce the other  Party's indemnification obligation pursuant to this Agreement only to the extent the Party is actually prejudiced by the failure.  Any such participation related to this clause (d) shall be an independent operation and option of the Seller and shall not create a partnership between the Parties as defined in the Code or the associated regulations to Title 26 or state law.

(e)     After the Closing Date, Buyer will grant or cause the Project Company to grant to Seller (or its designees) access at all reasonable times to all of the information, books and records relating to the Project Company for Pre-Transfer Returns or Straddle Period Returns within the possession of Buyer (including workpapers and correspondence with Tax authorities) reasonably necessary to permit Seller (or its designees) to prepare Tax Returns, respond to Tax audits and investigations, prosecute Tax protests, appeals and refund claims and conduct negotiations with Tax authorities. After the Closing Date, Buyer will preserve all information, records or documents in its possession relating to liabilities for Taxes of the Project Company and the Project for

events and the period through the Closing Date for 7 years or, if later, 6 months after expiration of any applicable statute of limitations (including extensions thereof) for the assessment of Taxes. Buyer will not dispose of any of the foregoing items without first offering the items to Seller.

(f)     Both Buyer and Seller agree to file any form required by the Treasury Department to facilitate access to information or for the participation in administrative actions under this Section 6.2.

(g)     To the extent that the provisions of Article IX are inconsistent with or conflict with the provisions of this Section 6.2, the provisions of this Section 6.2 will control.

Section 6.3     Pre-Closing Period Actions.    During the Pre-Closing Period for the Closing, Seller may take or cause the Project Company to take any action in furtherance of the development and construction of the Project and matters incidental thereto so long as such action is reasonable under the circumstances and not inconsistent with Seller's prior development and construction activities with respect thereto; provided that, except as set forth on Schedule Section 6.3, Seller shall not and shall cause the Project Company not to take any of the following actions without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed:

(a)     enter into any contract, agreement, commitment or other arrangement with any Person that imposes aggregate payment obligations on the Project Company in excess of Twenty Five Thousand Dollars ($25,000) or enter into any change order, modification, or amendment to any Contract;

(b)     amend or modify in any material respect or terminate any Material Contract, nor make nor cause or permit to be made any filing, by or on behalf of any of the Project Company, any application or notice of self-certification of status as a "qualifying facility" under the regulations of the FERC, nor any application to the FERC for "market-based rate" authority under Part 35 Subpart H of the regulations of the FERC, nor any application nor notice of self-certification of any of the Project Company as an "exempt wholesale generator" under the Public Utility Holding Company Act of 2005, including the regulations of the FERC thereunder, nor any other filing that would cause or would report any of the Project Company to be or become a "public utility" under the FPA;

(c)     redeem or otherwise acquire any equity ownership interests in the Project Company or issue any equity ownership interests in the Project Company or any option, warrant or right relating thereto, other than as required by Construction Lender to admit Construction Lender or its designee to the Project Company following a default under the Construction Loan;

(d)     merge or consolidate the Project Company with any other entity;

(e)      permit the Project Company to borrow any money or become contingently liable for any obligation or liability of others, other than Permitted Liens;

(f)      authorize or effect any change in the Project Company's organizational documents other than as required by Construction Lender to admit Construction Lender or its designee to the Project Company following a default under the Construction Loan;

(g)      cancel, compromise or settle any claim or other Action of the Project Company (unless such claim or other Action is otherwise paid or discharged by Seller at or before Closing);

(h)      voluntarily adopt a plan of complete or partial liquidation or dissolution of the Project Company or, other than as may be required by Construction Lender following a default under the Construction Loan, sell, lease, grant or otherwise transfer or dispose of any asset or property of the Project Company;

(i)      create or incur any Lien (A) on any property or asset of the Project or the Project Company or (B) on the Membership Interests in the Project Company, other than Permitted Liens;

(j)      submit an application for, or modify, revoke, withdraw or otherwise adversely affect any pending application for, any Governmental Approval for the Project; or

(k)      file an application for any U.S. federal grant or governmental subsidy for or with respect to the Project or the assets thereof.

Section 6.4      <u>Inspection Rights; Access to Information</u>.  During the Pre-Closing Period for the Project, upon reasonable advance notice from Buyer, Seller shall (a) afford or cause to be afforded to Buyer access during regular business hours to Seller's and the Project Company's legal counsel and other Representatives; (b) at Buyer's expense, provide or cause to be provided to Buyer accompanied by a representative of Seller, (i) reasonable access to the Project and the Project site and (ii) access to observe and inspect all aspects of the Project work, including design and construction drawings and specifications, construction, commissioning and testing activities required to complete the Project; <u>provided</u> that Buyer shall be subject to and shall comply with all rules, regulations, protocols and procedures in effect with respect to the Project and the Project site applicable to Seller's own personnel; (c) at Buyer's expense, grant Buyer upon reasonable notice access as Buyer requests to observe, to the extent reasonably practicable, regular Project update conference calls and meetings; and (d) provide or cause to be provided to Buyer reasonable access to the books and records of the Project Company.

Section 6.5      <u>Public Announcements</u>.  Except for statements made or press releases (a) required by Law or (b) require by the rules of a national securities exchange, none of Seller, Buyer or any of their respective Affiliates shall issue an press release or otherwise make any public statements with respect to the is Agreement or the transactions contemplated thereby without the prior written consent of the other Party.  Subject to any requirements of Law, each of Seller and Buyer shall be given the opportunity to review all information relating to this

Agreement and the transactions contemplated hereby before any such information appears in any filing or public announcement.

Section 6.6   Further Assurances.   Subject to the terms and conditions of this Agreement, at any time or from time to time after the Execution Date, at any Party's request and without further consideration, the other Party will execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as such Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

Section 6.7   EPC and O&M Matters.   The Buyer acknowledges and agrees (i) to the provisions of the EPC Contract with Novel Construction that permit Sponsor or its Affiliates to terminate such EPC Contract upon the occurrence of certain conditions described therein or in other agreements between Affiliates of Novel Construction and Sponsor, (ii) that Seller and/or Sponsor may engage any replacement EPC contractor (including an Affiliate of Sponsor) in its sole discretion and enter into a new EPC Contract with such replacement EPC contractor upon such terms and conditions as are substantially similar to those of the existing EPC Contract with Novel Construction, including similar post-completion warranties, and (iii) that such replacement EPC contractor and performance of the remaining balance of work under a new EPC Contract by Sponsor or its Affiliate or any replacement contractor so selected by Sponsor shall not constitute a breach of any of the terms of this Agreement or require any prior consent from Buyer.

Buyer further acknowledges and agrees that (i) the Project Company will (A) secure operations and maintenance services for the Project from providers selected by Buyer following the Closing Date and (B) benefit from all Project-related warranties currently in effect or that will come into effect pursuant to the Material Contracts following the Closing Date, and (ii) neither Seller nor any of its Affiliates shall have any operations, maintenance or other such obligations for a Project following its Closing Date.

## ARTICLE VII

## INDEMNIFICATION, LIMITATIONS OF LIABILITY AND WAIVERS

Section 7.1   Survival.   The representations and warranties of (a) Seller in Section 3.1 (*Organization*), Section 3.2 (*Authority; Enforceability*), Section 3.6 (*Brokers*), Section 4.1 (*Organization*), Section 4.2 (*Authority; Enforceability*), Section 4.5 (*Ownership of Membership Interests of Project Company*), Section 4.11 (*Tax Matters*), Section 4.19 (*Brokers*), and Section 4.27 (*Liabilities*) and (b) Buyer in Section 5.1 (*Organization*), Section 5.2 (*Authority; Enforceability*) and Section 5.7 (*Brokers*) (collectively the "**Fundamental Representations**") shall survive until the date that is ninety (90) days after the expiration of the applicable statute of limitations.   All representations and warranties, other than the Fundamental Representations, contained in or made pursuant to this Agreement or any Ancillary Agreement shall survive until the date that is twelve (12) months after the Closing Date.   The covenants and obligations of the Parties shall survive the Closing Date and will remain in full force and effect until fully performed.

Section 7.2    Indemnification by Indemnitors. To the fullest extent permitted by applicable Law, and subject to Sections 7.1 and 7.4, from and after the Closing Date, the Indemnitors, jointly and severally, will defend, indemnify and hold harmless Buyer and its Affiliates and Representatives (the "***Buyer Group***") from and against all Losses incurred by the Buyer Group arising out of or resulting, directly or indirectly, from or in connection with:

(a)    any breach of any representation or warranty made in Article III or Article IV of this Agreement; and

(b)    any material breach of any covenant, agreement or other obligation of Seller contained in this Agreement.

Section 7.3    Indemnification by Buyer. To the fullest extent permitted by applicable Law, and subject to Sections 7.1 and 7.4, from and after the Closing Date, Buyer will defend, indemnify and hold harmless Seller and its Affiliates and Representatives (the "***Seller Group***") from and against all Losses incurred by the Seller Group arising out of or resulting, directly or indirectly, from or in connection with:

(a)    any breach of any representation or warranty made in Article V of this Agreement; and

(b)    any material breach of any covenant, agreement or other obligation of Buyer contained in this Agreement.

Section 7.4    Limitations on Liability. Notwithstanding any contrary provision in this Agreement:

(a)    Time Bar on Claims. No Indemnified Party will be entitled to any recovery (including by way of off-set) from any Indemnifying Party unless a written notice (a "***Notice of Claim***") has been given on or before the expiration of time period for survival set forth in Section 7.1.

(b)    Insurance Recoveries. Losses for which any Indemnified Party will be reimbursed hereunder shall be decreased by insurance proceeds or payments from any other responsible parties actually received by such Indemnified Party (after deducting reasonable costs and expenses incurred in connection with recovery of such proceeds).

(c)    Deductible. Neither Party will be entitled to make any Claim for indemnification under Section 7.2 or Section 7.3, as applicable, until the aggregate amount of all Claims for indemnification by such Indemnified Party for the Project exceeds one percent (1%) of the aggregate Project Purchase Price actually paid by Buyer (the "***Deductible***"); provided, that (i) after the Deductible is exceeded a single time (for all Claims in the aggregate), the Indemnified Party will be entitled to recover the amount of Losses in excess of the Deductible and (ii) the Deductible will not apply to Losses incurred by any Indemnified Party relating to any fraud, gross negligence or willful misconduct of the Indemnifying Party.

(d)     <u>Mitigation of Losses</u>.  Each Indemnified Party will use its commercially reasonable efforts to mitigate (including by causing its respective Indemnified Parties to use commercially reasonable efforts to mitigate) any Losses for which such Party is or may become entitled to be indemnified hereunder.

(e)     <u>Tax Treatment</u>. To the maximum extent permitted by applicable Law, any indemnity payment made pursuant to this Agreement will be treated as an adjustment to the Project Purchase Price for Tax purposes, unless an audit or other administrative or judicial action with respect to the Indemnified Party causes any such payment not to constitute an adjustment to the Project Purchase Price for U.S. federal income tax purposes.

(f)     <u>Maximum Liability of Indemnitors</u>. No Indemnified Party will be entitled to recover from the Indemnifying Party for any Indemnity Claim under this Agreement any monetary amount in respect of Losses in excess of the Indemnity Cap; <u>provided</u>, <u>however</u>, that the Indemnity Cap shall not apply to and shall not include any Indemnity Claim relating to any fraud, gross negligence or willful misconduct of Indemnitors or any breaches of the Fundamental Representations (except for breaches of <u>Section 4.27</u>, which shall be subject to the Indemnity Cap).  Notwithstanding anything in the foregoing to the contrary, in no event shall Indemnifying Party's aggregate maximum liability to Indemnified Party for any claim for indemnification pursuant to <u>Section 7.2</u> exceed an amount equal to the Project Purchase Price, except for Losses related to fraud, willful misconduct or intentional breach, for which no cap shall apply.

(g)     <u>Limitation on Remedies</u>. The remedies of the Parties under this <u>Article VII</u> are the sole and exclusive remedies that a Party may have under this Agreement for the recovery of monetary damages with respect to any claims arising with respect to the Project, the Membership Interests or the Real Property Interests or any breach of any representation or warranty or covenant set forth in this Agreement and the Parties hereby waive and relinquish all other rights and remedies under common law, statutes and other bases for claims; <u>provided</u>, that, nothing in this <u>Article VII</u> shall preclude Seller or Buyer from exercising its rights or making any claim under the Ancillary Agreements with respect to Buyer's or Seller's, as applicable, breach or failure to perform hereunder or thereunder.  Nothing in this <u>Section 7.4(g)</u> shall limit or constitute a waiver of Seller's rights against Buyer with respect to any obligations owed by Buyer to Seller.

(h)     <u>Knowledge</u>.  No Indemnified Party will have a right or remedy after the Execution Date with respect to any breach of any representation or warranty made in this Agreement if on the Execution Date such Indemnified Party had actual knowledge of any information that would cause such breach and will be deemed to have waived its right to indemnification in respect thereof.

(i)     <u>No Special or Consequential Damages</u>.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NO PARTY WILL BE LIABLE    FOR    SPECIAL,    PUNITIVE,    EXEMPLARY,    INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES OR LOST PROFITS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR

OTHERWISE AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT ("**_NON-REIMBURSABLE DAMAGES_**"), <u>PROVIDED</u>, THAT (i) ANY AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO A THIRD PARTY CLAIM (OTHER THAN A CLAIM FOR CONSEQUENTIAL DAMAGES ARISING UNDER A CONTRACT PROVISION AGREED TO BY THE INDEMNIFIED PARTY THAT DOES NOT NEGATE CONSEQUENTIAL DAMAGES) OR (ii) ANY DAMAGES DUE TO FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL BREACH WILL NOT BE DEEMED NON- REIMBURSABLE DAMAGES.

(j)　　<u>No Duplication</u>. Notwithstanding anything to the contrary in this Agreement, any liability of a Person under this <u>Article VII</u> for the breach of a representation, warranty or covenant shall be determined solely with respect to each Project Company and each Project and subject to the applicable Indemnity Cap. No breach of a representation, warranty or covenant with respect to one Project Company or Project shall be deemed to cause such breach with respect to any other Project Company or Project.

Section 7.5　　<u>Procedures for Third Party Claims</u>.

(a)　　Promptly after receipt by an Indemnified Party of notice of the commencement of any Action by a third party (a "**_Third Party Claim_**") with respect to any matter for which indemnification is or may be owing pursuant to <u>Section 7.2</u> or <u>Section 7.3</u> hereof, the Indemnified Party will give notice thereof to the Indemnifying Party; <u>provided</u>, <u>however</u>, that the failure of the Indemnified Party to notify the Indemnifying Party will not relieve the Indemnifying Party of any of its obligations hereunder, except to the extent that the Indemnifying Party demonstrates that the defense of such Third Party Claim has been actually and prejudiced by the Indemnified Party's failure to give such notice.

(b)　　If any Action referred to in <u>Section 7.5(a)</u> is brought against an Indemnified Party and the Indemnified Party gives notice to the Indemnifying Party of the commencement of such Action, the Indemnifying Party will be entitled to participate (at its own expense) in such Action, and may assume (at its own expense) the defense of such Action with counsel satisfactory to the Indemnified Party and, after notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such Action, the Indemnifying Party will not, as long as it diligently conducts such defense, be liable to the Indemnified Party under this <u>Section 7.5</u> for any fees of other counsel with respect to the defense of such Action, in each case subsequently incurred by the Indemnified Party in connection with the defense of such Action.

(c)　　If the Indemnifying Party is entitled to and assumes the defense of an Action, no compromise or settlement of such claims or Action may be effected by the Indemnifying Party without the Indemnified Party's written consent unless (i) there is no finding or admission of any violation of Law or any violation of the rights of any Person and no effect on or grounds for the basis of any other Claims that may be made against the Indemnified Party, and (ii) the sole relief provided is monetary damages that are paid

in full by the Indemnifying Party; and the Indemnified Party will have no Liability with respect to any compromise or settlement of such claims or Action effected without Indemnified Party's written consent. Notwithstanding the assumption by the Indemnifying Party of the defense of any Claim or Action, the Indemnified Party will be permitted to join in such defense and to employ counsel at its own expense. If notice pursuant to Section 7.5(a) is given to an Indemnified Party of the commencement of any Action and the Indemnifying Party does not, within 10 days after such Indemnified Party's notice is given, give notice to the Indemnified Party of its election to assume the defense of such Action (meeting the requirements of Section 7.5(b)), the Indemnifying Party will be bound by any determination made in such Action. Whether or not the Indemnifying Party assumes the defense of a Third Party Claim, neither the Indemnified Party nor any of its Affiliates will admit any liability with respect to, or settle, compromise or discharge, any Third Party Claim without the prior written consent of the Indemnifying Party.

(d)     Indemnifying Party and Indemnified Party agree to provide each other with reasonable access during regular business hours to the properties, books and records and Representatives of the other (for the avoidance of doubt, excluding any materials protected by attorney-client or similar privilege), as reasonably necessary in connection with the preparation for an existing or anticipated Action involving a Third Party Claim and its obligations with respect thereto pursuant to this Article VII.

Section 7.6     Indemnification Procedures. The following procedures will apply to any claim for indemnification by the Buyer Group or the Seller Group that does not involve a Third Party Claim:

(a)     Notice of Claim. A Notice of Claim will be given as soon as practicable, but in no event later than 30 days, after the Indemnified Party determines that it is or may be entitled to indemnification pursuant to this Agreement; provided, however, that failure to provide notice will not prejudice the Indemnified Party's right to indemnity, except to the extent the Indemnifying Party is irrevocably prejudiced.  A Notice of Claim will be made as follows:

(i)     in the case of any Indemnity Claim by any member of the Buyer Group, by Buyer to Indemnitors at the address and in the manner provided in Section 9.1 (*Notices*). Buyer will be the Indemnified Party with respect to Indemnity Claims pursuant to Section 7.2, and no liability in respect of any such Indemnity Claim will be contested, settled, admitted, litigated or otherwise dealt with by or on behalf of the Buyer Group for this purpose by any person other than Buyer; and

(ii)     in the case of any Indemnity Claim by any member of the Seller Group against Buyer, by Seller to Buyer at the address and in the manner provided in Section 9.1 (*Notices*). Seller will be the Indemnified Party with respect to Indemnity Claims pursuant to Section 7.3, and no liability in respect of any such Indemnity Claim will be contested, settled, admitted, litigated or

otherwise dealt with by or on behalf of the Seller Group for this purpose by any person other than Seller.

(b)      Dispute Notice. If the Indemnifying Party delivers a notice to the Indemnified Party disputing (i) its obligation to indemnify the Indemnified Party in respect of any Indemnity Claim set forth in a Notice of Claim, or (ii) the Indemnity Claim Amount set forth in a Notice of Claim (a "*Dispute Notice*"), Buyer and Indemnitors will negotiate in good faith to settle the dispute, and the portion, if any, of the Indemnity Claim Amount which Buyer and Indemnitors agree in writing is payable will immediately be an Indemnity Amount Payable of the relevant Indemnifying Party. If Buyer and Indemnitors are unable to resolve any portion of the Indemnity Claim Amount within 2 months following the date the Dispute Notice is given, either Buyer or Indemnitors may initiate proceedings specified in Section 9.12 (*Governing Law; Venue; and Jurisdiction*) of this Agreement to obtain resolution of the dispute. If Buyer or Indemnitors initiates legal proceedings, the amount, if any, determined in a Final Order as payable by the Indemnifying Party will be an Indemnity Amount Payable of the relevant Indemnifying Party as of the date of such Final Order.

(c)      Payments of Indemnity Amounts Payable by Buyer. Subject to the limitations in Section 7.4, Buyer will pay to each relevant Indemnified Party any Indemnity Amount Payable by Buyer, by wire transfer of immediately available dollars (or as otherwise directed pursuant to any Final Order or as otherwise agreed by the Indemnified Party and the Indemnifying Party) to an account designated by Seller, promptly and in no event later than 5 Business Days after such Indemnity Amount Payable is established in accordance with this Agreement.

(d)      Payments of Indemnity Amounts Payable by Indemnitors. Subject to the limitations in Section 7.4, any Indemnity Amount Payable by Indemnitors to each relevant Indemnified Party will be paid by wire transfer of immediately available dollars (or as otherwise directed pursuant to any Final Order or as otherwise agreed by the Indemnified Party and the Indemnifying Party) to an account designated by Buyer, promptly and in no event later than 5 Business Days after such Indemnity Amount Payable is established in accordance with this Agreement.

## ARTICLE VIII

## PRE-CLOSING TERMINATION RIGHT

Section 8.1      Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Seller if the conditions precedent in Section 2.4 have been satisfied or waived and Closing does not occur on (y) if either party has elected to extend the Closing Date per Section 2.3(a), then such extended Closing Date, or (z) if neither party has elected to extend the Closing Date per Section 2.3(a), then the date that is five (5)

business days after the written notice of satisfaction of the conditions precedent delivered by Seller pursuant to <u>Section 2.3(a)</u>;

(c)     by Buyer if a Project is "placed in service", as defined in the Code, prior to the Closing Date;

(d)     by Buyer pursuant to <u>Section 9.5(b)</u>;

(e)     by Buyer or Seller in the event that:

(i)     there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(ii)     any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

Section 8.2     <u>Effect of Termination</u>.  In the event of the termination of this Agreement in accordance with this <u>Section 8</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof, except as provided in <u>Section 2.2(b)</u> above with respect to treatment of the NTP Payment.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1     <u>Notices</u>.

(a)     Unless this Agreement specifically requires otherwise, any notice, demand or request provided for in this Agreement, or served, given or made in connection with it, will be in writing and will be deemed properly served, given or made if delivered in person or sent by facsimile or email (in the case of delivery by facsimile or email, solely if receipt is confirmed) or sent by registered or certified mail, postage prepaid, or by a nationally recognized overnight courier service that provides a receipt of delivery, in each case, to the Parties at the addresses specified below:

If to Seller, to:

PGR Lessor K, LLC
c/o Pine Gate Renewables, LLC
1111 Hawthorne Lane, Suite 201
Charlotte, NC
Attn: Legal Department
Email: <u>legal@pinegaterenewables.com</u>

If to Buyer, to:

> GSPP Holdco, LLC
> GSPP Capital, LLC
> c/o Green Street Power Partners, LLC
> 1 Landmark Square, Suite 320
> Stamford, CT 06901
> Attn:  Scott Kerner
> Email:  scott@gspp.com

With a copy to:

> Debi Galler, Esq., General Counsel
> Green Street Power Partners, LLC
> 124 Marriott Dr., Suite 104
> Tallahassee, FL 32301
> Email:  dgaller@gspp.com

(b)     Notice given by personal delivery, mail or overnight courier pursuant to this Section 9.1 will be effective upon receipt. Notice given by facsimile or email pursuant to this Section 9.1 will be effective (i) as of the date of transmission if the sender can and does provide evidence of successful transmission, or (ii) the next succeeding Business Day if transmission is after 5:00 p.m. Central Time on any Business Day or during any non-Business Day.

Section 9.2    Entire Agreement.   Except for the Confidentiality Agreement, which remains in full force and effect, this Agreement and the Ancillary Agreements supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof, and this Agreement, the Ancillary Agreements, the Confidentiality Agreement and the other documents delivered pursuant to this Agreement contain the sole and entire agreement between the Parties hereto with respect to the subject matter hereof. The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the subject matter hereof will be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the Parties hereby agree that neither party hereto will have any remedies or cause of action (whether in contract or in tort) for any statements, communications, disclosures, failure to disclose, representations or warranties not set forth in this Agreement.

Section 9.3    Joint Effort.  Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one Party than against the other Party.

Section 9.4    Expenses. Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each Party will pay its

own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby, including all expenses and costs incurred to obtain approvals required by such Party from Governmental Authorities.

Section 9.5    Disclosure.

(a)    Seller may, at its option, include in the Exhibits and Schedules items that are not material in order to avoid any misunderstanding, and any such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgment or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in any Schedule will constitute a disclosure for purposes of all other Schedules notwithstanding the lack of specific cross-reference thereto, but only to the extent the applicability of such disclosure to such other Schedule is reasonably apparent. In no event will the inclusion of any matter in the Schedules be deemed or interpreted to broaden Seller's representations, warranties, covenants or agreements contained in this Agreement. The mere inclusion of an item in the Schedules will not be deemed an admission by Seller that such item represents a material exception or fact, event, or circumstance or that such item is reasonably likely to result in a Material Adverse Effect.

(b)    Prior to the Closing Date, Seller may supplement or amend the Schedules furnished by it under this Agreement.  In the event that the changes to the Schedules resulting from such supplements and amendments, considered collectively, give rise to a Material Adverse Effect, Buyer may either (a) terminate this Agreement without liability to either Party, or (b) not so terminate this Agreement (in which event any breach of any representation or warranty made by Seller which would otherwise exist absent such supplements and amendments will be deemed cured for all purposes of this Agreement). In order to terminate this Agreement pursuant to this Section 9.5(b), Buyer must give notice of such termination to Seller within ten (10) Business Days following receipt of such supplemented or amended Schedules from Seller.  In the event that Buyer terminates this Agreement pursuant to this Section 9.5(b), such termination will be Buyer's sole remedy hereunder, and Seller will have no further liability or obligation to Buyer.

Section 9.6    Waiver. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, will be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

Section 9.7    Amendment. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party.

Section 9.8    No Third Party Beneficiary. Except for the provisions of Sections 7.2 and 7.3 (which are intended for the benefit of the Persons identified therein), the terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective

successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person. For the avoidance of doubt, no Person who is not a Party to this Agreement, may challenge any termination of this Agreement, for any reason, or enforce or seek to enforce any provisions of this Agreement (except as set forth in the first sentence of this <u>Section 9.7</u>).

Section 9.9    <u>Assignment; Binding Effect</u>. Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any Party without the prior written consent of each of the other Parties, and any attempt to do so will be void, except for assignments and transfers by operation of Law, except that either Party may collaterally assign its rights under this Agreement to any Person providing acquisition, construction, back-leverage, term or other debt or tax equity financing directly or indirectly for the development, construction, ownership or operation of the Project, and Buyer may assign to an Affiliate; provided, that if Buyer assigns to an Affiliate, Buyer shall remain liable to Seller for any and all obligations assigned by Buyer to such Affiliate.

Section 9.10    <u>Headings</u>. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

Section 9.11    <u>Invalid Provisions</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party under this Agreement will not be materially and adversely affected thereby, such provision will be fully severable, this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 9.12    <u>Counterparts; Facsimile</u>. This Agreement may be executed in any number of counterparts (including by email), each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Any facsimile, portable document format (.pdf) or other similar electronic copies hereof or signature hereon will, for all purposes, be deemed originals.

Section 9.13    <u>Governing Law</u>.

(a)    This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), will be governed by the Laws of the State of New York without giving effect to any conflict or choice of law provision.

(b)     THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION IN THE STATE COURTS LOCATED IN NEW YORK, NEW YORK AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF NEW YORK (OR, IF SUCH NEW YORK COURTS DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, ANY FEDERAL COURT WITHIN THE SOUTHERN DISTRICT OF NEW YORK) FOR PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY AND EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS THEREFROM) IN ANY SUCH SUIT, ACTION OR PROCEEDING AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT ANY SUCH SUIT, ACTION OR PROCEEDING THAT IS BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  DURING THE PERIOD A LEGAL DISPUTE THAT IS FILED IN ACCORDANCE WITH THIS SECTION 9.12 IS PENDING BEFORE A COURT, ALL ACTIONS, SUITS OR PROCEEDINGS WITH RESPECT TO SUCH LEGAL DISPUTE OR ANY OTHER LEGAL DISPUTE, INCLUDING ANY COUNTERCLAIM, CROSS-CLAIM OR INTERPLEADER, WILL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.  EACH PARTY HEREBY WAIVES, AND WILL NOT ASSERT AS A DEFENSE IN ANY LEGAL DISPUTE, THAT (I) SUCH PARTY IS NOT SUBJECT THERETO, (II) SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SUCH COURT, (III) SUCH PARTY'S PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION, (IV) SUCH ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (V) THE VENUE OF SUCH ACTION, SUIT OR PROCEEDING IS IMPROPER.  A FINAL JUDGMENT IN ANY ACTION, SUIT OR PROCEEDING DESCRIBED IN THIS SECTION 9.12 FOLLOWING THE EXPIRATION OF ANY PERIOD PERMITTED FOR APPEAL AND SUBJECT TO ANY STAY DURING APPEAL WILL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAWS.

Section 9.14   Specific Performance and Other Remedies. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties do not perform their obligations under this Agreement in accordance with its specified terms or otherwise breach the provisions of this Agreement. The Parties acknowledge and agree that (a) each of the Parties shall be entitled to an injunction, specific performance, or other equitable relief, as provided in this Section 9.13 to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages, prior to the valid termination of this Agreement in accordance with Section 9.1, and (b) the right of an injunction, specific enforcement or other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement. Each Party agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that the other Party has an adequate remedy at Law or that an award

of an injunction, specific performance or other equitable relief is not an appropriate remedy for any reason at Law or equity. The Parties acknowledge and agree that any Party seeking an injunction, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 9.13 shall not be required to provide any bond or other security in connection with any such proceeding. The rights to specific performance, injunction or other equitable relief provided in this Section 9.13 are in addition to any other remedy to which the Party seeking such equitable relief is or may be entitled to under this Agreement, applicable Law or otherwise.

*[Remainder of page intentionally left blank.  Signature pages follow.]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officer of each Party as of the date first above written.


**BUYER:**

**GSPP HOLDCO, LLC**

By: _____
Name: Scott Kerner
Title: Manager

**GSPP CAPITAL, LLC**

By: _____
Name: Scott Kerner
Title: Manager

**SELLER:**

**PGR LESSOR K, LLC**

**By: PGR Manager K, LLC, its Manager**

**By: Pine Gate Assets, LLC, its Manager**

**By: Pine Gate Renewables, LLC, its Manager**

By: _____
Name:
Title:

**SPONSOR:**

**PINE GATE RENEWABLES, LLC**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officer of each Party as of the date first above written.

**BUYER:**             **GSPP HOLDCO, LLC**

By: _____
Name:
Title: Manager

**GSPP CAPITAL, LLC**

By: _____
Name:
Title: Manager

**SELLER:**            **PGR LESSOR K, LLC**

**By: PGR Manager K, LLC, its Manager**

**By: Pine Gate Assets, LLC, its Manager**

**By: Pine Gate Renewables, LLC, its Manager**

By: _____
Name: Raymond Shem
Title: CFO

**SPONSOR:**           **PINE GATE RENEWABLES, LLC**

By: _____
Name: Raymond Shem
Title: CFO

## **EXHIBITS AND SCHEDULES**


## **MIPA BETWEEN PGR AND GSPP**


## **HELD PROJECT**

## Exhibit A

Purchase Price and Adjustors

### 1. Base Project Purchase Price*

| Project | Held |
|---|---|
| MW DC* | 4.4 |
| Base Project Purchase Price ($/W DC) | $2.295 |
| Base Project Purchase Price ($) | $10,098,000 |

### 2. Production Adjustor

The Project's Purchase Price shall increase (decrease) by $0.00 /W DC for every 10 kWh/kWp increase (decrease) in the final specific yield as shown in the IE Report delivered as of the Closing Date relative to such Project's Base Specific Yield shown below:

| Project | Held |
|---|---|
| Base Specific Yield (kWh/kWp) | 1253 |

### 3. PPA Rate Adjustor

The Project's Purchase Price shall increase (decrease) by $0.00/W DC for every $.001/kWh increase (decrease) in the final subscription agreement rate (as defined below) from the Base Subscription Agreement Rate shown below:

| Project | Held |
|---|---|
| Base Subscription Agreement Rate ($/kWh) | $0.00 |

The final subscription agreement rate for the Project will be the weighted average subscription rate of all subscribers to the Project shown in $/kWh as calculated on the Closing Date.

### 4. PPA Escalation Adjustor

The Project's Purchase Price shall increase (decrease) by $0.00/W DC for every 1% increase (decrease) in the PPA Escalation from the Base Subscription Agreement Rate Escalation shown below:

| Project | Held |
|---|---|
| Base Subscription Agreement Rate ($/kWh) | 0.00% |

The final subscription agreement rate escalation for the Project will be the weighted average subscription agreement rate escalation of subscribers across that Project.

* Actual system size to be verified and adjusted at Closing

**Exhibit B**

**ASSIGNMENT AND CONVEYANCE**

      **THIS ASSIGNMENT AND CONVEYANCE** (this "Agreement"), dated as of _____, 2018 (the "Effective Date"), is made and entered into by and among PGR Lessor K, LLC, a North Carolina limited liability company ("Assignor"), GSPP Holdco, LLC, a New York limited liability company ("Holdco Assignee"), and GSPP Capital, LLC, a New York limited liability company ("Capital Assignee," together with Holdco Assignee, the "Assignees").

**RECITALS**

      **WHEREAS**, as of the date hereof, Seller owns one hundred percent (100%) of the Members Interests of [*Project Company*], a Minnesota limited liability company ("Project Company"); and

      **WHEREAS**, Assignor and Assignees are party to that certain Membership Interest Purchase Agreement, dated as of August ___, 2018 (the "MIPA"), pursuant to which, among other things, Assignor agreed to sell to Assignees Assignor's right, title and interest in and to the Membership Interests in Project Company held by Assignor (the "Transferred Interests"); and

      **WHEREAS**, to effect the sale and purchase of the Transferred Interests as contemplated by the MIPA, Assignor and Assignees are executing and delivering this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the parties hereto, intending to be bound legally hereby, covenant and agree as follows:

**TRANSFER AND AGREEMENTS**

      1.    Transfer of Transferred Interests to Holdco Assignee. Assignor does hereby sell, transfer, assign, convey, and deliver to Holdco Assignee ninety-nine percent (99%) of Assignor's right, title and interest in and to the Transferred Interests; and Holdco Assignee irrevocably accepts such sale, transfer, assignment, conveyance and delivery of the Transferred Interests from Assignor.

      2.    Transfer of Transferred Interests to Capital Assignee. Assignor does hereby sell, transfer, assign, convey, and deliver to Capital Assignee one percent (1%) of Assignor's right, title and interest in and to the Transferred Interests; and Capital Assignee irrevocably accepts such sale, transfer, assignment, conveyance and delivery of the Transferred Interests from Assignor.

      3.    Substitution of Members and Party to Limited Liability Company Agreements. As of the Effective Date, immediately following the actions taken pursuant to Section 1 hereof:

            a.    Project Company consents to, and each Assignee does hereby become, the sole members of Projects Company pursuant to the Transferred Interests acquired in Section 1 and Section 2 hereof.

b.     Each Assignee confirms and agrees that it shall be deemed, together with the other Assignee, to be the sole members of Project Company, a party to the Limited Liability Company Agreement of Project Company and bound by the terms and conditions thereby as if it were named as a member therein.

4.     <u>Conflict of Terms</u>.  This Agreement is delivered pursuant to and is subject to the terms of the MIPA.  Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change rescind, expand, exceed, enlarge, or in any way affect the provisions, including the warranties, covenants, agreements, conditions, or in general, any rights, remedies or obligations of Assignees or Assignor set forth in the MIPA.  In the event of any conflict or ambiguity between the terms of the MIPA and the terms of this Agreement, the terms of the MIPA shall govern and prevail, and any such provision in this Agreement shall be deemed to be amended to the extent necessary to eliminate any such conflict, inconsistency, ambiguity or difference.

5.     <u>Miscellaneous</u>.

a.     <u>Defined Terms</u>.  Capitalized terms that are not otherwise defined in this Agreement shall have the meaning given to such terms in the MIPA.

b.     <u>Further Assurances</u>.  Each party hereto hereby agrees to execute and deliver all such instruments and to take all such action as may be necessary to effectuate fully the transactions contemplated by and the purposes of this Agreement, including without limitation diligently pursuing any third party consents that may be required in connection with any assignment or transfer contemplated by this Agreement.

c.     <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes but all of which together shall constitute one and the same instrument.  Transmission of images of signed signature pages by facsimile, e-mail or other electronic means shall have the same effect as the delivery of manually signed documents in person.

d.     <u>Governing Law</u>.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), will be governed by the Laws of the State of New York without giving effect to any conflict or choice of law provision.

e.     <u>Venue</u>.   THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION IN THE STATE COURTS LOCATED IN NEW YORK, NEW YORK AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF NEW YORK (OR, IF SUCH NEW YORK COURTS DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, ANY FEDERAL WITHIN THE SOUTHERN DISTRICTION OF NEW YORK) FOR PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY AND EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS THEREFROM) IN ANY SUCH SUIT, ACTION OR PROCEEDING AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT ANY SUCH SUIT, ACTION OR PROCEEDING THAT IS BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   DURING THE PERIOD A LEGAL DISPUTE THAT IS FILED IN

ACCORDANCE WITH THIS <u>SECTION 5.e</u> IS PENDING BEFORE A COURT, ALL ACTIONS, SUITS OR PROCEEDINGS WITH RESPECT TO SUCH LEGAL DISPUTE OR ANY OTHER LEGAL DISPUTE, INCLUDING ANY COUNTERCLAIM, CROSS-CLAIM OR INTERPLEADER, WILL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.  EACH PARTY HEREBY WAIVES, AND WILL NOT ASSERT AS A DEFENSE IN ANY LEGAL DISPUTE, THAT (I) SUCH PARTY IS NOT SUBJECT THERETO, (II) SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SUCH COURT, (III) SUCH PARTY'S PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION, (IV) SUCH ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (V) THE VENUE OF SUCH ACTION, SUIT OR PROCEEDING IS IMPROPER.  A FINAL JUDGMENT IN ANY ACTION, SUIT OR PROCEEDING DESCRIBED IN THIS <u>SECTION 5.e</u> FOLLOWING THE EXPIRATION OF ANY PERIOD PERMITTED FOR APPEAL AND SUBJECT TO ANY STAY DURING APPEAL WILL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAWS

f.     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and permitted assigns.

g.     <u>Headings; Construction</u>.   The headings used herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.  This Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto by virtue of the authorship of any provision in this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF,** Assignor and Assignees have caused this Assignment and Conveyance to be executed as of the date first written above.

          **ASSIGNOR:**

          **PGR LESSOR K, LLC**,
          a North Carolina limited liability Company


          By: _____
          Name:
          Title:


          **ASSIGNEES:**

          **GSPP HOLDCO, LLC**

          a New York limited liability company


          By: _____
          Name:
          Title:


          **GSPP CAPITAL, LLC**

          a New York limited liability company


          By: _____
          Name:
          Title:

## Exhibit C

### Subscription Agreements

1. Solar Garden Subscription Agreement for Commercial Subscribers dated effective January 29, 2018, by and between Novel Solar One LLP and Clearwater Enterprises, as amended by that First Amendment to Subscription Agreement dated August 21, 2018 by and between Novel Solar One LLC and Clearwater Enterprises, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

2. Solar Garden Subscription Agreement for Commercial Subscribers dated effective April 13, 2017, by and between MN Community Solar, L.L.C. and Kwik Trip, Inc., as amended by that certain First Amendment to Subscription Agreement dated effective June 14, 2017, by and between MN Community Solar L.L.C. and Kwik Trip, Inc., as assigned by that certain Assignment Agreement by MN Community Solar LLC, to Novel Solar One LLC, dated March 1, 2018, as amended by that certain First [sic] Amendment to Subscription Agreement, dated April 20, 2018, by and between Novel Solar One LLC and Kwik Trip, Inc., as may be amended, amended and restated, supplemented or otherwise modified from time to time.

3. Solar Garden Subscription Agreement for Commercial Subscribers dated effective September 16, 2016 by and among MN Community Solar L.L.C. and District 742, as assigned by that certain Assignment Agreement dated March 1, 2018, by MN Community Solar LLC, to Novel Solar One LLC, Novel Solar Two LLC and Novel Solar Five LLC, as amended by that certain First Amendment to Subscription Agreement dated April 30, 2018, by and between Novel and St. Cloud Public Schools ISD 742, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

4. Solar Garden Subscription Agreement for Commercial Subscribers dated effective June 27, 2016 by and between MN Community Solar L.L.C. and St. Cloud Surgical Center, as assigned by that certain Assignment Agreement dated March 1, 2018, by and among MN Community Solar LLC, to Novel Solar One LLC, Novel Solar Two LLC and Novel Solar Five LLC, as amended by that certain First Amendment to Subscription Agreement dated April 18, 2018, by and between Novel Solar One LLC, Novel Solar Two LLC and Novel Solar Five LLC and St. Cloud Surgical Center, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

5. Solar Garden Subscription Agreement for Commercial Subscribers dated effective July 27, 2018, by and between Novel Energy Solutions LLC and St. Cloud Foot and Ankle Center, as assigned by the Assignment Agreement dated August 7, 2018 by and among Novel Energy Solutions LLC, Novel Solar One LLC and Novel Solar Five LLC, as may be assigned, amended, amended and restated, supplemented or otherwise modified from time to time.

# EXHIBIT D

## Purchase Price Payment and Project Completion

a.  The NTP Payment for the Project shall be applied on the date of Seller's receipt thereof first to payments under the Novel MIPA, and then to constructions costs of the Project, either by application of such proceeds to pay for current amounts due under the EPC Contract or repayment of amounts drawn under the Construction Loan for the Project, or both.  In the event the proceeds of such NTP Payment are in excess of the amount needed to accomplish the foregoing, such excess funds shall be held by the Construction Lender for application to Project costs as such become due.

b.  The Final Payment for the Project shall be applied on the date of Seller's receipt thereof as follows:

   i.  First, into an escrow account with Escrow Agent pursuant to the Escrow Agreement, to be released at Seller's direction as follows:
      a.  Amounts sufficient to repay in full the Construction Loan for the Project directly to the Construction Lender.  Such Construction Loan shall thereupon terminate with respect to the Project and the Construction Lender shall concurrently release all liens securing such Construction Loan; then
      b.  Amounts sufficient to pay payment applications then due and payable under the EPC Contract; then
      c.  An amount equal to the balance of the EPC Contract price for use to pay future draw requests under the EPC Contract (i.e., substantial completion and final completion milestone payments); then
   ii.  Second, the balance of such Final Payment proceeds shall be retained by Seller.

c.  If the Buyer makes both the NTP Payment and the Final Payment on the same date, such proceeds shall be applied in accordance with paragraphs A. and B. respectively, as if such payment had been made in two parts.

## <u>SCHEDULE 1.1(a)</u>

### Persons with Knowledge

Ray Shem

Ben Catt

James Luster

Chris Dunbar

Zoe Gamble Hanes

James Ortega

Mike Wrenn

Andrew Vietze

Stephanie Murr

**<u>SCHEDULE 1.1(b)</u>**

**Permitted Liens**

The Liens created pursuant to that certain Construction Loan Agreement, dated as of July 3, 2018, between Novel Solar One LLC, as Borrower, and Solar Construction Lending, LLC, as Lender and the other Loan Documents (as defined therein).

**<u>SCHEDULE 4.7</u>**

Bank Accounts

| Novel Solar One, LLC | 4529420655 | Wells Fargo[1] |
|----------------------|------------|----------------|
| Novel Solar One, LLC | 7472844369 | Fifth Third Bank |

---

[1] Note: These accounts were set up for future use, but no transactions have occurred in any of them as yet.  They are set up at both banks because PGR is in the process of making a switch from Wells to 53 as our relationship bank.

## SCHEDULE 4.13

### Material Contracts

1. All applicable real estate documents listed in Schedule 4.15
2. All Subscription Agreements and contracts for capacity or ancillary services as set forth on Exhibit C.
3. Equipment Warranties for Adani and Trina PV Modules
4. Equipment Warranties for Solectria Renewables PVI 50TL (Inverters)
5. Equipment Warranties for Unirac ground mount fixed-tilt racking system (racking)
6. Solar Project Engineering, Procurement and Construction Agreement dated June 6, 2018, by and between Novel Energy Construction, LLC and Novel Solar One LLC (the "Held EPC Agreement").
7. Guaranty Agreement dated June 6, 2018, made by Novel Energy Solutions, L.L.C. to and in favor of Novel Solar One LLC regarding the Gibbon EPC Agreement.
8. Operation and Maintenance Agreement by and between Novel Solar One LLC and Pine Gate O&M, LLC, dated as of July 23, 2018.
9. Generating System Interconnection Agreement dated effective May 15, 2018, by and between Xcel Energy, "Northern States Power Company" and Novel Solar One LLC (f/k/a Novel Solar One LLP) (Held 1)
10. Generating System Interconnection Agreement dated effective May 15, 2018, by and between Xcel Energy, "Northern States Power Company" and Novel Solar One LLC (f/k/a Novel Solar One LLP) (Held 2)
11. Generating System Interconnection Agreement dated effective May 15, 2018, by and between Xcel Energy, "Northern States Power Company" and Novel Solar One LLC (f/k/a Novel Solar One LLP) (Held 3)
12. Generating System Interconnection Agreement dated effective May 15, 2018, by and between Xcel Energy, "Northern States Power Company" and Novel Solar One LLC (f/k/a Novel Solar One LLP) (Held 4)
13. Generating System Interconnection Agreement dated effective May 15, 2018, by and between Xcel Energy, "Northern States Power Company" and Novel Solar One LLC (f/k/a Novel Solar One LLP) (Held 5)
14. Subscriber Agency Agreement and Consent Form dated January 29, 2018, by and between Clearwater Enterprises and Novel Solar One LLC (f/k/a Novel Solar One LLP).
15. Subscriber Agency Agreement and Consent Form dated August 6, 2018 by and between Kwik Trip, Inc. and Novel Solar One LLC (f/k/a Novel Solar One LLP).
16. Construction Loan Agreement by and between Novel Solar One LLC and Solar Construction Lending, LLC dated July 3, 2018.
17. Promissory Note by and between Novel Solar One LLC and Solar Construction Lending, LLC, dated July 3, 2018.
18. Security Agreement by and between Novel Solar One LLC and Solar Construction Lending, LLC, dated July 3, 2018.

## SCHEDULE 4.15

### Real Estate Interests

1.  That certain Community Solar Ground Lease dated February 8, 2017, by and between Held Limited Partnership and Novel Energy Solutions, LLC, as amended by that certain Amendment to Community Solar Garden Ground Lease dated September 25, 2017, by and between Held Limited Partnership and Novel Energy Solutions, LLC (as amended, the "Lease"), subject to that certain Access Easement Agreement dated June 8, 2017 and recorded on June 14, 2017 in the Office of the County Recorder for Stearns County, Minnesota as Document A1497723, and further subject to that certain Access Easement Agreement dated May 3, 2018 and recorded on May 18, 2018 in the Office of the County Recorder for Stearns County, Minnesota as Document A1520654, and further subject to that certain Temporary Access and Construction Agreement dated January 18, 2018 and recorded on February 7, 2018 in the Office of the County Recorder for Stearns County, Minnesota as Document A1514389.

## <u>S SCHEDULE 4.16</u>

### Permits

1. Conditional Use Permit (No. 006483)
2. Sauk River Watershed District (SRWD) Permit (No. 17-03)
3. NPDES General Permit (ID No. C00046941)
4. Land Disturbance Permit (issued as part of the building permit)
5. City of Waite Park Stormwater Permit (issued as part of the building permit)
6. City of Waite Park Building Permit (No. 2017-00254)
7. Stearns County Wetlands Approval

## SCHEDULE 4.17(a)

**Environmental Matters**

None.

## SCHEDULE 4.17(b)

### Environmental Permits and Reports

1.   Phase I Environmental Site Assessment, by Westwood Engineering, July 6th, 2017
2.   Limited Phase II Environmental Site Assessment, by Westwood Engineering, August 2nd, 2017
3.   Updated Phase I ESA; February 12, 2018
4.   Stormwater Report, by EVS, Inc., October 27, 2017
5.   Geotechnical Report, by Braun Intertec, October 9th, 2017
6.   Wetland Delineation Report, by Granite City Environmental, September 6th, 2016
7.   US Army Corps of Engineers Determination, January 30th, 2017
8.   State Historic Preservation Office Cultural Review, by Westwood Engineering, June 13, 2017
9.   Endangered Species Review, by Westwood Engineering May 26, 2017
10.  Endangered Species Review Confirmation, by US Fish and Wildlife Services, May 25, 2017

## <u>SCHEDULE 4.26</u>

## Support Obligations

| <u>Obligation</u> | <u>Reference</u> | <u>Issuing/Obligated Party</u> | <u>Beneficiary Party</u> | <u>Status/Timing of Release</u> |
|---|---|---|---|---|
| Surety: $50,000.00 | Performance Bond (Decommissioning): https://pgrenewables.app.box.com/file/309926557837<br><br>Permit Reference: https://pgrenewables.app.box.com/file/276481484877 | Novel Energy Solutions, LLC | City of Waite Park | Life of the project* |
| Surety: 23,380.65 | Performance Bond (Landscaping): https://pgrenewables.app.box.com/file/309928461046<br><br>Permit Reference: https://pgrenewables.app.box.com/file/276481484877 | Novel Energy Solutions, LLC | City of Waite Park | Life of the project* |
| Solar Rewards Community MN Deposit | https://pgrenewables.app.box.com/folder/47590531982<br>#SRC042722 ($100* 950 = $95,000)<br>#SRC042725 ($100* 950 = $95,000)<br>#SRC042727 ($100* 950 = $95,000)<br>#SRC042730 ($100* 950 = $95,000)<br>#SRC042731 ($100* 950 = $95,000) | Novel Energy Solutions LLC | Xcel Energy | Within thirty (30) days after either the project is completed or the date when the garden operator informs the Company that it will no longer continue pursuing completion of the garden project, or if the project is not completed within the twenty four (24) month timeline (including day-for-day extension described in the Solar*Rewards Community contract), the Company shall return to the garden operator of record in the SRC Application System the deposit. |

\* At bond expiration, Buyer needs to reinstate bond for the life of the project.