**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NOVEL ENERGY SOLUTIONS, LLC,

*Plaintiff*,

v.

PINE GATE RENEWABLES, LLC, and
GREEN STREET POWER PARTNERS,

*Defendants*.

Date Filed: 07/31/2020

Case No.: 1:20-cv-05992

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, NOVEL ENERGY SOLUTIONS, LLC ("Plaintiff"), by and through its attorneys, Buchanan Ingersoll & Rooney PC, for its Complaint against PINE GATE RENEWABLES, LLC ("Pine Gate") and GREEN STREET POWER PARTNERS ("Green Street;" together with Pine Gate, "Defendants"), alleges as follows:

### I.   NATURE OF THE ACTION

1.   This is an action for breach of contract, unjust enrichment and a declaratory judgment arising from Defendants' failure to reimburse Plaintiff for its overpayment of an interconnection utility fee as required by the parties' agreement.

2.   Specifically, Plaintiff seeks payment of $415,275.50 that was wrongfully withheld by Defendants in violation of the Membership Interest Purchase Agreement (the "Agreement") executed by Plaintiff and Pine Gate on February 2, 2018.  The Agreement is annexed to this Complaint as **Exhibit A**.

3.      The parties entered into the Agreement for the sale of four solar energy projects by Plaintiff to Pine Gate.  Pursuant to the Agreement, the parties subtracted from the projects' purchase price the amount necessary to pay the projects' estimated interconnection fee, which was charged by the local utility company to connect the projects to the power grid, and paid by Plaintiff as a deposit prior to the construction of the projects.  Because the interconnection fee was only an estimate, the parties agreed that the any additional interconnection fee charged to Pine Gate by the utility would be paid by Plaintiff, and that any refund from the utility would be paid to Plaintiff.  Indeed, Pine Gate followed the Agreement with respect to interconnection reimbursements to Novel previously.

4.      In fact, Pine Gate honored the parties' Agreement in its course of action regarding another project in the Agreement – the Imholte project.  After Imholte was connected to the power utility, Pine Gate received a refund of the interconnection fee paid by Plaintiff.  Pine Gate immediately returned the refund to Plaintiff.  This course of dealing with the Imholte Project confirmed the parties' Agreement and makes clear that the refund at issue here should have been returned to Plaintiff.

5.      However, prior to the issuance of the final invoice by the utility for one of the projects, the "Held Project," Pine Gate sold the project to Defendant Green Street Power Partners ("Green Street").  Thereafter, the local utility company operating the power grid to which the Held Project was connected issued an invoice showing that the estimated interconnection fee for that project – which had been advanced by Plaintiff – had been overstated by $415,275.50.  The utility then issued a refund of $415,275.50 (the "Interconnection Refund") to Green Street because Green Street was the point of contact on the utility company's website at that time.

6. Notwithstanding that Plaintiff's Agreement with Pine Gate mandated that the Interconnection Refund be returned to Plaintiff, Green Street refused to reimburse Plaintiff, claiming that it is not bound by the terms of Plaintiff's Agreement with Pine Gate. Pine Gate likewise refused to compensate Plaintiff for the amount of the refund.

7. Therefore, Plaintiff now seek an order from this Court enforcing the Agreement and requiring Defendants to reimburse Plaintiff the amount of the Interconnection Refund.

## II.  PARTIES

8. Plaintiff Novel is a limited liability company formed in the State of Minnesota with its corporate headquarters located at 2303 Wycliff Street, Suite 300, Saint Paul, MN 55114.

9. Defendant Pine Gate is a limited liability company formed in the State of North Carolina with its corporate headquarters located at 130 Roberts Street, Asheville, NC 28801.

10. Defendant Green Street is a limited liability company formed in the State of New York with its corporate headquarters located at 1 Landmark Square Suite 320, Stamford, CT 06901.

## III.  JURISDICTION AND VENUE

11. This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

12. Venue is proper in this judicial district because Plaintiff and Pine Gate voluntarily submitted to this Court's jurisdiction pursuant to Section 9.12(b) of the Agreement, which provides:

> a. THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK COUNTY AND OF THE FEDERAL DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN FOR PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY AND EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS THEREFROM) IN ANY SUCH SUIT, ACTION OR PROCEEDING AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT ANY SUCH SUIT, ACTION OR PROCEEDING THAT IS BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. DURING THE PERIOD A LEGAL DISPUTE THAT IS FILED IN ACCORDANCE WITH THIS SECTION 9.12 IS PENDING BEFORE A COURT, ALL ACTIONS, SUITS OR PROCEEDINGS WITH RESPECT TO SUCH LEGAL DISPUTE OR ANY OTHER LEGAL DISPUTE, INCLUDING ANY COUNTERCLAIM, CROSS-CLAIM OR INTERPLEADER, WILL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF SUCH COURT. EACH PARTY HEREBY WAIVES, AND WILL NOT ASSERT AS A DEFENSE IN ANY LEGAL DISPUTE, THAT (I) SUCH PARTY IS NOT SUBJECT THERETO, (II) SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SUCH COURT, (III) SUCH PARTY'S PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION, (IV) SUCH ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (V) THE VENUE OF SUCH ACTION, SUIT OR PROCEEDING IS IMPROPER.

13.     This Court has personal jurisdiction over Defendant Green Street because Green Street was formed in the State of New York.

## IV.     FACTUAL BACKGROUND

14.     On February 2, 2018, Plaintiff and Pine Gate executed a Membership Interest Purchase Agreement, pursuant to which Plaintiff sold its interest in four limited liability partnerships that were developing solar energy projects (the "Projects") in Minnesota:

    a. Novel Solar Three LLP, a Minnesota limited liability partnership (the "Gibbon Project Company"), which was developing an approximately 4.63 $MW_{DC}$ photovoltaic solar energy project in Gibbon, Minnesota (the "Gibbon Project");

    b.   Novel Solar One LLP, a Minnesota limited liability partnership (the "Held Project Company"), which was developing an approximately 5 MW$_{DC}$ photovoltaic solar energy project in St. Cloud, Minnesota (the "Held Project");

    c.   Novel Solar Five LLP, a Minnesota limited liability partnership (the "Imholte Project Company"), which was developing an approximately 1.498 MW$_{DC}$ photovoltaic solar energy project in St. Cloud, Minnesota (the "Imholte Project"); and

    d.   Novel Solar Two LLP, a Minnesota limited liability partnership (the "Schneider Project Company"), which was developing an approximately 7 MW$_{DC}$ photovoltaic solar energy project in St. Cloud, Minnesota (the "Schneider Project").

15.    Prior to construction of the Projects, the local utility company, Xcel Energy ("Xcel"), required the payment of a deposit the estimated cost of connecting the Projects to the power grid ("Interconnection Fees"). Xcel advised that a final invoice for the Interconnection Fees would be provided following the interconnection, and any refunds would be issued, or overages would be billed, at that time. The estimated Interconnection Fee for each of the projects was as follows:

    a.   $304,500 for the Gibbon Project;

    b.   $618,005 for the Held Project;

    c.   $305,596 for the Imholte Project; and

    d.   $565,110 for the Schneider Project;

16.    Plaintiff paid the estimated Interconnection Fee for the Held Project, $618,005, to Xcel on January 17, 2018.

17.     Section 1.1 of the Agreement set the Project Price for each project at $0.50 per watt (dc) of the final installed size of the Project as increased or decreased by any PPA Adjustment.

18.     Section 2.2 of the Agreement required Pine Gate to refund Plaintiff the amount of the estimated Interconnection Fees that Plaintiff had advanced to the Excel at the time of execution of the Agreement.  Section 1.1 required the amount of this refund to then be subtracted from the final purchase price of the Projects.

19.     Because the estimated Interconnection Fees were deducted from the amount of the purchase price prior to completion of the interconnection and receipt of the final invoices from Xcel, the parties agreed to subsequently true-up the amount of the Interconnection Fees. Specifically, the parties agreed that Pine Gate would return to Plaintiff any Interconnection Refund received from Xcel if the estimated Interconnection Fee was higher than the actual cost of the interconnection.  Conversely, Plaintiff would be responsible for payment of any overages charged to Pine Gate if the estimated interconnection fee was less than the ultimate cost of the interconnection,

20.     In March 2019, Pine Gate advised Plaintiff that Green Street had agreed to purchase the four Projects from Pine Gate.  The purchase agreement between Pine Gate and Green Street did not terminate Pine Gate's obligations under the Agreement, including the obligation to pay the Interconnection Refund, if any, to Plaintiff.

21.     On March 18, 2019, Plaintiff entered into a consulting agreement with Green Street, pursuant to which Plaintiff assisted Green Street in its purchase of the Projects from Pine Gate by providing services related to closing items, funding, due diligence and related issues.  A copy of the Consulting Agreement is annexed to this Complaint as **Exhibit B**.   In fact, Plaintiff was instrumental in ensuring a smooth closing between Pine Gate and Green Street.

22.    As a result of the consulting relationship with Plaintiff, Green Street was aware of and familiar with the contract between Plaintiff and Pine Gate, including Plaintiff' rights to receive the Interconnection Refund paid on any of the Projects.

23.    The Imholte Project was interconnected to the power grid on April 16, 2019. Xcel subsequently issued a final invoice in the amount of $122,728, which was $182,868 less than the estimated interconnection fee. Xcel issued the $182,868 refund to Pine Gate in September 2019. Pine Gate then immediately transferred the refund to Plaintiff in accordance with the Agreement.

24.    Pine Gate's return of the Interconnection Refund to Plaintiff confirmed the parties' agreement that any refund received from Excel for the projects was to be returned to Plaintiff.

25.    The Held Project was interconnected to the power grid in June 2019. Thereafter, Xcel issued a final invoice for the interconnection fee, totaling $202,747.50, which was $415,275.50 less than the initial estimate. Xcel issued the $415,275.50 refund (the "Interconnection Refund") to Green Street. The refund was issued to Green Street rather than Pine Gate because Green Street was the point of contact for the Held Project on Xcel's website at that time.

26.    On April 24, 2020, Plaintiff demanded payment of the Interconnection Refund from Pine Gate. Despite the terms of the Agreement, and the parties' performance with respect to the Imholte Project, Pine Gate has refused payment on the grounds that Green Street received the Interconnection Refund from Xcel. This, despite the fact that Pine Gate's sale of the projects did not relieve it from its obligations to Plaintiff per the Agreement. Pine Gate has failed to comply with its obligations under the Agreement.

27.    On April 24, 2020, Plaintiff demanded the payment of the Interconnection Refund from Green Street. Plaintiff explained that pursuant to its Agreement with Pine Gate, the

$415,275.50 refund was a true-up due back to Novel "because it is our money that we already paid (and was reflected in the purchase price calculation)."  Notwithstanding Green Street's consulting relationship with Plaintiff, and knowledge of Plaintiff' right to receive the Interconnection Refund, Green Street has refused to return the Interconnection Refund to Plaintiff.

## VI.    GOVERNING LAW

28.    Section 9.12 of the Agreement provides that the laws of the State of New York governs "all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) . . . ."

29.    Accordingly, New York law governs this action.

## VII.    CLAIMS FOR RELIEF

### FIRST COUNT
### BREACH OF CONTRACT
### (AGAINST PINE GATE)

30.    Plaintiff incorporate the allegations in all prior paragraphs within this Complaint as if they were fully set forth herein.

31.    The Agreement is a valid contract.

32.    Plaintiff have fully performed their obligations under the Agreement.

33.    The Agreement provided that Plaintiff was entitled to any Interconnection Refund issued by Xcel.

34.    Xcel issued an Interconnection Refund in the amount of $415,275.50 for the Held Project in June 2019.  While the Interconnection Refund was owed to Plaintiff, it was issued to

8

Green Street because Green Street was listed as the point of contact on Xcel's website as a result of its purchase agreement with Pine Gate. Green Street refused to transfer the refund to Plaintiff.

35.     Plaintiff advised Pine Gate that it owed it the amount of the Interconnection Refund. Pine Gate refused to compensate Plaintiff.

36.     Accordingly, Pine Gate breached the contract by failing to return the Interconnection Refund to Plaintiff.

37.     Plaintiff suffered $415,275.50 in damages as a direct result of Pine Gate's breach of contract.

## SECOND COUNT
## DECLARATORY JUDGMENT
## (AGAINST GREEN STREET)

38.     Plaintiff incorporates the allegations in all prior paragraphs within this Complaint as if they were fully set forth herein.

39.     There is a justiciable controversy between Plaintiff and Green Street regarding which party is entitled to the Interconnection Refund.

40.     Plaintiff paid the full amount of the estimated interconnection fee for the Held Project to Xcel in January, 2018. Pursuant to the Agreement, Plaintiff is entitled to the any refund related to that payment. There is no basis for Green Street to retain the funds that it received solely because it was registered as the point of contact for the Held Project on Xcel's website.

41.     This dispute is not hypothetical, contingent or remote, as the refund has been issued to Green Street and Green Street has refused to transfer it to Plaintiff.

42.     Therefore, the Court should enter a declaratory judgment clarifying Plaintiff' right to the refund and Green Street's obligation to transfer the amount of the refund to Plaintiff.

## THIRD COUNT
## UNJUST ENRICHMENT
## (AGAINST GREEN STREET)

43. Plaintiff incorporates the allegations in all prior paragraphs within this Complaint as if they were fully set forth herein.

44. Green Street has been unjustly enriched by its retention of the Interconnection Refund because Green Street did not pay any part of the fee that was being refunded. It simply received a windfall because it was listed as the point of contact for the Held Project on Xcel's website.

45. Green Street was unjustly enriched at Plaintiff's expense because Plaintiff was owed the Interconnection Refund under its Agreement with Pine Gate.

46. It is against equity and good conscience to permit Green Street to retain the Interconnection Refund because Green Street had not paid the estimated interconnection fee in the first place, and it has no basis to withhold the refund from Plaintiff. Green Street received the refund only because of its status on Xcel's website. Green Street did not bargain for the Interconnection Refund as Plaintiff did.

47. Plaintiff and Green Street had a sufficiently close relationship because Green Street was aware of Plaintiff' Agreement with Pine Gate and the requirement that the Interconnection Refund be issued to Plaintiff, and because Plaintiff worked closely with Green Street to aid in its closing process when it purchased the Held Project from Pine Gate.

48. Upon information and belief, the price of the Held Project paid by Green Street to Pine Gate did not include the cost of the Interconnection Fee previously paid by Plaintiff. As such, Green Street would be unjustly enriched if it were to keep the Interconnection Refund.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request that judgment be entered upon the First, Second, and Third causes of action against Defendants, jointly and severally, awarding the following relief to Plaintiff:

**(a)**   Enforce the Agreement and compel Pine Gate to pay the full amount of the Interconnection Refund, $415,275.50, to Plaintiff;

**(b)**   Enter declaratory judgment that Plaintiff are entitled to the Interconnection Refund issued by Excel to Green Street;

**(c)**   Enter judgment that Green Street was unjustly enriched by its receipt of the Interconnection Refund and compel Green Street to transfer the full amount of the refund, $415,275.50, to Plaintiff; and

**(d)**   Such other and further relief as the Court may deem just and proper.

DATED:      July 31, 2020
            New York, New York

                                   **BUCHANAN INGERSOLL & ROONEY PC**

                          By:   _____
                                Stephen J. Riccardulli (SR 7784)
                                Melissa J. Bayly
                                640 5th Avenue
                                9th Floor
                                New York, NY 10019-6102
                                Tel. 212-440-4400

                                *Attorneys for Plaintiff*

EXECUTION VERSION

MEMBERSHIP INTEREST PURCHASE AGREEMENT

by and among

Novel Energy Solutions, L.L.C.

and

MN Community Solar LLC

as Seller,

and Pine Gate Renewables, LLC

as Buyer

dated as of February 2, 2018

# TABLE OF CONTENTS

Page

Article I DEFINITIONS AND CONSTRUCTION ..................................................................... 1

  Section 1.1    Definitions .................................................................................................... 1

  Section 1.2    Rules of Construction. ............................................................................... 11

Article II SALE AND PURCHASE of Membership Interests ................................................. 12

  Section 2.1    Transfer of Membership Interests .............................................................. 12

  Section 2.2    Project Price and Project Closing Payment Allocation ............................. 12

  Section 2.3    Closing Date ............................................................................................... 13

  Section 2.4    Conditions Precedent to the Obligations of the Parties on the
                 Execution Date ........................................................................................... 14

  Section 2.5    Conditions Precedent to the Obligations of the Parties on a Closing
                 Date ............................................................................................................ 15

Article III REPRESENTATIONS AND WARRANTIES REGARDING SELLER .................. 16

  Section 3.1    Organization ............................................................................................... 16

  Section 3.2    Authority; Enforceability ........................................................................... 16

  Section 3.3    Consents and Approvals ............................................................................. 16

  Section 3.4    No Conflicts; Consents and Approvals ...................................................... 17

  Section 3.5    Legal Proceedings ...................................................................................... 17

  Section 3.6    Brokers ....................................................................................................... 17

  Section 3.7    Books and Records; Financial Condition ................................................... 17

  Section 3.8    Compliance with Law ................................................................................. 17

  Section 3.9    Disclosure .................................................................................................. 18

Article IV REPRESENTATIONS AND WARRANTIES REGARDING THE Project
           Companies .................................................................................................................. 18

  Section 4.1    Organization ............................................................................................... 18

  Section 4.2    Authority; Enforceability ........................................................................... 18

  Section 4.3    Consents and Approvals ............................................................................. 18

  Section 4.4    No Conflicts; Consents and Approvals ...................................................... 19

  Section 4.5    Ownership of Membership Interests of Project Companies ....................... 19

  Section 4.6    Project Company Assets ............................................................................. 19

  Section 4.7    Bank Accounts ........................................................................................... 19

  Section 4.8    Subsidiaries ................................................................................................ 20

  Section 4.9    Legal Proceedings ...................................................................................... 20

  Section 4.10   Compliance with Laws ............................................................................... 20

**TABLE OF CONTENTS**
**(Continued)**

**Page**

Section 4.11 Tax Matters ........................................................................................ 20

Section 4.12 Regulatory Status ............................................................................... 20

Section 4.13 Material Contracts .............................................................................. 20

Section 4.14 Liabilities ........................................................................................... 22

Section 4.15 Real Property ...................................................................................... 22

Section 4.16 Permits ............................................................................................... 23

Section 4.17 Environmental Matters ....................................................................... 23

Section 4.18 Intellectual Property ........................................................................... 24

Section 4.19 Brokers ............................................................................................... 24

Section 4.20 Employees and Labor Matters ............................................................ 24

Section 4.21 Employee Benefits ............................................................................. 24

Section 4.22 Title; Condition .................................................................................. 25

Section 4.23 Bankruptcy ......................................................................................... 25

Section 4.24 Casualty .............................................................................................. 25

Section 4.25 Support Obligations ........................................................................... 25

Section 4.26 No Other Representations and Warranties........................................... 25

Article V REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 25

Section 5.1 Organization........................................................................................ 25

Section 5.2 Authority; Enforceability .................................................................... 26

Section 5.3 Consents and Approvals ..................................................................... 26

Section 5.4 No Conflicts ....................................................................................... 26

Section 5.5 Legal Proceedings .............................................................................. 26

Section 5.6 Compliance with Laws ....................................................................... 27

Section 5.7 Brokers ............................................................................................... 27

Section 5.8 Securities Law Matters ...................................................................... 27

Section 5.9 Financial Resources ........................................................................... 27

Article VI COVENANTS ................................................................................................. 27

Section 6.1 EPC Agreement and Closing Date...................................................... 27

Section 6.2 Transfer Taxes .................................................................................... 27

Section 6.3 Tax Matters ........................................................................................ 27

Section 6.4 Public Announcements ....................................................................... 29

# TABLE OF CONTENTS
## (Continued)

**Page**

Section 6.5      Replacement of Credit Support.................................................................. 30

Section 6.6      Project Construction.......................................................................................... 30

Section 6.7      Further Assurances........................................................................................... 31

Section 6.8      Tax Treatment..................................................................................................... 31

Section 6.9      Solar Panel Supply............................................................................................ 31

Section 6.10     IE Report.............................................................................................................. 31

Section 6.11     Seller Transfer of Contracts ...................................................................... 31

Section 6.12     Buyer Interconnection Payment to Xcel ............................................. 31

Article VII INDEMNIFICATION, LIMITATIONS OF LIABILITY AND WAIVERS ........... 31

Section 7.1      Survival................................................................................................................. 31

Section 7.2      Indemnification by Seller............................................................................. 32

Section 7.3      Indemnification by Buyer ........................................................................... 32

Section 7.4      Limitations on Liability ................................................................................ 32

Section 7.5      Procedures for Third Party Claims ......................................................... 34

Section 7.6      Indemnification Procedures ..................................................................... 35

Article VIII PRE-CLOSING TERMINATION RIGHT.......................................................... 36

Section 8.1      Buyer Termination and Construction Option. ......................................... 36

Section 8.2      Mutual Termination Right .......................................................................... 37

Article IX MISCELLANEOUS.................................................................................................. 38

Section 9.1      Notices.................................................................................................................. 38

Section 9.2      Entire Agreement............................................................................................ 39

Section 9.3      Expenses.............................................................................................................. 39

Section 9.4      Disclosure ........................................................................................................... 39

Section 9.5      Waiver................................................................................................................... 40

Section 9.6      Amendment........................................................................................................ 40

Section 9.7      No Third Party Beneficiary.......................................................................... 40

Section 9.8      Assignment; Binding Effect........................................................................ 40

Section 9.9      Headings .............................................................................................................. 40

Section 9.10     Invalid Provisions ........................................................................................... 40

Section 9.11     Counterparts; Facsimile ............................................................................... 41

Section 9.12     Governing Law .................................................................................................. 41

**TABLE OF CONTENTS**
**(Continued)**

Page

Section 9.13    Specific Performance and Other Remedies ............................................. 42

## EXHIBITS

Exhibit A        Form of Assignment Agreement

Exhibit B        Calculation of PPA Adjustment

Exhibit C        Subscription Agreements

Exhibit D        Interconnection Reimbursement Amounts

## SCHEDULES

Schedule 1.1(a)        Seller Knowledge Persons

Schedule 1.1(b)        Permitted Liens

Schedule 1.1(c)        Support Obligations

Schedule 3.3            Seller Consents

Schedule 4.3            Project Company Consents

Schedule 4.7            Bank Accounts

Schedule 4.9            Legal Proceedings

Schedule 4.10          Compliance with Laws

Schedule 4.11          Tax Matters

Schedule 4.13          Material Contracts

Schedule 4.15          Real Property

Schedule 4.16          Permits

Schedule 4.17(a)        Environmental Compliance and Environmental Permits

Schedule 4.17(b)        Environmental Studies and Reports

Schedule 4.25          Support Obligations

# TABLE OF CONTENTS
## (Continued)

**Page**

Schedule 5.3          Buyer Consents

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "***Agreement***"), dated as of February 2, 2018 (the "***Execution Date***"), is made between Novel Energy Solutions, L.L.C., a Minnesota limited liability company ("***Novel***"), MN Community Solar LLC, a Minnesota limited liability company ("***MNCS***", together with Novel, collectively, "***Seller***"), and Pine Gate Renewables, LLC, a North Carolina limited liability company ("***Buyer***").

## RECITALS:

WHEREAS, Seller collectively owns 100% of the issued and outstanding partnership interests (the "***Membership Interests***") in each of (a) Novel Solar Three LLP, a Minnesota limited liability partnership (the "***Gibbon Project Company***"), (b) Novel Solar One LLP, a Minnesota limited liability partnership (the "***Held Project Company***"), (c) Novel Solar Five LLP, a Minnesota limited liability partnership (the "***Imholte Project Company***") and (d) Novel Solar Two LLP, a Minnesota limited liability partnership (the "***Schneider Project Company***" and, together with the Gibbon Project Company, the Held Project Company and the Imholte Project Company, the "***Project Companies***" and each a "***Project Company***").

WHEREAS, (a) the Gibbon Project Company is developing an approximately 4.63 $MW_{DC}$ photovoltaic solar energy project to be constructed in Gibbon, Minnesota (the "***Gibbon Project***"), (b) the Held Project Company is developing an approximately 5 $MW_{DC}$ photovoltaic solar energy project to be constructed in St. Cloud, Minnesota (the "***Held Project***"), (c) the Imholte Project Company is developing an approximately 1.498 $MW_{DC}$ photovoltaic solar energy project to be constructed in St. Cloud, Minnesota (the "***Imholte Project***") and (d) the Schneider Project Company is developing an approximately 7 $MW_{DC}$ photovoltaic solar energy project to be constructed in St. Cloud, Minnesota (the "***Schneider Project***" and, together with the Gibbon Project, the Held Project and the Imholte Project, the "***Projects***" and each a "***Project***").

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller on the terms and subject to the conditions set forth in this Agreement, 100% of the Membership Interests;

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.1     Definitions. As used in this Agreement, the following capitalized terms have the meanings set forth below:

"***1933 Act***" means the Securities Act of 1933, as amended.

"**Action**" means any legal, administrative, arbitral, mediation or other alternative dispute resolution procedure or other action, proceeding, claim, assessment, audit, inquiry or similar investigation before any court, arbitrator or other Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by Contract or otherwise.

"**Agreement**" is defined in the introduction to this Agreement.

"**Ancillary Agreements**" means the Assignment Agreements and the other documents and agreements to be delivered pursuant to this Agreement.

"**Assets**" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible and wherever situated), including the related goodwill, which assets and properties are operated, owned or leased by such Person, and in the case of the Project Companies includes all Real Property Interests, Permits, and agreements, engineering and construction contracts, components, materials, equipment, other personal property comprising or to be incorporated into any portion of the Projects, studies, reports, and all other development rights, interests and assets relating to the Projects.

"**Assignment Agreement**" means an assignment and transfer of the Membership Interests, substantially in the form attached hereto as Exhibit A.

"**Bankruptcy**" means, with respect to any Person, the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Code or like provision of law (except if such petition is contested by such Person and has been stayed or dismissed within ninety (90) days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of its Assets; commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates its approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally stayed or dismissed within ninety (90) days.

"**Bankruptcy Code**" means any and all section and chapters of Title 11 of the United States Code, or any similar law of any other jurisdiction, as in effect from time to time.

"**Benefit Plan**" means "employee benefit plan," as such term is defined in Section 3(3) of ERISA.  Benefit Plans do not include any Multiemployer Plans or any Benefit Plans maintained by any ERISA Affiliate.

2

"**Business**" means the ownership of the Assets of the Project Companies and the development, construction, ownership and operation of the Projects and the conduct of other activities by the Project Companies related or incidental to the foregoing, all as currently conducted.

"**Business Day**" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"**Buyer**" is defined in the introduction to this Agreement.

"**Buyer Consents**" is defined in Section 5.3.

"**Buyer Group**" is defined in Section 7.2.

"**Casualty Defect**" means any destruction by fire, explosion or other casualty or any taking, or pending or threatened taking, in condemnation or under the right of eminent domain, of any Project or any portion thereof, in each case that has or could reasonably be expected to have a Material Adverse Effect on such Project.

"**Claim**" means any demand, claim, action, investigation, legal proceeding (whether at law or in equity) or arbitration.

"**Closing Date**" is defined in Section 2.3.

"**Closing Date Payment**" is defined in Section 2.2(b)(i).

"**Code**" means the Internal Revenue Code of 1986.

"**Confidentiality Agreement**" means the Mutual Nondisclosure Agreement, dated as of October 30, 2017, between Seller and Buyer.

"**Consent**" means a consent, approval, authorization, waiver, filing, registration, declaration or similar action of, with or by any Person.

"**Contract**" means any contract, lease, license, evidence of Indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other valid and binding arrangement, but excludes Permits.

"**Data Site**" means the electronic documentation site established by or on behalf of Seller in connection with the transactions contemplated by this Agreement to which Buyer and its authorized representatives have been given access.

"**Deductible**" is defined in Section 7.4(c).

"**Default**" means, with respect to any Person, any circumstance, event or condition that would constitute, with or without notice or the passage of time or both, a violation, breach, default, conflict with, or give rise to any right of termination, modification, cancellation, prepayment, suspension, limitation, revocation, purchase, re-purchase or acceleration.

3

"***Dispute Notice***" is defined in <u>Section 7.6(b)</u>.

"***Environmental Claim***" means any Claim or Loss arising out of or related to any violation of Environmental Law.

"***Environmental Law***" means all applicable Laws pertaining to Hazardous Materials, protection of the environment, and natural resources, including, but not limited to, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) as amended, the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901 et seq.) as amended, the Clean Air Act (42 U.S.C. § 7401 et seq.), the Federal Water Pollution Control Act (also known as the Clean Water Act) (33 U.S.C. §§ 1251 et seq.), Rivers and Harbors Act of 1899, as amended (33 U.S.C. § 403), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), the Endangered Species Act (16 U.S.C. §§ 1531 et seq.), the Migratory Bird Treaty Act (16 U.S.C. §§ 703 et seq.), the Bald and Golden Eagle Protection Act (16 U.S.C. §§ 668 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. §§ 2701 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101 et seq.), the National Environmental Policy Act of 1969 (42 U.S.C. §§4321 to 4370h), the National Historic Preservation Act (16 U.S.C. §§ 470 et. seq.), Federal Aviation Administration regulations, including those at Title 14 Code of Federal Regulations Part 77 and 49 U.S.C. §44718 and any similar or analogous state and local statutes or regulations promulgated thereunder, as each of the foregoing may be amended or supplemented from time to time in the future.

"***Equity Interest***" means any share, capital, stock, partnership, membership or similar interest or indicia of equity ownership (including any option, warrant, profits interest or similar right or security convertible, exchangeable or exercisable therefor) in any Person.

"***EPC Agreement***" means, with respect to each Project, an engineering, procurement and construction agreement between Novel Construction and the Project Company that owns such Project.

"***Execution Date***" is defined in the Preamble to this Agreement.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***ERISA Affiliate***" means any entity, trade or business that is a member of a group described in Section 414(b) or (c) of the Code or Section 400l(b)(l) of ERISA that includes Seller, or that is a member of the same "controlled group" as Seller pursuant to Section 4001(a)(14) of ERISA; <u>provided</u>, <u>however</u>, that the Project Companies will not be considered ERISA Affiliates of Seller.

"***Existing Easements and Licenses***" is defined in <u>Section 4.15(a)(iii)</u>.

"***Existing Leases***" is defined in <u>Section 4.15(a)(i)</u>.

"***Existing Options***" is defined in <u>Section 4.15(a)(ii)</u>.

4

"**Final Order**" means a final order of a court of competent jurisdiction, (a) from which there is no right of appeal to a higher court or (b) with respect to which either (i) all applicable time periods during which an appeal may be made have expired or (ii) a period of 2 months has elapsed from the date on which the order which would otherwise be the subject of the appeal was issued and no appeal has been taken, whichever is the earliest to occur.

"**FPA**" means the Federal Power Act, as amended.

"**Fundamental Representations**" is defined in Section 7.1.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Gibbon Project**" is defined in the Recitals to this Agreement.

"**Gibbon Project Company**" is defined in the Recitals to this Agreement.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any state, county, city or other political subdivision, or similar governing entity, and including any governmental, quasi-governmental or non-governmental body administering, regulating or having general oversight over natural gas, electricity, power or other markets, in all cases with jurisdiction and authority over the matter or Person in question.

"**Hazardous Material**" means each substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any applicable Environmental Law and any petroleum or petroleum products that have been released into the environment in concentrations or locations for which remedial action is required under any applicable Environmental Law.

"**Held Project**" is defined in the Recitals to this Agreement.

"**Held Project Company**" is defined in the Recitals to this Agreement.

"**IE Report**" means a report prepared by the Independent Engineer setting forth calculations from the Independent Engineer related to the projected production scenarios for a Project, such report shall be reasonably acceptable to Seller and Buyer.

"**Imholte Project**" is defined in the Recitals to this Agreement.

"**Imholte Project Company**" is defined in the Recitals to this Agreement.

"**Indebtedness**" means any of the following: (a) any indebtedness for borrowed money; (b) any obligations evidenced by bonds, debentures, notes or other similar instruments; (c) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current liabilities arising in the ordinary course of business; (d) any obligations as lessee under capitalized leases; (e) any obligations, contingent or otherwise, under acceptance, letters of credit or similar facilities; (f) any obligations under any swap, hedge, or other derivative transaction, and (g) any guaranty of any obligations of any Person.

5

"***Indemnified Party***" means a Person entitled to be indemnified by another Person pursuant to the terms of this Agreement.

"***Indemnifying Party***" means a Person required to indemnify another Person pursuant to the terms of this Agreement.

"***Indemnity Amount Payable***" means any Indemnity Claim Amount which has become an Indemnity Amount Payable in accordance with Article VII, plus interest on such Indemnity Claim Amount at the Interest Rate from the date it becomes an Indemnity Amount Payable.

"***Indemnity Cap***" means in the case of any claim for indemnification from Seller pursuant to Section 7.2(a) for a breach of a representation or warranty relating to one or more specific Project Companies or Projects, an amount equal to the Project Price for the applicable Project Company(ies); provided, that in no event shall Seller's liability to Buyer for any claim for indemnification pursuant to Section 7.2(a) exceed an amount equal to the aggregate Project Price for all Project Companies.

"***Indemnity Claim***" means any claim made for indemnification in accordance with Article VII.

"***Indemnity Claim Amount***" means the amount of Losses claimed in any Notice of Claim, which amount, if not finally determined, may be a good faith estimate of the Losses that may be subject to indemnification pursuant to this Agreement.

"***Independent Engineer***" means Enertis.

"***Intellectual Property***" means the following intellectual property rights, both statutory and common law rights, if applicable: (a) copyrights, registrations and applications for registration thereof, (b) trademarks, service marks, trade names, slogans, domain names, logos, trade dress, and registrations and applications for registrations thereof, (c) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents, and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (d) trade secrets and confidential information, including ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable.

"***Interconnection Agreements***" is defined in Section 2.5(c).

"***Interconnection Reimbursement***" is defined in Section 2.2(a).

"***Interest Rate***" means a rate of interest per annum equal to 12%.

"***Knowledge***" means, when used in a particular representation in this Agreement with respect to Seller, the actual knowledge of the individuals listed on Schedule 1.1(a) that such individuals would have been expected to obtain upon reasonable inquiry.

6

"*Laws*" means all laws, statutes, rules, regulations, ordinances, orders, decrees, court decisions, and other pronouncements having the effect of law of any Governmental Authority with jurisdiction over the Seller, the Buyer, the Project Companies or the Projects, as applicable.

"*Leases*" means all leases, subleases, right to occupy or use and other arrangements with respect to real property, including, in each case, all amendments, modifications and supplements thereto and waivers and Consents thereunder.

"*Liability*" means any debts, liabilities, obligations, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"*Lien*" means any mortgage, pledge, deed of trust, assessment, security interest, charge, lien, option, warranty, purchase right or other agreement or arrangement that has the same or similar effect to the granting of security or of any similar right of any kind.

"*Loss*" means any and all judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, costs, charges, Taxes, obligations, demands, fees, interest, losses and expenses (including court costs and reasonable fees of attorneys, accountants and other experts in connection with any Third Party Claim). For all purposes in this Agreement, the term "Loss" does not include any Non-reimbursable Damages.

"*Material Adverse Effect*" means any event, circumstance, condition, effect or occurrence that, individually or in the aggregate, materially and adversely affects, or could reasonably be expected to materially and adversely affect, the business or condition (financial or otherwise) of Seller, any Project Company or any Project excluding the following to the extent it does not have a disproportional impact on Seller, any Project Company or any Project compared to other similar solar development companies and solar projects in the Minnesota region and does not cause material physical damage to or destruction of any Project:  (a) any change generally affecting the international, national or regional electric generating, transmission or distribution industry; (b) any change generally affecting the international, national or regional wholesale or retail markets for electric power; (c) any change generally affecting the solar-generated energy business generally; (d) any change in markets for commodities or supplies, including electric power, used in connection with any Project Company; (e)  any engagements of hostilities, acts of war or terrorist activities or changes imposed by a Governmental Authority associated with additional security; (f) any change in any Laws or industry standards; (g) any change in the financial condition or results of operation of Seller, a Project Company, or a Project caused by the transfer of the Membership Interests to Buyer from Seller; (h) any change in the financial, banking, or securities markets (including any suspension of trading in, or limitation on prices for, securities on the New York Stock Exchange, American Stock Exchange, or Nasdaq Stock Market) or any change in general national or regional economic or financial conditions; (i) any actions required to be taken pursuant to this Agreement; (j) the announcement or pendency of the transactions contemplated hereby; and (k) any labor strike, work stoppage, slowdown or lockout, request for representation, organizing campaign, or other labor dispute that is not specific to Seller or its Affiliates.  Any change in the business, financial condition or results of operations of Buyer or any of its Affiliates or any change in any business transaction between Buyer and any of its Affiliates will not be

7

considered when determining whether a "Material Adverse Effect" has occurred under this Agreement.

"***Material Contracts***" is defined in Section 4.13(a).

"***Membership Interests***" is defined in the Recitals to this Agreement.

"***MNCS***" is defined in the introduction to this Agreement.

"***Multiemployer Plan***" means any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA previously or currently covering employees.

"***Non-reimbursable Damages***" is defined in Section 7.4(g).

"***Notice of Claim***" is defined in Section 7.4(a).

"***Novel***" is defined in the introduction to this Agreement.

"***Novel Construction***" means Novel Energy Construction LLC, a Minnesota limited liability company.

"***Organizational Documents***" means, with respect to any Person, the articles or certificate of incorporation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, trust agreement, or other organizational documents of such Person, including (a) any shareholder, voting trust or similar Contract and (b) any that are required to be registered or kept in the place of incorporation, organization or formation of such Person and which establish the legal personality or governance of such Person.

"***Party***" or "***Parties***" means each of the Buyer and the Seller, and collectively, Buyer and Seller.

"***Permits***" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents and orders issued or granted by a Governmental Authority.

"***Permitted Lien***" means any of the following:  (a) any Lien for Taxes not yet due and payable or that may thereafter be paid or that is being contested in good faith by appropriate proceedings, <u>provided</u> that Seller has provided security therefor reasonably satisfactory to Buyer; (b) any Lien arising in the ordinary course of business by operation of Law with respect to a Liability that is not yet due or delinquent or that is being contested in good faith by Seller or a Project Company; (c) imperfections or irregularities of title and other Liens that would not, in the aggregate, reasonably be expected to materially detract from the value of the affected property or impair the use thereof for solar generation; (d) the terms and conditions of the Material Contracts and the Permits listed on Schedule 4.13; (e) restrictions on transfer of the Membership Interests of any Project Company under any applicable securities Law; and (f) the matters identified on Schedule 1.1(b).

8

"*Person*" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

"*Pre-Transfer Return*" is defined in <u>Section 6.3(a)</u>.

"*Project*" and "*Projects*" are defined in the Recitals to this Agreement.

"*Project Company*" and "*Project Companies*" are defined in the Recitals to this Agreement.

"*Project Company Consents*" is defined in <u>Section 4.3</u>.

"*Project Closing Payment*" means, with respect to each Project Company, an amount equal to the Project Price for such Project Company *minus* (a) for the first Project Closing Payment only, the $450,000 deposit previously paid by the Buyer, and (b) the amount of (i) the Interconnection Reimbursement paid by Buyer to Seller and (ii) any additional interconnection costs solely with respect to distribution, telemetry or the substation (or otherwise in connection with any updated interconnection packet prepared by Xcel Energy) that are received from Xcel Energy and paid by Buyer following the Execution Date, for such Project Company.

"*Project Closing Payment Statement*" is defined in <u>Section 2.2(c)</u>.

"*Project Financing Party*" is defined in <u>Section 6.7</u>.

"*Project Price*" means, with respect to each Project Company, an amount equal to $0.50 per watt (dc) of the final installed size of the Project owned by such Project Company as set forth in the IE Report, as increased or decreased by the PPA Adjustment, if applicable.

"*Project Substantial Completion*" shall have the meaning given to such term in the applicable EPC Agreement.

"*PPA Adjustment*" means for a Project, the amount calculated in accordance with <u>Exhibit B</u>.

"*PUHCA*" means the Public Utility Holding Company Act of 2005, as amended.

"*Real Property Interests*" means the Existing Leases, Existing Options and Existing Easements and Licenses, individually or collectively as the context requires.

"*Release*" means any release, spill, emission, leaking, pumping, injection, deposit, disposal or discharge of any Hazardous Materials into the environment.

"*Representatives*" means, as to any Person, its officers, directors, partners, members, and employees, accountants, financial advisors and consultants.

"*Schedules*" means the disclosure schedules for this Agreement.

"*Schneider Project*" is defined in the Recitals to this Agreement.

"*Schneider Project Company*" is defined in the Recitals to this Agreement.

"*Seller*" is defined in the introduction to this Agreement.

"*Seller Consents*" is defined in Section 3.3.

"*Seller Group*" is defined in Section 7.3.

"*Seller-Maintained Support Obligations*" is defined in Section 4.25(a).

"*Straddle Period Return*" is defined in Section 6.3(a).

"*Subscription Agreement*" means, with respect to each Project, each community solar subscription agreement, power purchase agreement and other electricity offtake arrangement for such Project and to which the Project Company owning such Project is a party, including, as of the date hereof, the agreements set forth in Exhibit C.

"*Subsidiary*" means, with respect to any Person of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of the Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership or association, or other business entity if such Person or Persons will be allocated a majority of limited liability company, partnership or association or other business entity gains or losses or will be or control any managing member or general partner of such limited liability company, partnership, association or other business entity.

"*Support Obligations*" means, collectively, each guaranty, letter of credit, indemnity, performance or surety bond or similar credit support arrangement issued by or for the account of Seller, a Project Company or any of their Affiliates, in relation to the Projects.

"*Tax*" or "*Taxes*" means any federal, state, local or foreign income, gross receipts, ad valorem, sales and use, employment, social security, disability, occupation, property, severance, value added, transfer, capital stock, excise, withholding, premium, occupation or other taxes, levies or other like assessments, customs, duties, imposts, charges surcharges or fees imposed by or on behalf of any Governmental Authority, including any interest, penalty thereon or addition thereto.

"*Tax Return*" means any report, form, claim for refund, return, statement or other information (including any amendments) required to be supplied to any Person with respect to Taxes, including information returns, any amendments thereof or schedule or attachment thereto.

"*Third Party Claim*" is defined in Section 7.5(a).

10

"***Transfer Taxes***" means all transfer, sales, use, goods and services, value added, documentary, stamp duty, gross receipts, excise, transfer and conveyance Taxes and other similar Taxes, duties, fees or charges.

"***Updating Information***" is defined in <u>Section 9.4(c)</u>.

Section 1.2     <u>Rules of Construction</u>.

(a)     All article, section, subsection, schedule and exhibit references used in this Agreement are to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified. The exhibits and schedules attached to this Agreement constitute a part of this Agreement and are incorporated in this Agreement for all purposes.

(b)     If a term is defined as one part of speech (such as a noun), it has a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender will include the feminine and neutral genders and vice versa. The words "includes" or "including" mean "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not any particular Section or Article in which such words appear.  The term "will" and "shall" have the same meaning. The conjunction "or" is to be deemed to be exclusive unless the context indicates otherwise.

(c)     Any reference to a Law includes any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, in each case as of the date of this Agreement.

(d)     Any reference to a Contract will be to that Contract as it may be amended, modified, supplemented or restated and in effect as of the date of this Agreement.

(e)     Currency amounts referenced in this Agreement are in U.S. Dollars.

(f)     Whenever this Agreement refers to a number of days, such number refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day. For determining any period of time, "from" means "including and after," "to" means "to but excluding" and "through" means "through and including."

(g)     Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement will not be applicable to the construction or interpretation of this Agreement.

(h)     All accounting terms used herein and not expressly defined herein will have the respective meanings given such terms under GAAP.

11

(i)      Whenever this Agreement provides for the consent of another Party for purposes of this Agreement, unless otherwise expressly provided herein, such consent may not be unreasonably withheld, delayed or conditioned.

(j)      Whenever this Agreement states that any document has been "made available," unless otherwise expressly provided herein, that means the document was posted in the Data Site or otherwise delivered to Buyer or any of its Affiliates.

## ARTICLE II

## SALE AND PURCHASE OF MEMBERSHIP INTERESTS

Section 2.1      <u>Transfer of Membership Interests</u>. On the terms and subject to the conditions set forth in this Agreement, including <u>Section 2.4</u>, upon the Execution Date, Seller will assign, transfer and deliver to Buyer, and Buyer agrees to accept from Seller, 100% of the Membership Interests in the Project Companies by mutual execution and delivery of Assignment Agreements for each Project Company.

Section 2.2      <u>Project Price and Project Closing Payment Allocation</u>.

(a)      <u>Interconnection Reimbursement</u>.  On the Execution Date, Buyer shall pay to Seller the amounts set forth on <u>Exhibit D</u> for the Projects, which amounts which have been paid, posted or abated by Seller on behalf of the applicable Project Company in connection with the applicable Interconnection Agreement and all related interconnection expenses for the applicable Projects prior to the Execution Date for such Project (each, an "***Interconnection Reimbursement***").  Such Interconnection Reimbursement payment shall be made by Buyer to Seller by wiring the applicable amount in immediately available funds to the account, or accounts, specified by Seller in writing at least two (2) Business Days prior to the Execution Date.  The Parties hereby agree that the Interconnection Reimbursements shall constitute a portion of each Project Closing Payment for Tax purposes.

(b)      On the terms and subject to the conditions set forth in this Agreement, including <u>Section 2.4</u> and <u>Section 2.5</u>, Buyer shall pay Seller for the Membership Interests in the applicable Project Company in separate payments, as set forth in this <u>Section 2.2</u>, in the aggregate equal to the Project Closing Payment for such Project Company.  Each separate portion of such Project Closing Payment shall be made by Buyer to Seller by wiring the applicable amount in immediately available funds to the account, or accounts, specified by Seller in writing to Buyer.  The Project Closing Payment for such Project Company shall be payable by Buyer to Seller in separate installments following the achievement and satisfaction (or waiver by the applicable Party or Parties) of the conditions precedent to each Closing Date, and in the manner set forth below:

(i)      the first installment of $0.10 per watt (dc) *multiplied by* (A) 4.63 $MW_{DC}$ for the Gibbon Project Company, (B) 5 $MW_{DC}$ for the Held Project Company, (C) 1.498 $MW_{DC}$ for the Imholte Project Company and (D) 7 $MW_{DC}$ for

the Schneider Project Company, shall be due and payable on the Closing Date for such Project Company ("**Closing Date Payment**");

(ii)  the second installment of the remaining balance of the Project Closing Payment (the "**Substantial Completion Payment**"), shall be due and payable within five (5) Business Days following date the Project owned by such Project Company achieves Project Substantial Completion.

(c)  No later than ten (10) Business Days prior to each Closing Date, Buyer shall provide Seller with a written statement setting forth Buyer's calculation of the Project Closing Payment for the applicable Project Company, including a calculation of the applicable PPA Adjustment based upon the IE Report delivered on or prior to the applicable Closing Date (a "**Project Closing Payment Statement**").  Seller shall notify Buyer in writing within three (3) Business Days of Seller's receipt of a Project Closing Payment Statement if Seller disputes or disagrees with any aspect of Buyer's calculation of the applicable Project Closing Payment, and Buyer and Seller shall work together in good faith until the applicable Closing Date to resolve such dispute or disagreement and Buyer shall thereafter (no later than the Business Day prior to the Closing Date) deliver to Seller a revised Project Closing Payment Statement reflecting such resolution, which shall constitute the final Project Closing Payment Statement for purposes of determining the Project Closing Payment for the applicable Project Company.  If Seller and Buyer are unable to resolve any dispute within five (5) days, Seller and Buyer shall retain a jointly-selected accountant to resolve the disputed items on an expedited basis.  Upon resolution of the disputed items, the Project Closing Payment shall be adjusted to reflect such resolution.  In the event Seller does not notify Buyer in writing of any dispute or disagreement within three (3) Business Days of Seller's receipt of the initial Project Closing Payment Statement from Buyer, such Project Closing Payment Statement shall be the final Project Closing Payment Statement for purposes of determining the Project Closing Payment for the applicable Project Company.  For the avoidance of doubt, the PPA Adjustment shall only affect, for payment purposes, the Substantial Completion Payment and shall not affect the applicable Closing Date Payment, which is fixed and payable on the applicable Closing Date.

Notwithstanding anything in this Agreement to the contrary, the Parties hereby agree that the IE Report delivered on or prior to the Closing Date and forming the basis of the PPA Adjustment referenced in <u>clause (c)</u> above shall only be run for purposes of determining the PPA Adjustment and the effect on the applicable Project Closing Payment prior to Closing and shall not thereafter be rerun (and no additional PPA Adjustment shall be made) unless the design and layout of the Project on the date such Project achieves Project Substantial Completion are materially different than those contemplated by such IE Report delivered on or prior to the Closing Date.

Section 2.3   Closing Date.  Subject to the terms and conditions of this Agreement, the payment of the Closing Date Payment with respect to a Project Company will take place on the date on which all conditions for such Project Company in Section 2.5 have been satisfied or waived in writing by the Party entitled to the benefit of such conditions, as applicable, or at such other place and time as Seller and Buyer may agree in writing (either such date the "**Closing Date**").

13

Section 2.4    Conditions Precedent to the Obligations of the Parties on the Execution Date. The obligation of each Party to consummate the execution of this Agreement is subject to the satisfaction, on or before the Execution Date, of each of the following conditions (any or all of which may be waived in whole or in part in writing by the Party entitled to the benefit of such conditions, as applicable):

(a)    Representations and Warranties.  Each of the representations and warranties of (i) Seller in Articles III and IV, and (ii) Buyer in Article V, in each case, shall be true and correct in all material respects (other than representations and warranties that are qualified by materiality or Material Adverse Effect, in which case such representations and warranties shall be true and correct in all respects, as so qualified) as of the Execution Date.

(b)    Assignment Agreement.  Each Party shall have delivered to the other Party a duly executed counterpart of the Assignment Agreement for such Project Company.

(c)    Consents.  All Seller Consents, Project Company Consents and Buyer Consents shall have been obtained or given and be in full force and effect.

(d)    Buyer Financial Statements.  Buyer shall have delivered to Seller (i) true, complete and correct copies of the unaudited balance sheet of the Buyer as of December 31, 2017 (and, if audited financial statements are available to Buyer as of the Execution Date, year-end audited financial statements) and (ii) as of the Execution Date, true complete and correct copies of the unaudited balance sheet, statement of operations for the period then ended and cash flows for the period then ended of the Buyer, in each case for the then-most recent calendar quarter.

(e)    Good Standing Certificate.  (i) Buyer shall have delivered to Seller certificate of good standing of Buyer and (ii) Seller shall have delivered to Buyer a certificate of good standing of each Seller and each Project Company, in each case, issued as of a recent date within fifteen (15) days prior to the Execution Date.

(f)    Secretary's Certificate.  Each Party shall have delivered to the other Party a secretary's certificate of such Party certifying as to resolutions authorizing the transactions contemplated in this Agreement and the Ancillary Agreements to which it is a party and certifying as to the incumbency and authorization of the officers executing documents in connection therewith.

(g)    Resignations.  Seller shall have delivered to Buyer written resignations of all managers, members of the board of directors or governors or other officers of each Project Company.

(h)    Non-Foreign Certificate.  The applicable Seller shall have delivered to Buyer a certification of non-foreign status in the form prescribed by Treasury Regulation Section 1.1445-2(b) with respect to such Seller.

Section 2.5    Conditions Precedent to the Obligations of the Parties on a Closing Date. The obligation of Buyer to make the Closing Date Payment with respect to a Project Company is subject to the satisfaction, on or before the applicable Closing Date, of each of the following conditions (any or all of which may be waived in whole or in part in writing by the Party entitled to the benefit of such conditions, as applicable):

(a)    Notice of Subscription Agreements.  Seller shall have delivered to Buyer a written certification that the Project owned by such Project Company is fully subscribed, with commercial or industrial subscribers only, and the applicable Subscription Agreements for such Project shall be reasonably acceptable to Buyer.

(b)    Conditional Use Permit.  Seller shall have delivered to Buyer evidence that the Project owned by such Project Company has obtained a conditional use permit or other equivalent documentation for the applicable Project site, if required by a Governmental Authority, which shall be reasonably acceptable to Buyer.

(c)    Interconnection Agreements.  Seller shall have delivered to Buyer a copy of the fully executed interconnection agreement for the Project owned by such Project Company (each, an "***Interconnection Agreement***"), which shall be reasonably acceptable to Buyer.

(d)    EPC Agreement.  Novel Construction and such Project Company shall have entered into an EPC Agreement for the Project owned by such Project Company.

(e)    Projected Project Production.  Buyer and Seller shall have received a copy of the IE Report, in form and substance reasonably acceptable to each of Buyer and Seller.

(f)    Buyer Construction Financing.   Buyer shall have delivered to Seller evidence that Buyer has secured financing for construction of the Project, in form and substance satisfactory to Seller.

(g)     Site Control. Executed copies of a recorded memorandum of lease, and amendments if required, for each Existing Lease of real property to which the applicable Project Company is a party or by which the applicable Project is bound.

(h)    Access. Evidence of confirmation of required access (including easements across adjacent properties) to interconnect the applicable Project.

(i)    Agricultural Contracts. Verification of any existing agricultural contracts affecting the applicable Project site and confirmation that such contracts do not preclude and will not delay or hinder the development, construction, ownership or operation of the applicable Project.

(j)    Phase I Report Reliance Letter.  Seller shall have delivered to Buyer a reliance letter for the Phase I environmental report for each Project, in form and substance reasonably satisfactory to Buyer.

(k)     ALTA Survey.  Seller shall have delivered to Buyer an ALTA/NSPS Land Title Survey for the applicable Project site, including access areas and other easements, reflecting the title commitment, including all customary title exceptions, in form and substance reasonably acceptable to Buyer.

(l)     Title Commitment.  Seller shall have delivered to Buyer an irrevocable title commitment from a title company reasonably satisfactory to Buyer to issue a title policy regarding the applicable Project site, in form and substance reasonably acceptable to Buyer.

(m)     SNDA.  For the Held Project Company only, Seller shall provide to Buyer an executed Subordination, Non-Disturbance and Attornment Agreement from the mortgagee of the Held Project site to the Held Project Company, in form and substance reasonably acceptable to Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Each Seller hereby, jointly and severally, represents and warrants to Buyer as of the Execution Date as follows:

Section 3.1     Organization. Seller is a limited liability company validly existing and in good standing under the Laws of the State of Minnesota.  Seller is duly qualified or licensed to do business in each other jurisdiction where the actions to be performed by it under this Agreement make such qualification or licensing necessary, except in those jurisdictions where the failure to be so qualified or licensed would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement.

Section 3.2     Authority; Enforceability. Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and the Ancillary Agreements to which Seller is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which Seller is a party, and the performance by Seller of its obligations hereunder and thereunder, have been duly and validly authorized by all necessary action on behalf of Seller. This Agreement has been, and each Ancillary Agreement to which Seller is a party has been, duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles.

Section 3.3     Consents and Approvals. Schedule 3.3 sets forth a true, correct and complete list of all material Consents required to be obtained from, or made to, third parties or Governmental Authorities by Seller in order to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the purchase and sale of the Membership Interests (the "*Seller Consents*").  All Seller Consents required prior to the

16

transfer of the Membership Interests in the Project Companies to Buyer have been obtained by Seller as of the Execution Date.

Section 3.4    No Conflicts; Consents and Approvals. The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which Seller is a party and the performance by Seller of its obligations under this Agreement and the Ancillary Agreements to which Seller is a party do not:

(a)    result in a violation of or a breach of any of the terms, conditions or provisions of the Organizational Documents of Seller;

(b)    assuming each of the Seller Consents is obtained or made, as applicable, result in a violation or Default under any Contract to which Seller is a party, except for any such violations or Defaults which would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Seller is or will be a party; and

(c)    assuming each of the Seller Consents is obtained or made, as applicable, (i) result in a violation or breach of any term or provision of any Law applicable to Seller, except as would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Seller is a party or (ii) require any Consent of any Governmental Authority under any applicable Law, other than such Consents which, if not made or obtained, would not have a Material Adverse Effect on Seller's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Seller is a party.

Section 3.5    Legal Proceedings. Seller has not been served with notice of any Claim, and to Seller's Knowledge no Claim is pending and none is threatened in writing against Seller, which seeks a writ, judgment, order, injunction or decree restraining, enjoining or otherwise prohibiting or making illegal the execution or delivery of, the performance of Seller's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Seller is a party.  Seller is not a party to, subject to or bound by any agreement or any judgment, order, writ, prohibition, injunction or decree of any court or other Governmental Authority that would prevent the execution or delivery of, the performance of Seller's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Seller is a party.

Section 3.6    Brokers. Seller does not have any Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer or the Project Companies could become liable or obligated.

Section 3.7    Books and Records; Financial Condition.  Seller has made available to Buyer for inspection true and correct copies of all of the books and records necessary to the business of each Project Company.

Section 3.8    Compliance with Law.  Seller is not in violation of or in default under any Law applicable to Seller or its Assets the effect of which, in the aggregate, would reasonably be expected to hinder, prevent or delay Seller from performing its obligations under this Agreement or any Ancillary Agreements to which Seller is a party.

17

Section 3.9    Disclosure.  No representation or warranty of Seller in this Agreement or in any certificate to be delivered by Seller as required hereunder and no statement in the Schedules, taken as a whole, contains any untrue statement of material fact or omits to state a material fact necessary to make such statements herein or therein, in light of the circumstances under which they were made, not misleading.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES REGARDING THE PROJECT COMPANIES

Each Seller hereby, jointly and severally, represents and warrants to Buyer as of the Execution Date with respect to each of the Project Companies as follows:

Section 4.1    Organization.

(a)    The Project Company (i) is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Minnesota and (ii) has all requisite organizational power and authority to carry on its respective business as it is currently conducted and to own, lease and operate its properties where such properties are now owned, leased or operated.

(b)    The Project Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensure necessary.

Section 4.2    Authority; Enforceability. The Property Company has all requisite limited liability company power and authority to execute and deliver each Ancillary Agreement to which it is a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby.  The execution and delivery by the Project Company of each Ancillary Agreement to which it is a party, and the performance of the Project Company of its obligations thereunder, have been duly and validly authorized by all necessary action on behalf of such Project Company.  Each Ancillary Agreement to which the Project Company is a party has been duly and validly executed and delivered by such Project Company and constitutes the valid and binding obligation of such Project Company enforceable against such Project Company in accordance with its terms, except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles.

Section 4.3    Consents and Approvals.  Schedule 4.3 sets forth a true, correct and complete list of all material Consents required to be obtained from, or made to, third parties or Governmental Authorities by the Project Company in order to authorize the execution and delivery of this Agreement and the Ancillary Agreements and the purchase and sale of the Membership Interests (the "**Project Company Consents**"). All Project Company Consents required prior to the transfer of the Membership Interests in the Project Companies to Buyer have been obtained by the Project Companies as of the Execution Date.

18

Section 4.4    No Conflicts; Consents and Approvals. The execution and delivery by the Project Company of the Ancillary Agreements to which it is a party, the performance by such Project Company of its obligations thereunder and the consummation of the transactions contemplated thereby and the taking of any action contemplated to be taken by such Project Company thereunder does not:

(a)    result in a violation or breach of any of the terms, conditions or provisions of the Organizational Documents of the Project Company;

(b)    assuming each of the Project Company Consents is obtained or made, as applicable, result in a violation or Default under any Material Contract, Real Property Interest or Permit;

(c)    assuming each of the Project Company Consents is obtained or made, as applicable, (i) result in a violation or breach of any term or provision of any Law applicable to the Project Company or any of its material Assets; (ii) require the Consent of any Governmental Authority under any applicable Law other than Permits required for the Business, which are separately addressed in Sections 4.16 and 4.17; or (iii) result in the imposition or creation of any Lien on any Asset of the Project Company or on the Membership Interests.

Section 4.5    Ownership of Membership Interests of Project Companies.

(a)    Seller is the direct owner, holder of record and beneficial owner of 100% of the Membership Interests of the Project Company free and clear of all Liens, other than those arising pursuant to or as described in this Agreement.

(b)    The Membership Interests constitute all of the Equity Interests of the Project Company.

(c)    The Membership Interests are duly authorized and validly issued.

(d)    No membership interest certificates or similar documents or instruments have been issued by any Project Company evidencing the Membership Interests.

(e)    Neither the Seller, the Project Company or any of their Affiliates has granted to any Person any agreement or option, or any right or privilege capable of becoming an agreement or option, for the purchase, subscription, allotment or issue of any Equity Interest in the Project Company.

Section 4.6    Project Company Assets.  The Project Company has good and valid title to, or rights by Contract or other agreement to use, all of its material Assets free and clear of all Liens (except for Permitted Liens).

Section 4.7    Bank Accounts. Schedule 4.7 sets forth a list of the names and locations of banks, trust companies and other financial institutions at which the Project Company maintains accounts of any nature or safe deposit boxes and the names of all persons authorized to draw thereon, make withdrawals therefrom or have access thereto.

19

Section 4.8    Subsidiaries. The Project Company does not have any subsidiaries or own any Equity Interest in any Person.

Section 4.9    Legal Proceedings. Except as set forth on Schedule 4.9, no Claim is pending against the Project Company, and to Seller's Knowledge, the Project Company has not been threatened with being made a party to any action, suit or proceeding that, in either case, could reasonably be expected to result in a Material Adverse Effect.

Section 4.10    Compliance with Laws. Except as set forth on Schedule 4.10, the Project Company is currently in compliance in all material respects with all Laws applicable to its operations or Assets. The representations and warranties contained in this Section 4.10 do not apply to Tax matters (which are governed exclusively by Section 4.11), environmental matters (which are governed exclusively by Section 4.17) or intellectual property matters (which are governed exclusively by Section 4.18).

Section 4.11    Tax Matters.  Except as set forth on Schedule 4.11:

(a)    The Project Company has filed all material Tax Returns, if any, required to be filed with Tax authorities, and all Taxes required to be paid or withheld by such Project Company have been paid or withheld as required by Law.

(b)    Seller is not currently the beneficiary of or subject to any extension of time within which to file any Tax Returns or for the assessment or collection of any Tax with respect to the Project Company or the Project owned by such Project Company.

(c)    Seller has made available to Buyer true and correct copies of all Tax Returns filed by or on behalf of the Project Company, and copies of all material correspondence between any Governmental Authority and such Project Company, Seller, or their respective Affiliates regarding any Tax rates or any Tax abatement or limitation arrangements with respect to such Project Company.

(d)    The Project Company is not a party to a tax allocation or tax sharing agreement or tax indemnity or similar arrangement.

(e)    The Project has not benefited from or applied for, any government grants, tax-exempt financing, subsidized energy financing or other federal tax credits within the meaning of Section 45(b)(3) of the Code.

Section 4.12    Regulatory Status. The Project Company is not subject to regulation under the PUHCA, the FPA or any state law regulating energy utilities, in each case, taking into account the current activities by the Project Company.

Section 4.13    Material Contracts.

(a)    Part I of Schedule 4.13 sets forth a true, correct and complete list of the following Contracts to which the Project Company is a party or by which its Assets are

20

bound, other than those Contracts set forth on Part II of Schedule 4.13 (the "***Material Contracts***"):

(i)     all Subscription Agreements and contracts for capacity or ancillary services, electricity transmission agreements and electricity interconnection agreements;

(ii)     operating and maintenance agreements, engineering agreements, construction agreements, balance of plant agreements, warranty agreements or service agreements;

(iii)     any Contract under which the Project Company is obligated to sell or lease any of its respective real or personal property;

(iv)     any Contract containing a covenant not to compete or not to solicit applicable to the Project Company or the Project owned by such Project Company or that grants any exclusive right relating to such Project;

(v)     any Contract under which the Project Company has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) any Indebtedness, including for the Indebtedness of any other Person;

(vi)     any Contract that provides for the Project Company to provide any surety, pledge, guarantee, letter of credit or other credit support;

(vii)     any Contract that grants or creates any Lien (other than Permitted Liens) upon any Assets of the Project Company

(viii)     any Contract between or among Seller or any of Seller's Affiliates or Representatives, on the one hand, and the Project Company, on the other hand;

(ix)     any Contract establishing any joint venture, strategic alliance, partnership or other collaboration;

(x)     any Contracts for a commodity, currency or interest rate hedge, exchange or similar instrument, including any exchange traded, over-the-counter or other swap, cap, floor, collar, futures contract, forward contract, option or other derivative financial instrument;

(xi)     any Contract requiring a capital expenditure or known payment by the Project Company or any other Person on behalf of or for the benefit of the Project Company in excess of an aggregate of $75,000 or more during a calendar year (other than those Contracts set forth in the foregoing Sections 4.13(a)(i) through (x); and

(xii)     any amendment relating to any of the foregoing.

(b)     Seller has made available to Buyer true, correct and complete copies of all Material Contracts.

(c)     Each of the Material Contracts is in full force and effect in all material respects and constitutes a valid and binding obligation of the Project Company that is a party thereto and, to Seller's Knowledge, the other parties thereto, except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally, or by general equitable principles.  No Project Company has assigned, conveyed or transferred any interest in any Material Contract.

(d)     The Project Company is not in breach or default, in any material respect, under any Material Contract. None of Seller or the Project Company has received written notice from a counterparty to any Material Contract (i) alleging any breach or default by such Project Company under such Material Contract; (ii) alleging termination, rescission, invalidity or unenforceability of such Material Contract; or (iii) of any intention to modify, or to exercise any right or remedy exercisable on breach or default under, such Material Contract, in each case, except for any which has been cured or waived.

(e)     Part II of Schedule 4.13 sets forth a list of Contracts to which a Project Company's Assets are bound and which will be transferred to the applicable Project Company prior to the Closing Date.

Section 4.14     Liabilities.  Except for the Ancillary Agreements, the Project Company is not a party to or otherwise bound by any Contract with Seller or any of its Affiliates or has any outstanding Indebtedness or Liability to Seller or any of its Affiliates.

Section 4.15     Real Property.

(a)     Schedule 4.15 sets forth a list of the following Real Property Interests:

(i)     except for the real property agreements set forth on Part II of Schedule 4.13, all Leases of real property to which the Project Company is a party or by which the Project owned by such Project Company is bound, including solar leases under which such Project Company is lessee for purposes of creating a leasehold interest, electrical transmission line easement or access easement or right-of-way in favor of such Project Company (collectively, the "***Existing Leases***");

(ii)     all options for real property interests (including options to acquire real property in fee, leasehold or easement estates) to which the Project Company is a party or by which the Project owned by such Project Company is bound (collectively, the "***Existing Options***"); and

(iii)     all separate easements and licenses other than the Existing Leases and Existing Options to which the Project Company is a party or by which the Project owned by such Project Company is bound (collectively, the "***Existing Easements and Licenses***").

22

(b)     Seller has made available to Buyer copies of all the Existing Leases, Existing Options, and Existing Easements and Licenses, and those copies are complete and accurate in all material respects.  Except for the Real Property Interests set forth in <u>Schedule 4.15</u>, the Project Company does not have any fee, leasehold or other interest (including any easement, license or similar interest) in any real property.

(c)     The Project Company is not in breach or default of any material obligation under any Real Property Interests.  None of Seller or the Project Company has received written notice from a counterparty to any Contract relating to any Real Property Interest (i) alleging any breach or default by such Project Company under such Contract; (ii) alleging termination, rescission, invalidity or unenforceability of such Contract or (iii) of any intention to modify, or to exercise any right or remedy exercisable on breach or default under, such Contract, in each case, except for any which has been cured or waived.

(d)     The Project Company has not assigned, transferred, conveyed, mortgaged, deeded in trust, granted any option with respect to, or encumbered any of the Real Property Interests and all such Real Property Interests are free and clear of all Liens other than Permitted Liens.

Section 4.16    <u>Permits</u>.

(a)     <u>Part I</u> of <u>Schedule 4.16</u> sets forth all (i) Permits held by any Project Company in connection with its Project and (ii) applications for Permits not yet issued which have been filed by any Project Company in connection with its Project.  Except as set forth on <u>Part I</u> of <u>Schedule 4.16</u>, the applicable Project Company is in compliance in all material respects with the Permits set forth on <u>Part I</u> of <u>Schedule 4.16</u> that have been issued to the applicable Project Company, and such Permits are validly issued, final and in full force and effect and not subject to any current legal proceeding, any unsatisfied condition to their effectiveness or any appeal period that has not expired.

(b)     <u>Part II</u> of <u>Schedule 4.16</u> sets forth all Permits which will be required (other than Permits listed in <u>Part I</u> of <u>Schedule 4.16</u>) in connection with the Project based on current plans and designs for the Projects.

The representations and warranties in this <u>Section 4.16</u> are Seller's sole representations and warranties regarding Permits except for Permits required by Environmental Laws (which are governed exclusively by <u>Section 4.17</u>).

Section 4.17    <u>Environmental Matters</u>.

(a)     Except as set forth on <u>Part I</u> of <u>Schedule 4.17(a)</u>:

(i)     the Project Companies are in compliance in all material respects with all applicable Environmental Laws and Permits obtained by the Project Companies pursuant to Environmental Laws;

(ii)     except as set forth on <u>Part II</u> of <u>Schedule 4.17(a)</u>, the Project Companies have obtained, maintained and complied in all material respects with

23

all Permits necessary under any applicable Environmental Law for the Business as currently conducted, each of which Permits is set forth on <u>Part II</u> of <u>Schedule 4.17(a)</u>, and such Permits are validly issued, final and in full force and effect and not subject to any current legal proceeding, any unsatisfied condition to their effectiveness or any appeal period that has not expired;

(iii)   the Project Company has not been served with written notice of any Environmental Claims that are currently outstanding, and, to Seller's Knowledge, no Environmental Claims are pending or threatened against such Project Company by any Governmental Authority under any Environmental Laws; and

(iv)   no Project Company has handled or stored any Hazardous Material in violation of any Environmental Law, and there have been no Releases of Hazardous Materials to or from any Project or Project Site in violation of Environmental Laws that would reasonably be expected to result in a material Liability for investigation, removal or remediation of Hazardous Materials.

(b)   <u>Schedule 4.17(b)</u> contains a true and complete list of all studies and reports relating to Environmental Laws or Hazardous Materials with respect to the Project Company's Project, and a true and correct copy of each such report, including any amendments thereto, has been made available to Buyer.

The representations and warranties set forth in this <u>Section 4.17</u> are Seller's sole and exclusive representations and warranties concerning environmental matters, including Environmental Laws, Environmental Claims and Permits.

Section 4.18   <u>Intellectual Property</u>.

(a)   The Project Company owns, or has the license or right to use for the Business, all material Intellectual Property currently used in the Business.

(b)   To Seller's Knowledge, as of the date of this Agreement, the Project Company has not received from any third party a claim in writing that it is infringing the Intellectual Property of such third party.

The representations and warranties set forth in this <u>Section 4.18</u> are Seller's sole and exclusive representations and warranties concerning Intellectual Property matters.

Section 4.19   <u>Brokers</u>. The Project Company has no Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

Section 4.20   <u>Employees and Labor Matters</u>. The Project Company does not have and has never had any employees.

Section 4.21   <u>Employee Benefits</u>. The Project Company has not sponsored, maintained or contributed to any Benefit Plan, any Multiemployer Plan, or any Benefit Plan maintained by any ERISA Affiliate.

24

Section 4.22    Title; Condition. The Project Company is the sole owner of the Project owned by it and all of such Project Company's Assets, free and clear of all Liens other than Permitted Liens.  All of the Project Company's Assets are in good repair and operating condition subject to ordinary wear and tear and are suitable for the purposes for which they are to be deployed.

Section 4.23    Bankruptcy. No event of Bankruptcy has occurred with respect to the Project Company.

Section 4.24    Casualty. There is no Casualty Defect (regardless of whether covered by insurance) in existence with respect to the Project owned by the Project Company.

Section 4.25    Support Obligations.

(a)    Schedule 4.25(a) sets forth a true, correct and complete list of all Support Obligations maintained or provided by Seller or any of its Affiliates (other than the Project Companies) for the benefit of the Project Company and the Project owned by such Project Company (the "*Seller-Maintained Support Obligations*").

(b)    Schedule 4.25(b) sets forth a true, correct and complete list of all Support Obligations maintained or provided by the Project Company for its own benefit or the benefit of the Project owned by such Project Company.

Section 4.26    No Other Representations and Warranties.  Except for the representations and warranties contained in Article III and Article IV (including the related portions of the Schedules), none of Seller, any Project Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, or a Project Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Project Companies or any Projects furnished or made available to Buyer and its Representatives, any information, documents or material made available to Buyer in the Data Site, in management presentations or in any other form or manner in expectation of the transactions or as to the future revenue, profitability or success of the Project Companies or the Projects, or any other representation or warranty of any kind, express or implied, arising under any Law.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

Section 5.1    Organization. Buyer is a limited liability company, validly existing and in good standing under the Laws of the State of North Carolina.  Buyer is duly qualified or licensed to do business in each other jurisdiction where the actions to be performed by it under this Agreement makes such qualification or licensing necessary, except in those jurisdictions where the failure to be so qualified or licensed would not have a material adverse effect on its ability to perform such actions.

25

Section 5.2    <u>Authority; Enforceability</u>. Buyer has all requisite power and authority to enter into this Agreement and the Ancillary Agreements to which Buyer is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party have been duly and validly authorized by all necessary action on behalf of Buyer. This Agreement and each Ancillary Agreement to which Buyer is a party has been duly and validly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms except as the same may be limited by Bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to or affecting the rights of creditors generally or by general equitable principles.

Section 5.3    <u>Consents and Approvals</u>. Schedule 5.3 sets forth a true, correct and complete list of all material Consents required to be obtained from, or made to, third parties or Governmental Authorities by Buyer in connection with the execution and delivery of this Agreement and the Ancillary Agreements to which Buyer is a party and the purchase and sale of the Membership Interests (the "***Buyer Consents***").  All Buyer Consents required prior to the transfer of the Membership Interests in the Project Companies from Seller have been obtained by Buyer as of the Execution Date.

Section 5.4    <u>No Conflicts</u>. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer and the performance by Buyer of its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party do not:

(a)    result in a violation of or a breach of any of the terms, conditions or provisions of the Organizational Documents of Buyer;

(b)    assuming each of the Buyer Consents is obtained or made, as applicable, result in a violation or Default under any Contract to which Buyer is a party, except for any such violation or Default which would not have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Buyer is or will be a party; or

(c)    assuming each of the Buyer Consents is obtained or made, as applicable, (i) result in a violation or breach of any term or provision of any Law applicable to Buyer, except as would not have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Buyer is a party or (ii) require any Consent of any Governmental Authority under any applicable Law, other than such Consents which, if not made or obtained, would not have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any Ancillary Agreements to which Buyer is a party.

Section 5.5    <u>Legal Proceedings</u>. Buyer has not been served with notice of any Claim, and to Buyer's knowledge no Claim is pending and none is threatened in writing against Buyer, which seeks a writ, judgment, order, injunction or decree restraining, enjoining or otherwise prohibiting or making illegal the execution or delivery of, the performance of Buyer's obligations

under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Buyer is a party. Buyer is not a party to, subject to or bound by any agreement or any judgment, order, writ, prohibition, injunction or decree of any court or other Governmental Authority that would prevent the execution or delivery of, the performance of Buyer's obligations under, or the transactions contemplated by this Agreement or any Ancillary Agreements to which Buyer is a party.

Section 5.6    Compliance with Laws. Buyer is not in violation of or in default under any Law applicable to Buyer or its Assets the effect of which, in the aggregate, would reasonably be expected to hinder, prevent or delay Buyer from performing its obligations under this Agreement or any Ancillary Agreements to which Buyer is a party.

Section 5.7    Brokers. Buyer does not have any Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller or a Project Company could become liable or obligated.

Section 5.8    Securities Law Matters. Buyer acknowledges that the Membership Interests are not registered pursuant to the 1933 Act and that none of the Membership Interests may be transferred, except pursuant to an applicable exception under the 1933 Act. Buyer is an "accredited investor" as defined under Rule 501 promulgated under the 1933 Act.

Section 5.9    Financial Resources. Buyer has or will have available funds sufficient to pay the amounts payable by Buyer to Seller pursuant to Section 2.2(a) at the time such payments are due. Buyer knows of no circumstance or condition that could reasonably be expected to prevent the availability of such funds as of each Closing Date.

## ARTICLE VI

## COVENANTS

Section 6.1    EPC Agreement and Closing Date. The Parties will use commercially reasonable efforts to (a) execute an EPC Agreement for each Project Company within thirty (30) days following the Execution Date and (b) satisfy each condition to the Closing Date in Section 2.5 for each Project Company within sixty (60) days following the Execution Date.

Section 6.2    Transfer Taxes. Buyer and Seller shall each pay one-half (50%) of any Transfer Taxes imposed on Buyer, Seller or the Project Companies in connection with the sale of the Membership Interests. Accordingly, if either Party (or its Affiliates) is required by Law to pay any such Transfer Taxes, the other Party will promptly reimburse such Party for one-half (50%) of such Transfer Taxes. The Party required by Law to file a Tax Return relating to Transfer Taxes in connection with the sale will do so within the time period required by Law and provide the other Party with a copy of the return, but will alert the other Party of the need to file such a return first in writing in case there is any disagreement about whether Transfer Taxes are owed and work in good faith to resolve any disagreement.

Section 6.3    Tax Matters. Except as provided in Section 6.2 relating to Transfer Taxes:

(a)     Seller will cause any Tax Return for an event or period ending before the Execution Date (a "**Pre-Transfer Return**") to be prepared in a manner consistent with practices followed in prior tax periods, except as required by changes in fact. The Parties will work in good faith to resolve any disagreements and, thereafter Seller will reimburse Buyer for the amount of Tax shown on the Tax Return as required by Section 6.3(b), and Buyer will file the Tax Return and provide Seller with a copy of the final Tax Return as filed.  Buyer will cause any Tax Return for a period that begins on the applicable Execution Date (a "**Straddle Period Return**") to be prepared in a manner consistent with practices followed in prior tax periods, except as required by Law or changes in fact, and deliver the draft Tax Return to Seller at least 15 days before the due date (including extensions) for Seller's review and comment. The Parties will work in good faith to resolve any disagreements and, thereafter, Seller will reimburse Buyer for the pre-Transfer share of Tax shown on the Tax Return as required by Section 6.3(b), and Buyer will file the Tax Return and provide Seller with a copy of the final Tax Return as filed.

(b)     Seller will be responsible for and indemnify Buyer against, and be entitled to all refunds of or credits for, any Tax that was paid or should have been paid on a Pre-Transfer Return or that was paid or should have been paid on a Straddle Period Return and relates to the period prior to the applicable Execution Date. Seller will not be liable or indemnify Buyer for any Taxes (i) that are paid by Seller directly to the Tax authorities, (ii) that are recoverable from a third party, or (iii) to the extent the Taxes relate to transactions or actions taken by Buyer after the Execution Date.  The Parties will determine pre-transfer share of Tax shown on any Straddle Period Return by an interim closing of the books of the Project Companies as of the Execution Date, except for franchise Taxes based solely on capital, ad valorem Taxes and property Taxes which will be prorated on a daily basis through the Execution Date. For this purpose, any franchise Tax will be allocated to the tax period for which payment of the Tax provides the right to engage in business, regardless of the tax period during which the income, operations, assets or capital that is the base for the Tax is measured. In determining the extent to which a property Tax is attributable to the period through the Execution Date, any property Tax that is based on the assessed value of assets, property or other rights as of a lien date or other specified valuation date will be attributed to the tax period specified in the relevant property Tax bill.

(c)     Buyer will be responsible for and indemnify Seller against, and Buyer will be entitled to all refunds and credits of, all Taxes relating to any event or period (or portion thereof) beginning on or after the Execution Date.

(d)     With respect to any Tax (or portion thereof) for which Seller is responsible to indemnify Buyer pursuant to this Agreement, Seller will have the right, at its sole cost and expense, to control (in the case of a Pre-Transfer Return) or participate in (in the case of a Straddle Period Return) the prosecution, settlement or compromise of any proceeding involving the Tax, including the determination of the value of property for purposes of real and personal property ad valorem Taxes. Buyer will (and will cause the Project Companies to) take such action in connection with any such proceeding that Seller reasonably requests, including the selection of counsel and experts and the execution of powers of attorney. Notwithstanding the foregoing, Buyer will be entitled to participate in any proceeding involving a Pre-Transfer Return, and Seller will not settle any proceeding with respect to

28

any issue that could materially and adversely affect Buyer or the Project Companies in a future tax period (or portion thereof) after the Execution Date without Buyer's prior written consent, not to be unreasonably withheld, conditioned or delayed. Buyer will (and will cause the Project Companies to) inform Seller promptly, and send Seller copies promptly upon receipt, of any notice of an audit, examination, claim or assessment for any Tax for which Seller is responsible and keep Seller informed of progress in the proceedings and allow Seller to attend any meetings and scheduled calls with the Tax authorities to the extent Seller is not controlling the proceedings. Seller will have an obligation to keep Buyer similarly informed about proceedings that it controls. Failure to give any notice or keep the other Party informed will reduce Seller's indemnification obligation pursuant to this Agreement only to the extent Seller is actually prejudiced by the failure. Any such participation related to this clause (d) shall be an independent operation and option of the Seller and shall not create a partnership between the Parties as defined in the Code or the associated regulations to Title 26 or state law.

(e)     After the Execution Date, Buyer will grant or cause the Project Companies to grant to Seller (or its designees) access at all reasonable times to all of the information, books and records relating to the Project Companies for Pre-Transfer Returns or Straddle Period Returns within the possession of Buyer (including workpapers and correspondence with Tax authorities) reasonably necessary to permit Seller (or its designees) to prepare Tax Returns, respond to Tax audits and investigations, prosecute Tax protests, appeals and refund claims and conduct negotiations with Tax authorities. After the Execution Date, Buyer will preserve all information, records or documents in its possession relating to liabilities for Taxes of the Project Companies and the Projects for events and the period through the Execution Date for 7 years or, if later, 6 months after expiration of any applicable statute of limitations (including extensions thereof) for the assessment of Taxes. Buyer will not dispose of any of the foregoing items without first offering the items to Seller.

(f)     Both Buyer and Seller agree to file any form required by the Treasury Department to facilitate access to information or for the participation in administrative actions under this Section 6.3.

(g)     To the extent that the provisions of Article IX are inconsistent with or conflict with the provisions of this Section 6.3, the provisions of this Section 6.3 will control.

Section 6.4    Public Announcements.    Except for statements made or press releases (a) required by Law or (b) require by the rules of a national securities exchange, none of Seller, Buyer or any of their respective Affiliates shall issue an press release or otherwise made any public statements with respect to the is Agreement or the transactions contemplated thereby without the prior written consent of the other Party. Subject to any requirements of Law, each of Seller and Buyer shall be given the opportunity to review all information relating to this Agreement and the transactions contemplated hereby before any such information appears in any filing or public announcement.

29

Section 6.5    Replacement of Credit Support.  To the extent that Buyer has not, as of the Execution Date, obtained substitute credit support arrangements in replacement for all Seller-Maintained Support Obligations for the applicable Project Company or Project, Seller or its Affiliates, as applicable, shall keep in place such Seller-Maintained Support Obligation until the earlier to occur of (a) the date that is sixty (60) days after the Execution Date or (b) the date on which Buyer replaces such Seller-Maintained Support Obligation.  If any claim is made against a Seller-Maintained Support Obligation, or if a Seller-Maintained Support Obligation is drawn upon, as applicable, after the Execution Date, upon receipt of written notice thereof from Seller, Buyer shall pay Seller or its designee the amount so claimed or drawn within five (5) Business Days after the date of such written notice.  Except as provided by this Section 6.5, after the Execution Date, Seller and its Affiliates shall not be responsible for posting or maintaining any credit support required in connection with the Projects.

Section 6.6    Project Construction.

(a)    Following the Execution Date, Seller and Buyer shall each use commercially reasonable efforts and work together in good faith to continue to develop and maintain and pursue completion of the Projects in compliance with all Material Contracts, this Agreement, the Ancillary Agreements, prudent industry practices and the Project Companies development plan and schedule (as may be amended by mutual agreement of the Parties after the Execution Date).  Further, except for such assignments or grants of security interests as otherwise may be required by Buyer's Financing Parties, Buyer shall maintain all of the Project Company's Assets within the applicable Project Company transferred by Seller that are reasonably necessary for the continued development, construction and operation of the applicable Project, including the payment of Support Obligations set forth on Schedule 4.25.

(b)    From the Execution Date until the applicable Closing Date, Buyer also hereby grants Seller and Seller's Affiliates the authority to do all things which are necessary, proper or desirable to continue the development of the applicable Project and effectuate the conditions to Closing, including (i) full rights of access to the applicable Project and the Project site (including for the purpose of engaging in reasonable site, soil and property testing and surveying, as well as design and engineering and related activities), (ii) rights, in coordination with the Buyer (acting reasonably), to act on behalf of the applicable Project Company with counterparties of Material Contracts including in negotiations and discussions with such counterparties, and in pursuing reasonable amendments or waivers to such Material Contracts, (iii) rights to negotiate, coordinate, execute and direct subcontracts related to construction of the Project among prospective or current subcontractors and vendors to Novel Construction, and (iv) rights, in consultation with the Buyer, to act on behalf of the Project Company with respect to any ongoing permitting activities or interactions with Governmental Authorities.  Notwithstanding the foregoing, Seller shall not take any action under this Section 6.6(b) that would either (a) materially reduce the expected value of any Project to Buyer, or (b) materially alter the terms of any Material Contract, without Seller's prior written consent.

Section 6.7    Further Assurances.

(a)    If requested by Buyer, Seller shall execute a Consent and Agreement (in form and substance reasonably acceptable to Seller) in favor of any of the Buyer's or any Project Company's, or any of their Affiliates', financing parties (including any person providing acquisition, construction, backleverage, term or other debt or tax equity financing directly or indirectly for the development, construction, ownership or operation of any Project (each, a "***Project Financing Party***"), and any other documentation reasonably requested by Buyer or a Project Financing Party in connection with any such financing.

(b)    Subject to the terms and conditions of this Agreement, at any time or from time to time after the Execution Date, at any Party's request and without further consideration, the other Party will execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as such Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

Section 6.8    Tax Treatment.  Seller shall and Buyer acknowledges that Seller shall treat the transfer of the Membership Interests of a Project Company as the sale of all of the activities of such Project Company as a functional unit for Tax purposes.

Section 6.9    Solar Panel Supply.  Buyer agrees to provide solar panels for installation at each Project in the quantities contemplated by the capacity of such Projects or as otherwise required under the terms of the EPC Agreement.

Section 6.10    IE Report.  Buyer agrees to use the IE Report delivered pursuant to this Agreement for purposes of obtaining any financing from any Project Financing Party.

Section 6.11    Seller Transfer of Contracts.  Seller agrees to use commercially reasonable efforts to transfer the agreements listed in Part II of Schedule 4.13 to the applicable Project Company prior to the Closing Date.

Section 6.12    Buyer Interconnection Payment to Xcel.  After the Execution Date, Buyer acknowledges and agrees to pay Xcel Energy $126,400 for interconnection costs when due and payable pursuant to the Gibbon Project Company's interconnection arrangements.

## INDEMNIFICATION, LIMITATIONS OF LIABILITY AND WAIVERS

Section 7.1    Survival.  The representations and warranties of (a) Seller in Section 3.1 (*Organization*), Section 3.2 (*Authority; Enforceability*), Section 3.6 (*Brokers*), Section 4.1 (*Organization*), Section 4.2 (*Authority; Enforceability*), Section 4.5 (*Ownership of Membership Interests of Project Companies*) and Section 4.19 (*Brokers*) and (b) Buyer in Section 5.1 (*Organization*), Section 5.2 (*Authority; Enforceability*) and Section 5.7 (*Brokers*") (collectively the "***Fundamental Representations***") and Section 4.11 (*Tax Matters*) shall survive until the date that is sixty (60) days after the expiration of the applicable statute of limitations.    All representations and warranties, other than the Fundamental Representations, contained in or made pursuant to this Agreement or any Ancillary Agreement shall survive until the date that is twelve

31

(12) months after the Execution Date.  The covenants and obligations of the Parties shall survive the Execution Date and will remain in full force and effect until fully performed.

Section 7.2     <u>Indemnification by Seller</u>. Subject to <u>Sections 7.1</u> and <u>7.4</u>, from and after the Execution Date, the Sellers, jointly and severally, will indemnify Buyer and its Affiliates and Representatives (the "***Buyer Group***") from and against all Losses arising, directly or indirectly, from or in connection with:

(a)     any breach of any representation or warranty made in <u>Article III</u> or <u>Article IV</u> of this Agreement; and

(b)     any material breach of any covenant, agreement or other obligation of Seller contained in this Agreement.

Section 7.3     <u>Indemnification by Buyer</u>. Subject to <u>Sections 7.1</u> and <u>7.4</u>, from and after the Execution Date, Buyer will indemnify Seller and its Affiliates and Representatives (the "***Seller Group***") from and against all Losses arising, directly or indirectly, from or in connection with:

(a)     any breach of any representation or warranty made in <u>Article V</u> of this Agreement; and

(b)     any material breach of any covenant, agreement or other obligation of Buyer contained in this Agreement.

Section 7.4     <u>Limitations on Liability</u>. Notwithstanding any contrary provision in this Agreement:

(a)     <u>Time Bar on Claims</u>. No Indemnified Party will be entitled to any recovery (including by way of off-set) from any Indemnifying Party unless a written notice (a "***Notice of Claim***") has been given on or before the expiration of time period for survival set forth in <u>Section 7.1</u>.

(b)     <u>Insurance Recoveries</u>. Losses for which any Indemnified Party will be reimbursed hereunder shall be decreased by insurance proceeds or payments from any other responsible parties actually received by such Indemnified Party (after deducting costs and expenses incurred in connection with recovery of such proceeds).

(c)     <u>Deductible</u>. Neither Party will be entitled to make any Claim for indemnification under <u>Section 7.2(a)</u> or <u>Section 7.3(a)</u>, as applicable, until the aggregate amount of all Claims for indemnification by such Indemnified Party for such Project exceeds one percent (1%) of the aggregate Project Closing Payment actually paid by Buyer (the "***Deductible***"); <u>provided</u>, that (i) after the Deductible is exceeded a single time (for all Claims in the aggregate), the Indemnified Party will be entitled to recover the amount of Losses in excess of the Deductible and (ii) the Deductible will not apply to Losses incurred by any Indemnified Party relating to any fraud, gross negligence or willful misconduct of the Indemnifying Party.

(d)     Mitigation of Losses.  Each Indemnified Party will use its commercially reasonable efforts to mitigate (including by causing its respective Indemnified Parties to use commercially reasonable efforts to mitigate) any Losses for which such Party is or may become entitled to be indemnified hereunder.

(e)     Tax Treatment. To the maximum extent permitted by applicable Law, any indemnity payment made pursuant to this Agreement will be treated as an adjustment to the Project Closing Payment for Tax purposes, unless an audit or other administrative or judicial action with respect to the Indemnified Party causes any such payment not to constitute an adjustment to the Project Closing Payment for U.S. federal income tax purposes.

(f)     Maximum Liability of Seller. Buyer and the other members of the Buyer Group will not be entitled to recover from Seller for any Indemnity Claim under this Agreement any monetary amount in respect of Losses in excess of the applicable Indemnity Cap; provided, however, that the Indemnity Cap shall not apply to and shall not include any Indemnity Claim relating to any fraud, gross negligence or willful misconduct of Seller or any breaches of the Fundamental Representations.

(g)     Limitation on Remedies. The remedies of the Parties under this Article VII are the sole and exclusive remedies that a Party may have under this Agreement for the recovery of monetary damages with respect to any claims arising with respect to the Projects, the Membership Interests or the Real Property Interests or any breach of any representation or warranty or covenant set forth in this Agreement and the Parties hereby waive and relinquish all other rights and remedies under common law, statutes and other bases for claims; provided, that, nothing in this Article VII shall preclude Seller or Buyer from exercising its rights or making any claim under the Ancillary Agreements with respect to Buyer's or Seller's, as applicable, breach or failure to perform hereunder or thereunder. Nothing in this Section 7.4(g) shall limit or constitute a waiver of Seller's rights against Buyer with respect to any obligations owed by Buyer to Seller.

(h)     Knowledge.  No Indemnified Party will have a right or remedy after the Execution Date with respect to any breach of any representation or warranty made in this Agreement if on the Execution Date such Indemnified Party had actual knowledge of any information that would cause such breach and will be deemed to have waived its right to indemnification in respect thereof.

(i)     No Special or Consequential Damages. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NO PARTY WILL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES OR LOST PROFITS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT ("*NON-REIMBURSABLE DAMAGES*"), PROVIDED, THAT ANY AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO A THIRD PARTY CLAIM (OTHER THAN A CLAIM FOR CONSEQUENTIAL DAMAGES ARISING

33

UNDER A CONTRACT PROVISION AGREED TO BY THE INDEMNIFIED PARTY THAT DOES NOT NEGATE CONSEQUENTIAL DAMAGES) WILL NOT BE DEEMED NON- REIMBURSABLE DAMAGES.

(j)     No Duplication. Notwithstanding anything to the contrary in this Agreement, any liability of a Person under this Article VII for the breach of a representation, warranty or covenant shall be determined solely with respect to each Project Company and each Project and subject to the applicable Indemnity Cap.  No breach of a representation, warranty or covenant with respect to one Project Company or Project shall be deemed to cause such breach with respect to any other Project Company or Project.

Section 7.5     Procedures for Third Party Claims.

(a)     Promptly after receipt by an Indemnified Party of notice of the commencement of any Action by a third party (a "***Third Party Claim***") with respect to any matter for which indemnification is or may be owing pursuant to Section 7.2 or Section 7.3 hereof, the Indemnified Party will give notice thereof to the Indemnifying Party; provided, however, that the failure of the Indemnified Party to notify the Indemnifying Party will not relieve the Indemnifying Party of any of its obligations hereunder, except to the extent that the Indemnifying Party demonstrates that the defense of such Third Party Claim has been actually and prejudiced by the Indemnified Party's failure to give such notice.

(b)     If any Action referred to in Section 7.5(a) is brought against an Indemnified Party and the Indemnified Party gives notice to the Indemnifying Party of the commencement of such Action, the Indemnifying Party will be entitled to participate (at its own expense) in such Action, and may assume (at its own expense) the defense of such Action with counsel satisfactory to the Indemnified Party and, after notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such Action, the Indemnifying Party will not, as long as it diligently conducts such defense, be liable to the Indemnified Party under this Section 7.5 for any fees of other counsel with respect to the defense of such Action, in each case subsequently incurred by the Indemnified Party in connection with the defense of such Action.

(c)     If the Indemnifying Party is entitled to and assumes the defense of an Action, no compromise or settlement of such claims or Action may be effected by the Indemnifying Party without the Indemnified Party's written consent unless (i) there is no finding or admission of any violation of Law or any violation of the rights of any Person and no effect on or grounds for the basis of any other Claims that may be made against the Indemnified Party, and (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party; and the Indemnified Party will have no Liability with respect to any compromise or settlement of such claims or Action effected without Indemnified Party's written consent. Notwithstanding the assumption by the Indemnifying Party of the defense of any Claim or Action, the Indemnified Party will be permitted to join in such defense and to employ counsel at its own expense. If notice pursuant to Section 7.5(a) is given to an Indemnified Party of the commencement of any Action and the Indemnifying Party does not, within 10 days after such Indemnified Party's notice is given, give notice to the Indemnified Party of its election to assume the defense of such

34

Action (meeting the requirements of <u>Section 7.5(b)</u>), the Indemnifying Party will be bound by any determination made in such Action. Whether or not the Indemnifying Party assumes the defense of a Third Party Claim, neither the Indemnified Party nor any of its Affiliates will admit any liability with respect to, or settle, compromise or discharge, any Third Party Claim without the prior written consent of the Indemnifying Party.

(d)     Indemnifying Party and Indemnified Party agree to provide each other with reasonable access during regular business hours to the properties, books and records and Representatives of the other (for the avoidance of doubt, excluding any materials protected by attorney-client or similar privilege), as reasonably necessary in connection with the preparation for an existing or anticipated Action involving a Third Party Claim and its obligations with respect thereto pursuant to this <u>Article VII</u>.

Section 7.6     <u>Indemnification Procedures</u>. The following procedures will apply to any claim for indemnification by the Buyer Group or the Seller Group that does not involve a Third Party Claim:

(a)     <u>Notice of Claim</u>. A Notice of Claim will be given as soon as practicable, but in no event later than 30 days, after the Indemnified Party determines that it is or may be entitled to indemnification pursuant to this Agreement; <u>provided</u>, <u>however</u>, that failure to provide notice will not prejudice the Indemnified Party's right to indemnity, except to the extent the Indemnifying Party is irrevocably prejudiced.  A Notice of Claim will be made as follows:

(i)     in the case of any Indemnity Claim by any member of the Buyer Group, by Buyer to Seller at the address and in the manner provided in <u>Section 9.1</u> (*Notices*). Buyer will be the Indemnified Party with respect to Indemnity Claims pursuant to <u>Section 7.2</u>, and no liability in respect of any such Indemnity Claim will be contested, settled, admitted, litigated or otherwise dealt with by or on behalf of the Buyer Group for this purpose by any person other than Buyer; and

(ii)     in the case of any Indemnity Claim by any member of the Seller Group against Buyer, by Seller to Buyer at the address and in the manner provided in <u>Section 9.1</u> (*Notices*). Seller will be the Indemnified Party with respect to Indemnity Claims pursuant to <u>Section 7.3</u>, and no liability in respect of any such Indemnity Claim will be contested, settled, admitted, litigated or otherwise dealt with by or on behalf of the Seller Group for this purpose by any person other than Seller.

(b)     <u>Dispute Notice</u>. If the Indemnifying Party delivers a notice to the Indemnified Party disputing (i) its obligation to indemnify the Indemnified Party in respect of any Indemnity Claim set forth in a Notice of Claim, or (ii) the Indemnity Claim Amount set forth in a Notice of Claim (a "***Dispute Notice***"), Buyer and Seller will negotiate in good faith to settle the dispute, and the portion, if any, of the Indemnity Claim Amount which Buyer and Seller agree in writing is payable will immediately be an Indemnity Amount Payable of the relevant Indemnifying Party. If Buyer and Seller are unable to resolve any portion of the Indemnity Claim Amount within 2 months following the date the Dispute

Notice is given, either Buyer or Seller may initiate proceedings specified in Section 9.12 (*Governing Law; Venue; and Jurisdiction*) of this Agreement to obtain resolution of the dispute. If Buyer or Seller initiates legal proceedings, the amount, if any, determined in a Final Order as payable by the Indemnifying Party will be an Indemnity Amount Payable of the relevant Indemnifying Party as of the date of such Final Order.

(c)      Payments of Indemnity Amounts Payable by Buyer. Subject to the limitations in Section 7.4, Buyer will pay to each relevant Indemnified Party any Indemnity Amount Payable by Buyer, by wire transfer of immediately available dollars (or as otherwise directed pursuant to any Final Order or as otherwise agreed by the Indemnified Party and the Indemnifying Party) to an account designated by Seller, promptly and in no event later than 5 Business Days after such Indemnity Amount Payable is established in accordance with this Agreement.

(d)      Payments of Indemnity Amounts Payable by Seller. Subject to the limitations in Section 7.4, any Indemnity Amount Payable by Seller to each relevant Indemnified Party will be paid by wire transfer of immediately available dollars (or as otherwise directed pursuant to any Final Order or as otherwise agreed by the Indemnified Party and the Indemnifying Party) to an account designated by Buyer, promptly and in no event later than 5 Business Days after such Indemnity Amount Payable is established in accordance with this Agreement.

## ARTICLE VIII

## PRE-CLOSING TERMINATION RIGHT

Section 8.1      Buyer Termination and Construction Option.

Notwithstanding any provision herein to the contrary:

(a)      if the Closing Date has not occurred for any Project by August 1, 2018 at Buyer's option, Buyer may terminate this Agreement as to the applicable Project Company and, in lieu of any further payment obligations under this Agreement as to such Project Company, will pay to Seller (i) $0.50 per watt (dc) for such Project Company (for any such Project Company, the "***Development Fee***") *plus* (ii) either (A) the cost of any materials and related installation work for such materials that has been reasonably incurred by Seller, each installed by Seller, Seller's Affiliate or its counterparties under any construction contract on (or equipment installed or located on) the applicable Project site (if no EPC Agreement has been entered into with the Project Company that owns the applicable Project) or (B) all amounts due and payable under the EPC Agreement (if an EPC Agreement has been entered into with the Project Company that owns the Option Project), and the obligation to reach the Closing Date in respect to such Project Company shall no longer be binding on either Seller or Buyer;

(b)      to exercise its right to terminate this Agreement as to a Project Company under Section 8.1(a), Buyer must deliver written notice to Seller of its intent and election

36

to exercise such termination right ("**_Termination Notice_**") no later than September 15, 2018;

(c)    the Development Fee and costs indicated in <u>clause (a)</u> above for the applicable Project Company shall be paid by Buyer to Seller, by wire of immediately available funds, proportionally as follows: (i) 40% of the Development Fee *plus* the costs indicated in <u>clause (a)(ii)</u> above within 10 days after the date of the Termination Notice (or such earlier date as the Parties may agree); (ii) 20% of the Development Fee as of the start of construction of such Project; and (iii) 40% of the Development Fee within five (5) Business Days following the date such Project achieves Project Substantial Completion; and

(d)    in the event Buyer elects to exercise its right to terminate this Agreement as to Project Company pursuant to this <u>Section 8.1</u>, Buyer and the applicable Project Company shall have the unilateral right to terminate the applicable EPC Agreement (if any) in its entirety pursuant to the terms and conditions thereunder and, thereafter, the right to enter into such construction contracts for the applicable Project with such Person(s) as Buyer determines in its sole and absolute discretion.

Section 8.2    <u>Mutual Termination Right</u>.  If an EPC Agreement is not executed within the time provided under <u>Section 6.1(b)</u> with respect to a Project Company, unless such time is extended by written agreement among each Party to this Agreement, either Buyer or Seller may, by written notice to the other Party, terminate this Agreement with respect to such Project Company, subject to the following:

(a)    Seller shall pay Buyer the amount of Interconnection Reimbursement for such Project that was paid by Buyer to Seller on the Execution Date (and, with respect to the Gibbon Project, the $450,000 deposit previously paid by Buyer) *plus* interest on such amounts at a rate equal to 15% per annum calculated from the Execution Date until the date such amounts are paid to Buyer from Seller;

(b)    Buyer shall transfer to Seller, or its Affiliate, 100% of the Membership Interests in the applicable Project Company free and clear of all Liens, except for Permitted Liens (and in connection with such transfer Buyer shall make reasonable representations (substantially similar to those made by Seller in <u>Article IV</u>) related to the Project Company and the quality of the Project Assets included in the Project being transferred); and

(c)    if this Agreement is terminated (with respect to one or more Projects and Project Companies) pursuant to <u>Section 8.2(a)</u>, this Agreement shall be null and void with respect to such Project and such Project Company and all obligations and liabilities of any Party hereunder with respect to the applicable Project Company and Project shall terminate, except the obligation of Seller pursuant to <u>clause (a)</u>, in which case the Seller shall remain obligated to perform such payment obligation.

# ARTICLE IX

# MISCELLANEOUS

Section 9.1    Notices.

(a)    Unless this Agreement specifically requires otherwise, any notice, demand or request provided for in this Agreement, or served, given or made in connection with it, will be in writing and will be deemed properly served, given or made if delivered in person or sent by facsimile or email (in the case of delivery by facsimile or email, solely if receipt is confirmed) or sent by registered or certified mail, postage prepaid, or by a nationally recognized overnight courier service that provides a receipt of delivery, in each case, to the Parties at the addresses specified below:

If to Buyer, to:

> Pine Gate Renewables, LLC
> 1111 Hawthorne Lane, Suite 201
> Charlotte, NC
> Attn: Zoë Gamble Hanes
> Email: zhanes@pgrenewables.com

If to Seller, to Novel at:

> Novel Energy Solutions, L.L.C.
> 1633 South Robert Street, unit A
> West Saint Paul, MN 55118
> Attn:  Cliff Kaehler
> Email: cliff.kaehler@novelenergy.biz

With a copy to:

> Orrick, Herrington & Sutcliffe LLP
> 1152 15th Street, N.W
> Washington, DC 20005
> Attn: Christopher Gladbach
> Fax: 202-339-8500
> Email: CGladbach@orrick.com

If to Seller, to MNCS at:

> MN Community Solar LLC
> 1633 South Robert Street, unit A
> West Saint Paul, MN 55118
> Attn:  Cliff Kaehler
> Email: cliff.kaehler@novelenergy.biz

38

(b)     Notice given by personal delivery, mail or overnight courier pursuant to this Section 9.1 will be effective upon receipt. Notice given by facsimile or email pursuant to this Section 9.1 will be effective (i) as of the date of transmission if the sender can and does provide evidence of successful transmission, or (ii) the next succeeding Business Day if transmission is after 5:00 p.m. Central Time on any Business Day or during any non-Business Day.

Section 9.2     Entire Agreement. Except for the Confidentiality Agreement, which remains in full force and effect, this Agreement and the Ancillary Agreements supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof, and this Agreement, the Ancillary Agreements, the Confidentiality Agreement and the other documents delivered pursuant to this Agreement contain the sole and entire agreement between the Parties hereto with respect to the subject matter hereof. The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the subject matter hereof will be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the Parties hereby agree that neither party hereto will have any remedies or cause of action (whether in contract or in tort) for any statements, communications, disclosures, failure to disclose, representations or warranties not set forth in this Agreement.

Section 9.3     Expenses. Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each Party will pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby, including all expenses and costs incurred to obtain approvals required by such Party from Governmental Authorities.

Section 9.4     Disclosure.

(a)     Seller's Disclosure.  Seller may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and any such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgment or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in any Schedule will constitute a disclosure for purposes of all other Schedules notwithstanding the lack of specific cross-reference thereto, but only to the extent the applicability of such disclosure to such other Schedule is reasonably apparent. In no event will the inclusion of any matter in the Schedules be deemed or interpreted to broaden Seller's representations, warranties, covenants or agreements contained in this Agreement. The mere inclusion of an item in the Schedules will not be deemed an admission by Seller that such item represents a material exception or fact, event, or circumstance or that such item is reasonably likely to result in a Material Adverse Effect.

(b)     Each Party will promptly notify the other Party upon becoming aware of (i) the occurrence, or failure to occur, of any event that such Party has determined has

caused any representation or warranty of such Party contained in this Agreement or in any exhibit, schedule, certificate, document or written instrument attached hereto to be untrue or inaccurate, (ii) any failure of such Party to comply with, perform or satisfy, in any respect, any covenant, condition or agreement to be complied with, performed by or satisfied by it under this Agreement or any exhibit, schedule, certificate, document or written instrument attached hereto and (iii) any notice or other communication from any Governmental Authority in connection with this Agreement, the Assignment Agreement or the transactions contemplated herein and therein; provided, that such disclosure will not be deemed to cure, or to relieve any Party of any Liability or obligation with respect to, any breach of or failure to satisfy any representation, warranty, covenant or agreement or any condition hereunder, and will not affect any Party's right with respect to indemnification hereunder.

Section 9.5    Waiver. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, will be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

Section 9.6    Amendment. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party.

Section 9.7    No Third Party Beneficiary. Except for the provisions of Sections 7.2 and 7.3 (which are intended for the benefit of the Persons identified therein), the terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person. For the avoidance of doubt, no Person who is not a Party to this Agreement, may challenge any termination of this Agreement, for any reason, or enforce or seek to enforce any provisions of this Agreement (except as set forth in the first sentence of this Section 9.7).

Section 9.8    Assignment; Binding Effect. Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any Party without the prior written consent of each of the other Party, and any attempt to do so will be void, except for assignments and transfers by operation of Law, except that either Party may collaterally assign its rights under this Agreement to any Person providing acquisition, construction, backleverage, term or other debt or tax equity financing directly or indirectly for the development, construction, ownership or operation of any Project.

Section 9.9    Headings. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

Section 9.10    Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party under this Agreement will not be materially and adversely affected thereby, such provision will be fully severable, this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, the remaining provisions of this

40

Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 9.11   Counterparts; Facsimile. This Agreement may be executed in any number of counterparts (including by email), each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Any facsimile, portable document format (.pdf) or other similar electronic copies hereof or signature hereon will, for all purposes, be deemed originals.

Section 9.12   Governing Law.

(a)    This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), will be governed by the Laws of the State of New York without giving effect to any conflict or choice of law provision.

(b)    THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK COUNTY AND OF THE FEDERAL DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN FOR PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY AND EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS THEREFROM) IN ANY SUCH SUIT, ACTION OR PROCEEDING AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT ANY SUCH SUIT, ACTION OR PROCEEDING THAT IS BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  DURING THE PERIOD A LEGAL DISPUTE THAT IS FILED IN ACCORDANCE WITH THIS SECTION 9.12 IS PENDING BEFORE A COURT, ALL ACTIONS, SUITS OR PROCEEDINGS WITH RESPECT TO SUCH LEGAL DISPUTE OR ANY OTHER LEGAL DISPUTE, INCLUDING ANY COUNTERCLAIM, CROSS-CLAIM OR INTERPLEADER, WILL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.  EACH PARTY HEREBY WAIVES, AND WILL NOT ASSERT AS A DEFENSE IN ANY LEGAL DISPUTE, THAT (I) SUCH PARTY IS NOT SUBJECT THERETO, (II) SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SUCH COURT, (III) SUCH PARTY'S PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION, (IV) SUCH ACTION, SUIT OR PROCEEDING IS

41

BROUGHT IN AN INCONVENIENT FORUM OR (V) THE VENUE OF SUCH ACTION, SUIT OR PROCEEDING IS IMPROPER.  A FINAL JUDGMENT IN ANY ACTION, SUIT OR PROCEEDING DESCRIBED IN THIS <u>SECTION 9.12</u> FOLLOWING THE EXPIRATION OF ANY PERIOD PERMITTED FOR APPEAL AND SUBJECT TO ANY STAY DURING APPEAL WILL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAWS.

Section 9.13   <u>Specific Performance and Other Remedies</u>. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties do not perform their obligations under this Agreement in accordance with its specified terms or otherwise breach the provisions of this Agreement. The Parties acknowledge and agree that (a) each of the Parties shall be entitled to an injunction, specific performance, or other equitable relief, as provided in this <u>Section 9.13</u> to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages, prior to the valid termination of this Agreement in accordance with <u>Section 9.1</u>, and (b) the right of an injunction, specific enforcement or other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement. Each Party agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that the other Party has an adequate remedy at Law or that an award of an injunction, specific performance or other equitable relief is not an appropriate remedy for any reason at Law or equity. The Parties acknowledge and agree that any Party seeking an injunction, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 9.13</u> shall not be required to provide any bond or other security in connection with any such proceeding. The rights to specific performance, injunction or other equitable relief provided in this <u>Section 9.13</u> are in addition to any other remedy to which the Party seeking such equitable relief is or may be entitled to under this Agreement, applicable Law or otherwise.

*[Remainder of page intentionally left blank.  Signature pages follow.]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officer of each Party as of the date first above written.


**SELLER:**                         **NOVEL ENERGY SOLUTIONS, L.L.C.**

By: _Cliff Kaehler_

Name: CLIFF Kaehler

Title: CEO


**SELLER:**                         **MN COMMUNITY SOLAR LLC**

By: _Cliff Kaehler_

Name: CLIFF Kaehler

Title: CEO

**BUYER:**                              **PINE GATE RENEWABLES, LLC**

By: _____
Name: Ray Shem
Title:   Chief Financial Officer

# EXHIBIT A

## FORM OF ASSIGNMENT AGREEMENT

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "***Agreement***") is made and entered as of [__], 2018 among Novel Energy Solutions, L.L.C., a Minnesota limited liability company ("***Novel***"), MN Community Solar LLC, a Minnesota limited liability company ("***MNCS***", together with Novel, collectively, "***Assignor***"), and Pine Gate Renewables, LLC, a North Carolina limited liability company ("***Assignee***"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in that certain Membership Interest Purchase Agreement, dated as of February 1, 2018, between Assignor and Assignee (the "***MIPA***").

## WITNESSETH

WHEREAS, Assignor directly owns one hundred percent (100%) of the membership interests (the "***Membership Interests***") of [_____] (the "***Project Company***"); and

WHEREAS, pursuant to and in accordance with the MIPA, on the date hereof Assignor desires to transfer and assign all of its right, title, and interest in and to the Membership Interests to Assignee, and Assignee desires to accept such assignment and transfer.

NOW, THEREFORE, for good and value consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.1     Assignment and Acceptance. Assignor hereby sells, assigns, conveys, transfers, and delivers the Membership Interests to Assignee, and Assignee hereby and accepts the Membership Interests from Assignor.

1.2     Effect of Transfer. As of the date hereof, (a) Assignor will cease to be a member of the Project Company and (b) Assignee will be admitted as, and become, the sole member of Project Company, and such termination and admission will be deemed to occur simultaneously.

1.3     Assignee Agreement to be Bound by Project Company Limited Liability Agreement. As of the date hereof, Assignor hereby agrees to be bound by the limited liability company agreement of the Project Company.

1.4     Further Assurances. Each of Assignor and Assignee agrees to execute and deliver such additional instruments and other documents, and to take such other actions, as may be reasonably requested by the other party to further effectuate and confirm the transfer and assignment of the Membership Interests as herein provided.

1.5     The MIPA. This Agreement is being delivered pursuant to the MIPA and will be construed consistently therewith. This Agreement is not intended to, and does not, in any manner enhance, diminish, or otherwise modify the rights and obligations of the parties under the MIPA.

A-1

To the extent that any provision of this Agreement conflicts or is inconsistent with the terms of the MIPA, the terms of the MIPA will govern.

1.6     <u>Governing Law</u>. This Agreement will be governed by the laws of the State of New York without giving effect to any conflict or choice of law provision.

1.7     <u>Successors and Assigns</u>. This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

1.8     <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including by email), each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any facsimile or portable document format (.pdf) copies hereof or signature hereon will, for all purposes, be deemed originals.

*[Remainder of page intentionally left blank.  Signatures follow.]*

A-2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first written above.

**ASSIGNOR:**

**NOVEL ENERGY SOLUTIONS, L.L.C.**

By: _____
Name:
Title:

**MN COMMUNITY SOLAR LLC**

By: _____
Name:

Title:

**ASSIGNEE:**

**PINE GATE RENEWABLES, LLC**

By: _____
Name:
Title:

**EXHIBIT B**

**CALCULATION OF PPA ADJUSTMENT**

To the extent (a) the price for energy to be produced from the Project owned by the Project Company, as agreed under any Subscription Agreement (the "***Subscription Agreement Price***") exceeds or is less than $0.11296/kWh with a 2% annual escalator (the "***Assumed Price***"), or (b) the IE Report shows that the projected annual production yield (the "***Annual Production Yield***") exceeds or is less than annual amount of 1,300 kWh per kW, with a .6% annual decrease in panel kWh production (the "***Assumed Yield***") the Project Price for such Project Company shall be adjusted only to account for the net present value of such positive or negative difference in price and projected yield according to the net present value calculation set forth in this Exhibit B, which shall applying the following assumptions:

Net Present Value Assumptions:

| Base Case Assumptions: | Variable Assumptions: |
|---|---|
| 1. 10.5% Discount Rate applied to calculate the Net Present Value<br><br>2. Assumed Price<br><br>3. Assumed Yield, including a .6% annual decrease in panel kWh production<br><br>4. Assumed Contract Term of 25 years | 1. Subscription Agreement Price<br><br>2. Annual Production Yield |

The PPA Adjustment for each Project Company shall not exceed +/- $0.16 per watt (DC). The Parties agree that the IE Report delivered pursuant to Section 2.5(e), shall be used to determine whether any PPA Adjustment is necessary for the Project Company. No adjustments to Project Price other than a PPA Adjustment shall be made in respect of the price of energy or the projected yield of the Project.

Exhibit B-1

# EXHIBIT C

# SUBSCRIPTION AGREEMENTS

| Subscription Document | Subscriber | Provider | Effective Date | Project Assignment(s) |
|---|---|---|---|---|
| City of Chanhassen Subscription Agreement | City of Chanhassen | Novel Solar Three LLP | 1/5/18 | Novel Solar Three LLP |
| City of Waconia 1 Subscription Agreement | City of Waconia | Novel Solar Three LLP | 1/16/18 | Novel Solar Three LLP |
| City of Waconia 2 Subscription Agreement | City of Waconia | Novel Solar Three LLP | 1/16/18 | Novel Solar Three LLP |
| Clearwater Enterprises 1 Subscription Agreement | Clearwater Enterprises | Novel Solar One LLP | 1/29/18 | H Novel Solar One LLP |
| Clearwater Enterprises 2 Subscription Agreement | Clearwater Enterprises | Novel Solar Two LLP | 1/29/18 | Novel Solar Two LLP |
| Clearwater Enterprises 3 Subscription Agreement | Clearwater Enterprises | Novel Solar Five LLP | 1/29/18 | Novel Solar Five LLP |
| Kwik Trip 6 Subscription Agreement | Kwik Trip, Inc. | MN Community Solar L.L.C. | 4/13/17 | Novel Solar Three LLP |
| Kwik Trip 7 First Amendment to Subscription Agreement | Kwik Trip, Inc. | MN Community Solar L.L.C. | 6/14/17 | Novel Solar One LLP |
| Kwik Trip 7 Subscription Agreement | Kwik Trip, Inc. | MN Community Solar L.L.C. | 4/13/17 | Novel Solar One LLP |
| Kwik Trip 8 First Amendment to Subscription Agreement | Kwik Trip, Inc. | MN Community Solar L.L.C. | 6/14/17 | Novel Solar Two LLP, Novel Solar Five LLP |
| Kwik Trip 8 Subscription Agreement | Kwik Trip, Inc. | MN Community Solar L.L.C. | 4/13/17 | Novel Solar Two LLP, Novel Solar Five LLP |
| Oak Terrace 1 Health Care Center Subscription Agreement | Oak Terrace Health Care Center of Gaylord, LLC | MN Community Solar L.L.C. | 3/14/17 | Novel Solar Three LLP |
| Oak Terrace 2 Senior Housing Subscription Agreement | Oak Terrace Senior Housing of Gaylord, LLC | MN Community Solar L.L.C. | 3/14/17 | Novel Solar Three LLP |
| Oak Terrace 3 Assisted Living Subscription Agreement | Oak Terrace Assisted Living of North Mankato, LLC | MN Community Solar L.L.C. | 3/14/17 | Novel Solar Three LLP |
| Oak Terrace 4 Senior Housing Subscription Agreement | Oak Terrace Senior Housing of North Mankato, LLC | MN Community Solar L.L.C. | 3/14/17 | Novel Solar Three LLP |
| St. Cloud School ISD 742 Subscription Agreement | District 742 | MN Community Solar L.L.C. | 9/16/16 | Novel Solar One, LLP; Novel Solar Two, LLP; Novel Solar Five, LLP |

Exhibit C -1

| St. Cloud Surgical Center Subscription Agreement | St. Cloud Surgical Center | MN Community Solar L.L.C. | 6/27/16 | Novel Solar One, LLP; Novel Solar Two, LLP; Novel Solar Five, LLP |
|---|---|---|---|---|

Exhibit C-2

**EXHIBIT D**

**INTERCONNECTION REIMBURSEMENT AMOUNTS**

The Interconnection Reimbursement for each Project shall be an amount equal to the following:

(a)      the Gibbon Project Company $304,500;

(b)      the Held Project Company $618,005;

(c)      the Imholte Project Company $305,596; and

(d)      the Schneider Project Company $565,110.

Exhibit D-1

**SCHEDULE 1.1(A)**

**SELLER KNOWLEDGE PERSONS**

1. Will Georgia

2. Cliff Kaehler

3. Ralph Kaehler

4. Neta Eitan-Johnson

5. Patrick Zander

6. Laura Gorski

7. Paula Fitzgerald

4162-4392-3217.13

**SCHEDULE 1.1(B)**

**PERMITTED LIENS**

None.

# SCHEDULE 1.1(C)

# SUPPORT OBLIGATIONS

See Schedule 4.25.

**SCHEDULE 3.3**

**SELLER CONSENTS**

None.

Schedule 3.3-1

# SCHEDULE 4.3

# PROJECT COMPANY CONSENTS

Xcel Energy will be required to countersign Assignment Agreements for the following Interconnection Agreements to transfer ownership from Seller to the applicable Project Company:

**Novel Solar Two LLP**

1. Interconnection Agreement for SRC042652 between Xcel Energy and Novel Energy Solutions LLC

2. Interconnection Agreement for SRC042655 between Xcel Energy and Novel Energy Solutions LLC

3. Interconnection Agreement for SRC042659 between Xcel Energy and Novel Energy Solutions LLC

4. Interconnection Agreement for SRC042662 between Xcel Energy and Novel Energy Solutions LLC

5. Interconnection Agreement for SRC042667 between Xcel Energy and Novel Energy Solutions LLC

**Novel Solar Five LLP**

1. Interconnection Agreement for SRC045928 between Xcel Energy and Novel Energy Solutions LLC

## SCHEDULE 4.7

## BANK ACCOUNTS

None.

**SCHEDULE 4.9**

**LEGAL PROCEEDINGS**

None.

**SCHEDULE 4.10**

**COMPLIANCE WITH LAWS**

None.

# SCHEDULE 4.11

# TAX MATTERS

None.

# SCHEDULE 4.13

## MATERIAL CONTRACTS

**Part I**:

**Novel Solar One LLP**

1. Option to Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated September 21, 2015

2. Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated February 8, 2017

3. Memorandum of Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated December 5, 2017

4. Amendment to Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated September 25, 2017

5. Access Easement between Held Limited Partnership and Novel Solar One LLP

6. Interconnection Agreement for SRC042722 between Xcel Energy and Novel Solar One LLP

7. Interconnection Agreement for SRC042725 between Xcel Energy and Novel Solar One LLP

8. Interconnection Agreement for SRC042727 between Xcel Energy and Novel Solar One LLP

9. Subscription Agreements set forth on Exhibit C

**Novel Solar Two LLP**

1. Solar Power Site Lease between Gary M. Schneider and Jodi A. Schneider and Novel Solar Two LLP dated June 21, 2017

2. Memorandum of Solar Power Site Lease between Gary M. Schneider and Jodi A. Schneider and Novel Solar Two LLP dated June 21, 2017

3. Interconnection Agreement for SRC042652 between Xcel Energy and Novel Energy Solutions LLC

Schedule 4.13-1

4. Interconnection Agreement for SRC042655 between Xcel Energy and Novel Energy Solutions LLC

5. Interconnection Agreement for SRC042659 between Xcel Energy and Novel Energy Solutions LLC

6. Interconnection Agreement for SRC042662 between Xcel Energy and Novel Energy Solutions LLC

7. Interconnection Agreement for SRC042667 between Xcel Energy and Novel Energy Solutions LLC

8. Subscription Agreements set forth on <u>Exhibit C</u>


**Novel Solar Three LLP**

1. Solar Power Site Lease between Lilia J. Sillerud, Clifford Sillerud, Eileen M. Knudsen, Frederick Knudsen, Lynn M. Lagerstedt, Carol Lagerstedt, Gary A. Lagerstedt, Carla Lagerstedt, Mark L. Lagerstedt, and Novel Solar Three LLP dated June 16, 2017

2. Memorandum of Solar Power Site Lease between Lilia J. Sillerud, Clifford Sillerud, Eileen M. Knudsen, Frederick Knudsen, Lynn M. Lagerstedt, Carol Lagerstedt, Gary A. Lagerstedt, Carla Lagerstedt, Mark L. Lagerstedt, and Novel Solar Three LLP dated June 16, 2017

3. Partial Release of Utility by Xcel Energy dated September 29, 2017

4. Interconnection Agreement for SRC042439 between Xcel Energy and Novel Solar Three LLP

5. Interconnection Agreement for SRC042464 between Xcel Energy and Novel Solar Three LLP

6. Interconnection Agreement for SRC042465 between Xcel Energy and Novel Solar Three LLP

7. Interconnection Agreement for SRC042467 between Xcel Energy and Novel Solar Three LLP

8. Subscription Agreements set forth on <u>Exhibit C</u>.

**Novel Solar Five LLP**

1. Solar Power Site Lease between Frank B. Imholte and Margaret A. Imholte and Novel Solar Five LLP dated October 30, 2017

2. Memorandum of Solar Power Site Lease between Frank B. Imholte and Margaret A. Imholte and Novel Solar Five LLP dated October 30, 2017

3. Access Easement between Frank B. Imholte and Margaret A. Imholte and Novel Solar Five LLP dated October 30, 2017

4. Interconnection Agreement for SRC045928 between Xcel Energy and Novel Energy Solutions LLC

5. Subscription Agreements set forth on <u>Exhibit C</u>


<u>Part II</u>:

1. Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated February 8, 2017

2. Amendment to Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated September 25, 2017

3. Interconnection Agreement for SRC042652 between Xcel Energy and Novel Energy Solutions LLC.

4. Interconnection Agreement for SRC042655 between Xcel Energy and Novel Energy Solutions LLC

5. Interconnection Agreement for SRC042659 between Xcel Energy and Novel Energy Solutions LLC

6. Interconnection Agreement for SRC042662 between Xcel Energy and Novel Energy Solutions LLC

7. Interconnection Agreement for SRC045928 between Xcel Energy and Novel Energy Solutions LLC

4162-4392-3217.13

**SCHEDULE 4.15**

**REAL PROPERTY**

**Novel Solar One LLP**

1. Option to Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated September 21, 2015

2. Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated February 8, 2017

3. Memorandum of Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated December 5, 2017

4. Amendment to Solar Power Site Lease between Held Limited Partnership and Novel Energy Solutions LLC dated September 25, 2017

5. Access Easement between Held Limited Partnership and Novel Solar One LLP

**Novel Solar Two LLP**

1. Solar Power Site Lease between Gary M. Schneider and Jodi A. Schneider and Novel Solar Two LLP dated June 21, 2017

2. Memorandum of Solar Power Site Lease between Gary M. Schneider and Jodi A. Schneider and Novel Solar Two LLP dated June 21, 2017

**Novel Solar Three LLP**

1. Solar Power Site Lease between Lilia J. Sillerud, Clifford Sillerud, Eileen M. Knudsen, Frederick Knudsen, Lynn M. Lagerstedt, Carol Lagerstedt, Gary A. Lagerstedt, Carla Lagerstedt, Mark L. Lagerstedt, and Novel Solar Three LLP dated June 16, 2017

2. Memorandum of Solar Power Site Lease between Lilia J. Sillerud, Clifford Sillerud, Eileen M. Knudsen, Frederick Knudsen, Lynn M. Lagerstedt, Carol Lagerstedt, Gary A. Lagerstedt, Carla Lagerstedt, Mark L. Lagerstedt, and Novel Solar Three LLP dated June 16, 2017

3. Partial Release of Utility by Xcel Energy dated September 29, 2017

**Novel Solar Five LLP**

4162-4392-3217.13

1. Solar Power Site Lease between Frank B. Imholte and Margaret A. Imholte and Novel Solar Five LLP dated October 30, 2017

2. Memorandum of Solar Power Site Lease between Frank B. Imholte and Margaret A. Imholte and Novel Solar Five LLP dated October 30, 2017

3. Access Easement between Frank B. Imholte and Margaret A. Imholte and Novel Solar Five LLP dated October 30, 2017

4162-4392-3217.13

# SCHEDULE 4.16

# PERMITS

Part I – Permits held by any Project Company in connection with its Project and applications for Permits not yet issued which have been filed by any Project Company in connection with its Project.

| Project Name | Permit/Surety | Issuing/Receiving Authority |
|---|---|---|
| Novel Solar Three LLP | Road Access Permit | Sibley County |
| Novel Solar Three LLP | CUP | Sibley County |
| Novel Solar Three LLP | Building Permit | Sibley County |
| Novel Solar Three LLP | NPDES | MNPCA |
| Novel Solar One LLP | CUP | Stearns County |
| Novel Solar One LLP | Building Permit | City of Waite Park |
| Novel Solar One LLP | Land Disturbance Permit | City of Waite Park |
| Novel Solar One LLP | Erosion and Sediment Control | Sauk River Watershed District |
| Novel Solar One LLP | NPDES | MNPCA |
| Novel Solar Five LLP | CUP | City of Waite Park |
| Novel Solar Five LLP | Erosion and Sediment Control | Sauk River Watershed District |
| Novel Solar Five LLP | Surety: $12,500 | Sauk River Watershed District |
| Novel Solar Two LLP | CUP | City of Waite Park |

4162-4392-3217.13

Part II – Permits which will be required (other than Permits listed in Part I of this Schedule 4.16) in connection with the Project based on current plans and designs for the Projects.

| Project Name | Permit/Surety | Issuing/Receiving Authority |
|---|---|---|
| Novel Solar Five LLP | Building Permit | City of Waite Park |
| Novel Solar Five LLP | Land Disturbance Permit | City of Waite Park |
| Novel Solar Five LLP | NPDES | MNPCA |
| Novel Solar Two LLP | Erosion and Sediment Control | Sauk River Watershed District |
| Novel Solar Two LLP | Building Permit | City of Waite Park |
| Novel Solar Two LLP | Land Disturbance Permit | City of Waite Park |
| Novel Solar Two LLP | NPDES | MNPCA |
| Novel Solar Two LLP | Surety: 125% of cost of stormwater BMP installation | Sauk River Watershed District |
| Novel Solar One LLP | Surety: $50,000 | City of Waite Park |
| Novel Solar One LLP | Surety: 125% of cost to vegetate project | City of Waite Park |

**SCHEDULE 4.17(A)**

**ENVIRONMENTAL COMPLIANCE AND ENVIRONMENTAL PERMITS**

Part I – None.

Part II – None.

4162-4392-3217.13

**SCHEDULE 4.17(B)**

**ENVIRONMENTAL STUDIES AND REPORTS**

1. Novel Solar One LLP  Project –Phase I Environmental Site Assessment, by Westwdood Engineering, July 6th, 2017

2. Novel Solar One LLP  Project – Limited Phase II Environmental Site Assessment, by Westwdood Engineering, August 2nd, 2017

3. Novel Solar One LLP  Project - Stormwater Report, by EVS, Inc., October 27, 2017

4. Novel Solar One LLP  Project –Geotechnical Report, by Braun Intertec, October 9th, 2017

5. Novel Solar One LLP  Project –Wetland Delineation Report, by Granite City Environmental, September 6th, 2016

6. Novel Solar One LLP  Project –US Army Corps of Engineers Determination, January 30th, 2017

7. Novel Solar One LLP  Project – State Historic Preservation Office Cultural Review, by Westwood Engineering, June 13, 2017

8. Novel Solar One LLP  Project – Endangered Species Review, by Westwood Engineering May 26, 2017

9. Novel Solar One LLP  Project – Endangered Species Review Confirmation, by US Fish and Wildlife Services, May 25, 2017

10. Novel Solar Three LLP  Project –Phase I Environmental Site Assessment, by Westwdood Engineering, June 30th, 2017

11. Novel Solar Three LLP  Project –Stormwater Report, by Westwood Engineers, March 24, 2017

12. Novel Solar Three LLP  Project –Geotechnical Report, by Braun Intertec, October 9th, 2017

13. Novel Solar Three LLP  Project –Wetland Delineation Report, by Granite City Environmental, March 24th, 2017

14. Novel Solar Three LLP  Project –US Army Corps of Engineers Determination, May 30th, 2017

15. Novel Solar Three LLP  Project – State Historic Preservation Office Cultural Review, by Westwood Engineering, June 14, 2017

4162-4392-3217.13

16. Novel Solar Three LLP  Project – Endangered Species Review, by Westwood Engineering May 26, 2017

17. Novel Solar One LLP  Project – Endangered Species Review Confirmation, by US Fish and Wildlife Services, May 24, 2017

18. Novel Solar Five LLP  Project –Phase I Environmental Site Assessment, by Westwdood Engineering, July 11th, 2017

19. Novel Solar Five LLP  Project –Stormwater Report, by Westwood Engineers, March 24, 2017

20. Novel Solar Five LLP  Project –Geotechnical Report, by Braun Intertec, October 5th, 2017

21. Novel Solar Five LLP  Project –Wetland Delineation Report, by Granite City Environmental, June 30th, 2017

22. Novel Solar Five LLP  Project –US Army Corps of Engineers Determination, May 30th, 2017

23. Novel Solar Five LLP  Project – State Historic Preservation Office Cultural Review, by Westwood Engineering, June 29, 2017

24. Novel Solar Five LLP  Project – Endangered Species Review, by Westwood Engineering May 26, 2017

25. Novel Solar Five LLP  Project – Endangered Species Review Confirmation, by US Fish and Wildlife Services, June 23, 2017

26. Novel Solar Two LLP –Phase I Environmental Site Assessment, by Westwdood Engineering, August 14th, 2017

27. Novel Solar Two LLP Project –Stormwater Report, by Westwood Engineers, March 24, 2017

28. Novel Solar Two LLP Project –Geotechnical Report, by Haugo Geotechnical Services, October 23th, 2017

29. Novel Solar Two LLP Project –Wetland Delineation Report, by Westwood Engineering, August 14th, 2017

30. Novel Solar Two LLP Project –US Army Corps of Engineers Determination, September 21st, 2017

31. Novel Solar Two LLP Project – State Historic Preservation Office Cultural Review, by Westwood Engineering, September 20, 2017

32. Novel Solar Two LLP Project – Endangered Species Review, by Westwood Engineering May 26, 2017

33. Novel Solar Two LLP Project – Endangered Species Review Confirmation, by US Fish and Wildlife Services, September 12, 2017.

Schedule 4.17(b)-3

# SCHEDULE 4.25

## SUPPORT OBLIGATIONS

(a) – Seller-Maintained Support Obligations

| Project Name | Permit/Surety | Issuing/Receiving Authority |
|---|---|---|
| Imholte | Surety: $12,500 | Sauk River Watershed District |

(b) – Support Obligations maintained or provided by the Project Company

None.

Buyer Support Obligations:

Support Obligations not obtained as of the Execution Date and for Buyer acknowledges and agrees Buyer shall obtain, or cause to be obtained, in accordance with Section 6.6 prior to commencement of construction for the applicable Project.

| Project Name | Permit/Surety | Issuing/Receiving Authority |
|---|---|---|
| Schneider Project | Surety: 125% of cost of stormwater BMP installation | Sauk River Watershed District |
| Held Projects | Surety: $50,000 | City of Waite Park |
| Held Project | Surety: 125% of cost to vegetate project | City of Waite Park |

**SCHEDULE 5.3**

**BUYER CONSENTS**

None.

# CONSULTING AGREEMENT

This **CONSULTING AGREEMENT** ("Agreement") is dated March 18, 2019 ("Effective Date") by and between **Novel Energy Solutions, L.L.C.**, a Minnesota limited liability company ("Consultant" or "Novel"), and **Green Street Power Partners, LLC** a New York limited liability company ("Client"), collectively the "Parties" and each a "Party".

**NOW, THEREFORE** in consideration of the promises herein and for other good and valuable consideration, the Parties agree as follows:

1. **Services**: Consultant and Client agree Consultant will perform services associated with providing closing items, funding and financing assistance, assisting in due diligence activities, subscriber relationship management and pursuing landowner and subscriber estoppels all as reasonably requested by Client (such services, the "Services") in connection with Client obtaining tax and permanent financing related to Novel Solar One LLC, a Minnesota limited liability company (the "Held Project Company"), Novel Solar Five LLC, a Minnesota limited liability company (the "Imholte Project Company"), and Novel Solar Three LLC, a Minnesota limited liability company (the "Gibbon Project", and collectively with the Held Project Company and the Imholte Project Company, the "Project Companies" (and the solar projects collectively held by the Project Companies, the "Projects")). The Services to be provided pursuant to this Agreement are intended by the Parties to be used by the Client solely in connection with the obtaining financing from tax and debt financing parties (the "Intended Purpose").

2. **Independent Contractor**: Consultant is an independent contractor and is not an employee of Client. Services performed by Consultant under this Agreement are solely for the benefit of Client. Nothing contained in this Agreement creates any duties on the part of Consultant toward any person not a party to this Agreement.

3. **Standard of Care**: Consultant will perform services under this Agreement with the degree of skill and diligence normally practiced by consultants performing the same or similar services. No other warranty or guarantee, expressed or implied, is made with respect to the Services furnished under this Agreement and all implied warranties with respect to the Services are disclaimed. Further, Consultant makes no representations or warranties with respect to its Services related to the subscriptions for the Projects and no guarantee of outcome with respect to those Services.

4. **Changes/Amendments**: This Agreement and its exhibits constitute the entire agreement between the Parties with respect to the Services and, together with its exhibits, supersede any prior written or oral agreements with respect to the Services. This Agreement may not be changed except by written amendment signed by the Parties. The estimate of the level of effort, schedule and payment required to complete the Services, as Consultant understands it, is reflected herein. Services not expressly set forth therein are excluded. Consultant shall promptly notify Client if changes to the Services affect the schedule, level of effort or payment to Consultant and the schedule and payment shall be equitably adjusted with the consent of Client. If Consultant is delayed in performing its Services due to an event beyond its control, including but not limited to fire, flood, earthquake, explosion, strike, transportation or equipment delays, act of war, or act of God, then the payment under this Agreement shall be equitably adjusted in coordination and with the consent of Client, if necessary, to compensate Consultant for any additional costs due to the delay.

   If any change to the pricing, scope or schedule is determined by Consultant or Client to be needed with respect to the Services, this will be documented either by a formal written amendment or an email authorization.

5. **Fee for Services**:  The fee for Services reasonably requested by Client under this Agreement will be based on the reasonably documented costs incurred by Consultant in performing such services, which, if performed by Consultant's employees shall be invoiced to Client on a time-and-materials basis for an amount equal to the actual hours of the Services furnished, multiplied by Consultant's applicable hourly rates for the applicable employee performing such Services, plus a margin of 20%.  Expenses are additional and will be billed at cost.

Exhibit A contains the applicable hourly rates applied to the performance of the Services—without application of the above-referenced margin.

6. **Payment**:  Client shall pay Consultant for time and materials (T&M) Services furnished under the Agreement at upon submission of monthly invoices for the fees discussed above.

Client shall pay Consultant in U.S. dollars within ten (10) business days of receipt of invoices.

**Advance Payments**.  Notwithstanding the foregoing, Client shall pay $20,000 within three (3) business days of signing as an advance payment, which shall be held by Consultant and applied to invoices submitted by Consultant for the Services provided.  Client agrees to make additional advance payments as and if required from time to time in Consultant's sole discretion.

7. **EPC Payment Acceleration**.  The following addresses the respective Solar Project Engineering, Procurement and Construction Agreements (each, an "EPC Contract") for the Imholte and Held Project Companies.  The Parties agree that notwithstanding the time periods set forth in Section 5.7 of each respective EPC Contract, that Client shall cause each of the Imholte and Held Project Companies to pay properly documented invoices submitted by the Contractor (as defined in each EPC Contract) within ten (10) business days after the receipt of each applicable Contractor invoice.

8. **Indemnity**:

Client agrees to indemnify, defend and hold harmless Consultant and its directors, officers, shareholders, employees and subconsultants from and against any liability (including, without limitation, reasonable costs and attorney's fees) incurred by Consultant to the extent (a) caused by Client's negligent acts, errors or omissions, including judgments in favor of any third party or (b) related to any third-party claim arising from Consultant's performance of the Services.

If Consultant provides Services at a construction site, Client agrees to shall indemnify and hold harmless Consultant from any and all loss, damage, claim, or liability (including, without limitation, reasonable attorneys' fees) incurred by Client or Consultant as a result of Consultant providing the Services; provided, however, that Consultant shall not be indemnified for any loss, damage, claim, or liability resulting solely from the negligent acts, errors, or omissions Consultant.

9. **Limitation of Liability:**  No employee of Consultant shall have individual liability to Client.  To the extent permitted by law, the total aggregate liability of Consultant, its officers, directors, shareholders, employees and subconsultants for any and all claims arising out of this Agreement, including attorneys' fees, and whether caused by negligence, errors, omissions, strict liability, breach of contract or contribution, or indemnity claims based on third party claims, shall not exceed in the aggregate, the revenue received by Consultant under this Agreement, except for any damages arising out of Consultant's gross negligence or willful misconduct.

10. **No Consequential Damages**:  In no event and under no circumstances shall Consultant be liable to the Client for any principal, interest, loss of anticipated revenues, earnings, profits, increased expense of operation or construction, loss by reason of shutdown or non-operation due to late completion or otherwise or for any other economic, consequential, indirect or special damages except for damages arising out of Consultant's gross negligence or willful misconduct.

4148-2054-5307.3

11. **Information Provided by Others**: Client shall provide to Consultant in a timely manner any information Consultant indicates is needed to perform the services hereunder. Consultant may rely on the accuracy of information provided by Client and its representatives.

12. **Safety and Security**: Unless specifically included as a service to be provided under this Agreement, Consultant specifically disclaims any authority or responsibility for job site safety and safety of persons other than Consultant's employees. Consultant shall not provide any such services and disclaims any responsibility under this Agreement related to site security or the assessment, evaluation, review, testing, maintenance, operation or safety practices or procedures related to security.

13. **Termination**: Any Party may terminate this Agreement upon thirty (30) days prior written notice to the other Party(s). Client shall pay Consultant for all services rendered to the date of termination plus reasonable expenses for winding down the services. Further, this Agreement shall terminate (following payment of all fees and expenses owing to Consultant) upon the final closing of tax equity financings for the Projects.

14. **Dispute Resolution**: The Parties shall attempt to resolve conflicts or disputes under this Agreement in a fair and reasonable manner and agree, if resolution cannot be made, to attempt to mediate the conflict by a professional mediator (except for payment disputes which may be submitted directly to arbitration). If mediation does not settle any dispute or action which arises under this Agreement or which relates in any way to this Agreement or the subject matter of this Agreement within ninety (90) days after either requests mediation, each of the Parties shall have all remedies available to them in law or at equity.

15. **Litigation Expenses:** Client will be responsible for payment of all expenses and costs associated with Consultant's compliance with a subpoena or Client request to produce documents, data or testimony relating to any proceeding relating to any information pertaining to Client's project or to the work Consultant performed for Client, excluding any litigation or proceeding between Client and Consultant. These costs will include hourly charges for persons involved in responding to a subpoena or Client request, travel and reproduction expenses, advice and participation of external counsel in responding to a subpoena and other request and other reasonable expenses. Consultant will endeavor to confer with Client prior to responding to any subpoena or request covered by this paragraph.

16. **Miscellaneous**:

    a) This Agreement is binding upon and will inure to the benefit of the Parties and their respective successors and assigns. No Party may assign its rights or obligations hereunder without the prior written consent of the other Party(s).

    b) The Parties expressly agree that all provisions of the Agreement were mutually negotiated and that but for the inclusion of the limitation of liability clause in the Agreement, Consultant's compensation for services would otherwise be greater and/or Consultant would not have entered into the Agreement.

    c) If any provision of this Agreement is invalid or unenforceable, the remainder of this Agreement shall continue in full force and effect and the provision declared invalid or unenforceable shall continue as to other circumstances.

    d) This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

    e) In any action to enforce or interpret this Agreement, the prevailing Party shall be entitled to recover, as part of its judgment, reasonable attorneys' fees and costs from the other Party.

    f) This Agreement shall not be construed against Consultant only on the basis that Consultant drafted the Agreement.

    g) Notwithstanding any statute to the contrary, the Parties agree that any action to enforce or interpret this Agreement shall be initiated within two (2) years from the time the Party knew or should have known of the

fact giving rise to its action, and shall not in any case be initiated later than six (6) years after Consultant completes its Services under this Agreement.

**h)** This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original instrument, but all of which taken together shall constitute one instrument.

**IN WITNESS WHEREOF,** the Parties have signed this Agreement as of the date first written above.

**Novel**

Signature _Cliff Kaehler_

Name     Cliff Kaehler

Title       CEO

**Green Street Power Partners, LLC**

Signature

Name     Debi Galter

Title       General Counsel

**Exhibit A**
**Hourly Billing Rates**

| Rate Class | Hourly Rate (US$) | Roles |
|:---:|:---:|:---:|
| 1 | 50 | Clerical, Administration, Junior Analysts and Technicians |
| 2 | 100 | Staff Consultants and Technicians |
| 3 | 200 | Senior Consultants and Technicians, Finance and Project Managers |
| 4 | 350 | Executive Team Members, Senior Project Managers, and Senior Staff |
| 5 | 400 | CEO, COO, CFO |