**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

NOVEL ENERGY SOLUTIONS, LLC,

<em>Plaintiff</em>,

v.

PINE GATE RENEWABLES, LLC, and
GREEN STREET POWER PARTNERS,

<em>Defendants</em>.

Case No.:  1:20-CV-05992-VSB

**Oral Argument Requested**

-----------------------------------------------------------------------------------------------
**NOVEL ENERGY SOLUTIONS, LLC'S BRIEF IN OPPOSITION TO PINE GATE
RENEWABLES, LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT**
-----------------------------------------------------------------------------------------------

Stephen J. Riccardulli
**BUCHANAN INGERSOLL & ROONEY PC**
Incorporated in Pennsylvania
640 5th Avenue, 9th Floor
New York, NY 10019-6102
Tel.:      (212) 440-4482
Fax:      (212)440-4401
stephen.riccardulli@bipc.com
melissa.bayly@bipc.com

*Attorneys for Plaintiff*
*Novel Energies Solutions, LLC*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................................................1

INTRODUCTION .........................................................................................................2

STATEMENT OF FACTS ...............................................................................................4

ARGUMENT STANDARD GOVERNING MOTION ............................................................8

POINT I  Pine Gate Breached the Agreement by Failing to Ensure the
Interconnection Refund was returned to Novel.................................................... 9

      A.    The Court Must Look to Extrinsic Evidence of the Parties' Intent
Because the Contract is Silent with Respect to the Interconnection
Refund...................................................................................................... 10

      B.    That Pine Gate failed to Properly Structure its Contract with Green
Street Does not Relieve it of its Obligations under the Agreement
with Novel............................................................................................... 16

CONCLUSION............................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Awards.com LLC v. Kinko's, Inc.*,
  834 N.Y.S.2d 147 (1st Dep't. 2007) ....................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..............................................................................................8

*Conley v. Gibson*,
  355 U.S. 41 (1957) ................................................................................................8

*ECA & Local 134 IBEW Joint Pension Trust Fund of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................................................8, 12

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir.1985) .................................................................................8

*Haines v. City of New York*,
  41 N.Y.2d 769 (1977) ..........................................................................................10

*Hart v. Kinney Drugs, Inc.*,
  888 N.Y.S.2d 297 (3d Dept 2009) ..................................................................10, 13

*Kaplan v. Cott Beverage Corp.*,
  212 N.Y.S.2d 103 (Sup. Ct. 1961) .......................................................................15

*Kaplan, Inc. v. Yun*,
  16 F. Supp.3d 341 (S.D.N.Y. 2014) ...........................................................9, 14, 15

*LaSalle Bank N.A. v. CIBC Inc.*,
  2011 U.S. Dist. LEXIS 119373 (S.D.N.Y. Oct. 17, 2011) ..................................10

*Marks v. New York University*,
  61 F. Supp. 2d 81 (S.D.N.Y. 1999) ........................................................................9

*Scholastic Inc. v. Harris*,
  259 F.3d 73 (2d Cir. 2001) ...................................................................................10

*Sheppard v. Beerman*,
  18 F.3d 147 (2d Cir. 1994) .....................................................................................8

*Stamatopoulos v. Karasik*,
  656 N.Y.S.2d 432 (3d Dept 1997) ........................................................................11

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)...................................................................................8

*Superior Ice Rink, Inc. v. Nescon Contracting Corp.*,
    861 N.Y.S.2d 362 (2d Dep't 2008).......................................................................11

*In re World Trade Ctr. Disaster Site Litig. (Cirino v. City of New York)*,
    754 F.3d 114 (2d Cir. 2014)...................................................................10, 15, 16

**Other Authorities**

Memorandum of Law in Support of Defendant Pine Gate Renewables, LLC's
    Motion to Dismiss Plaintiff's Amended Complaint, DE 41 ...................................12

Rule 12(b)(6)...........................................................................................................8

## PRELIMINARY STATEMENT

Plaintiff, Novel Energy Solutions LLC ("Plaintiff" or "Novel"), respectfully submits this memorandum of law in opposition to Defendant, Pine Gate Renewables LLC's ("Pine Gate") second motion to dismiss.  Pine Gate moved to dismiss Plaintiffs' initial complaint on August 26, 2020.  Thereafter, Plaintiff opposed Pine Gates's first motion and amended its complaint to add entities related to Green Street.  The amended complaint remained unchanged as to Pine Gate.  Nonetheless, Pine Gate filed the instant motion, which advances arguments not included in its first motion.  The instant motion, like Pine Gate's first, is insufficient as a matter of law and should be denied.

In its motion, Pine Gate argues that the governing contract is silent as to how a refund from the third party utility of the estimated interconnection fee should be treated.  Pine Gate argues that the silence does not constitute an ambiguity because the ambiguity does not arise from the text of the contract.  Pine Gate is wrong.

First, the ambiguity as to the treatment of the interconnection refund directly arises from the text of the contract.  Indeed, the contract provided that the purchase price was reduced by the price of the estimated interconnection fee.  Pine Gate points to the fact that the contract provided for a mechanism by which any additional fees charged by the utility company would be paid by Plaintiff but is silent as to how a refund is to be treated.  What Pine Gate fails to acknowledge is that the interconnection fees were separate and apart from the contract price of the projects and were the sole obligation of Novel.

Indeed the result here arose because Pine Gate took ownership of the projects before the interconnections were finalized.  Had the interconnections been finalized before the sale of the projects, Novel would have received the refund and Pine Gate would have paid the full contract

price.  This is because the interconnection fees were ***not*** a cost included in the purchase price.  Instead, payment by Pine Gate of the estimated interconnection fee to Novel (and the subsequent adjustment to the contract price) was an accounting mechanism required for Pine Gate to take ownership of the project before the interconnection was completed.  By resolving the ambiguity in Pine Gate's favor, would in effect, give Pine Gate a discount off the purchase price for any project in which a refund was issued.

Second, the ambiguity of the contract is evidenced by Pine Gate's multiple motions and various attempts to explain how the contract was clear.  Novel respectfully requests that if the contract was as clear as Pine Gate suggests, one motion would have been sufficient.  In light of the ambiguity as to how the refund should be treated, Plaintiff suggests that the best evidence of the parties' understanding is Pine Gate's conduct with respect to a prior refund for the Imholte Project.  The fact that Pine Gate has removed the argument regarding its prior return of the Imholte refund to Novel suggests it understands its prior position is fatal to its motion.

Lastly, Pine Gate argues that because it did not receive the refund from the utility absolves it of any obligation to compensate Novel.  Pine Gate's apparent failure to not account for a potential refund of a portion of the interconnection fees in its contract with Green Street cannot impair Novel's rights to recover same.  Indeed, Pine Gate had already knew that a refund was possible at the time it resold the projects to Green Street, considering it had already received a refund on the Imholte Project and returned same to Novel.

## **<u>INTRODUCTION</u>**

Pine Gate brings this action for breach of contract, unjust enrichment, and a declaratory judgment against Pine Gate and Green Street Power Partners ("Green Street;" together with Pine Gate, "Defendants") arising from Defendants' failure to reimburse Novel for its overpayment of

an interconnection utility fee as required by the Membership Interest Purchase Agreement (the "Agreement") executed by Novel and Pine Gate on February 2, 2018.

Novel and Pine Gate entered into the Agreement for the sale of four solar energy projects by Novel to Pine Gate.  Before the parties' agreement, Novel paid an estimated interconnection fee to the utility company.  Pursuant to the Agreement, Novel bore the cost of the projects' interconnection fee ("Interconnection Fee"), with the parties agreeing that the cost of the interconnection fee would need to be adjusted to reflect the actual cost of the interconnection once the project was connected to the utility.  At the time of the sale of the projects, the utility had not finalized the interconnection of the projects.  To permit Pine Gate to take ownership of the project, the parties agreed that the registration with the utility would need to change to Pine Gate.  To account for this change, Pine Gate agreed to pay to Novel the amount of the estimated interconnection fees.  In exchange, the parties agreed that the contract price owed by Pine Gate would be reduced by the amount of the estimated Interconnection Fee.

However, because the interconnection fee was only an estimate, the parties agreed that Novel would compensate Pine Gate for any additional interconnection fee charged to Pine Gate by the utility company after the sale of the projects, and that Pine Gate would return any refund received from the utility to Novel.  The return of any refund is necessary for Novel to receive the full contract price under the Agreement.  There is no doubt that Pine Gate understood its obligation to return any refund from the utility.  Indeed, Pine Gate followed the Agreement with respect to interconnection reimbursement received for the "Imholte Project," another solar energy project governed by the Agreement, and returned the $182,868 refund to Novel.

However, prior to the issuance of a refund for the project at issue, the "Held Project," Pine Gate sold the project to Defendant Green Street.  Thereafter, the utility company issued a refund

of $415,275.50 for the Held Project (the "Interconnection Refund") to Green Street because Green Street was now the registered owner of the project the utility company's website at that time.

Notwithstanding the terms of the Agreement, neither Pine Gate nor Green Street has returned the Interconnection Refund to Novel.  In its motions to dismiss, Pine Gate argues, disingenuously, and without substantiation, that the Agreement did not require it to return any interconnection refunds to Novel and that it simply did so "voluntarily" with respect to the Imholte Project.  The problem for Pine Gate, clearly, is that it does not have the money it unequivocally owes to Novel because it failed to address the issue with Green Street when it sold the Held Project. Substantial as that error was, it does not eliminate Pine Gate's obligation to repay Novel the refund it is owed.

Therefore, Novel now seek an order from this Court enforcing the Agreement and requiring Defendants to reimburse Plaintiff the amount of the Interconnection Refund.

## STATEMENT OF FACTS

On February 2, 2018, Novel and Pine Gate executed a Membership Interest Purchase Agreement (the "Agreement"), pursuant to which Novel sold its interest in four limited liability partnerships that were developing solar energy projects (the "Projects") in Minnesota:

    a.  Novel Solar Three LLP, a Minnesota limited liability partnership (the "Gibbon Project Company"), which was developing an approximately 4.63 MW$_{DC}$ photovoltaic solar energy project in Gibbon, Minnesota (the "Gibbon Project");

    b.  Novel Solar One LLP, a Minnesota limited liability partnership (the "Held Project Company"), which was developing an approximately 5 MW$_{DC}$ photovoltaic solar energy project in St. Cloud, Minnesota (the "Held Project");

> c. Novel Solar Five LLP, a Minnesota limited liability partnership (the "Imholte Project Company"), which was developing an approximately 1.498 MW$_{DC}$ photovoltaic solar energy project in St. Cloud, Minnesota (the "Imholte Project"); and
>
> d. Novel Solar Two LLP, a Minnesota limited liability partnership (the "Schneider Project Company"), which was developing an approximately 7 MW$_{DC}$ photovoltaic solar energy project in St. Cloud, Minnesota (the "Schneider Project").

Complaint at ¶ 14.

Prior to construction of the Projects, the local utility company, Xcel Energy ("Xcel"), required the payment of a deposit for the estimated cost of connecting the Projects to the power grid ("Interconnection Fees"). Xcel advised that a final invoice for the Interconnection Fees would be provided following the interconnection, and any refunds would be issued, or overages would be billed, at that time. The estimated Interconnection Fee for each of the projects was as follows:

> a. $304,500 for the Gibbon Project;
>
> b. $618,005 for the Held Project;
>
> c. $305,596 for the Imholte Project; and
>
> d. $565,110 for the Schneider Project;

*Id.* at ¶ 15.

Plaintiff paid the estimated Interconnection Fee at issue for the Held Project, $618,005, to Xcel on January 17, 2018, prior to the execution of the Agreement. *Id.* at ¶ 16.

Section 1.1 of the Agreement set the Project Price for each project at $0.50 per watt (dc) of the final installed size of the Project as increased or decreased by any PPA Adjustment. *Id.* at ¶ 17. Section 2.2 of the Agreement required Pine Gate, at the time of execution of the Agreement,

to refund Novel the amount of the estimated Interconnection Fees that Novel had advanced to Xcel (the "Interconnection Reimbursement").  *Id.* at ¶ 19.  This payment, however, was simply an accounting measure taken so that Novel could close out the Interconnection Fee on its books.  It was not intended to actually compensate Novel for the Interconnection Fee, as the parties' understanding was that Novel, not Pine Gate would ultimately be responsible for the fee.  That is why Section 1.1 of the Agreement subsequently required the amount of the Interconnection Reimbursement paid by Pine Gate to Novel at the time of execution to be subtracted from the final payment of the purchase price of the Projects.  *Id.* at ¶ 18.  This arrangement is clearly memorialized in the definition of "Project Closing Payment":

> ***"Project Closing Payment"*** means, with respect to each Project Company, an amount equal to the Project Price for such Project Company ***minus*** (a) for the first Project Closing Payment only, the $450,000 deposit previously paid by the Buyer, and (b) ***the amount of (i) the Interconnection Reimbursement paid by Buyer to Seller*** and (ii) any additional interconnection costs solely with respect to distribution, telemetry or the substation (or otherwise in connection with any updated interconnection packet prepared by Xcel Energy) that are received form Xcel Energy and paid by Buyer following the Execution date, for such Project Company.

Complaint, Exhibit A (emphasis added).

Because the Project Closing Payment was made prior to completion of the interconnection and receipt of the final invoices from Xcel, the parties agreed to subsequently true-up the amount of the Interconnection Fees.  *Id.* at ¶ 19.  Specifically, the parties agreed that Pine Gate would return to Novel any interconnection refund received from Xcel if the estimated Interconnection Fee was higher than the actual cost of the interconnection.  Conversely, Novel would be responsible for payment of any overages charged to Pine Gate if the estimated interconnection fee was less than the ultimate cost of the interconnection.  *Id.*

In March 2019, Pine Gate advised Novel that Green Street had agreed to purchase the four Projects from Pine Gate.  The purchase agreement between Pine Gate and Green Street did not terminate Pine Gate's obligations under the Agreement, including the obligation to pay the Interconnection Refund, if any, to Plaintiff.  *Id.* at ¶ 20.

The Imholte Project was interconnected to the power grid on April 16, 2019.  Xcel subsequently issued a final invoice in the amount of $122,728, which was $182,868 less than the estimated interconnection fee.  Xcel issued the $182,868 refund to Pine Gate in September 2019.  Pine Gate then immediately transferred the refund to Novel in accordance with the Agreement.  *Id.* at ¶ 23.  Pine Gate's return of the Interconnection Refund to Plaintiff confirmed the parties' agreement that any refund received from Excel for the projects was to be returned to Plaintiff.  *Id.* at ¶ 24.

The Held Project was interconnected to the power grid in June 2019.  Thereafter, after Pine Gate sold the Held Project to Green Street, Xcel issued a final invoice for the interconnection fee, totaling $202,747.50, which was $415,275.50 less than the initial estimate paid by Novel.  Xcel issued the $415,275.50 refund (the "Interconnection Refund") to Green Street.  The refund was issued to Green Street rather than Pine Gate because Green Street was owner of the Held Project and the point of contact on Xcel's website at that time.  *Id.* at ¶ 25.

On April 24, 2020, Novel demanded payment of the Interconnection Refund from Pine Gate.  Despite the terms of the Agreement, and the parties' performance with respect to the Imholte Project, Pine Gate has refused payment on the grounds that Green Street received the Interconnection Refund from Xcel.  This, despite the fact that Pine Gate's sale of the projects did not relieve it from its obligations to Novel under the Agreement.  Pine Gate has failed to comply with its obligations under the Agreement.  *Id.* at ¶ 26.

On April 24, 2020, Plaintiff demanded the payment of the Interconnection Refund from Green Street.  Plaintiff explained that pursuant to its Agreement with Pine Gate, the $415,275.50 refund was a true-up due back to Novel "because it is our money that we already paid (and was reflected in the purchase price calculation)."   Notwithstanding Green Street's consulting relationship with Plaintiff, and knowledge of Plaintiff's right to receive the Interconnection Refund, Green Street has refused to return the Interconnection Refund to Plaintiff.  *Id.* at ¶ 27.

## ARGUMENT

## STANDARD GOVERNING MOTION

To survive a motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly* , 550 U.S. 544, 570 (2007).  Since "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff need only allege enough facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted).  The court's function on a motion to dismiss is not to "weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985).  In making that determination, all factual allegations of a complaint must be "accepted as true and all reasonable inferences are drawn in the plaintiff's favor." *ECA & Local 134 IBEW Joint Pension Trust Fund of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 196 (2d Cir. 2009).  A complaint should not be dismissed on the pleadings unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (citing *Conley v. Gibson*, 355 U.S.

41, 45-46 (1957)).  It is axiomatic that a Court "cannot resolve . . .  a factual dispute on a motion to dismiss. . ."  *Kaplan, Inc. v. Yun*, 16 F. Supp.3d 341, 347 (S.D.N.Y. 2014).

## POINT I

### Pine Gate Breached the Agreement by Failing to Ensure the Interconnection Refund was returned to Novel.

When the Agreement was executed, the parties agreed that Novel was entitled to all interconnection refunds issued by Xcel, as Novel was ultimately responsible for the payment of the Interconnection Fee.  Indeed, Pine Gate followed that precise understanding with respect to the Imholte Project, returning the refund to Novel once it was received.  Even now, Pine Gate does not claim that the Agreement provides that Pine Gate has a right to the Interconnection Refund – instead, it argues only that the Agreement's silence on the issue necessarily works in Pine Gate's favor – delivering a windfall to Pine Gate.  Contrary to Pine Gate's assertions, however, New York law is clear that the Agreement's silence requires the court to assess the parties' intentions at the time the Agreement was reached.  At this juncture, Plaintiff's allegations that the parties intended that the refund be returned to Novel must be accepted as true.  Accordingly, Pine Gate's motion to dismiss must be denied.

Under New York law, the elements of a breach of contract claim are (1) existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach.  *Marks v. New York University*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).  With respect to the first two elements, there is no dispute that the Agreement was a valid contract between Novel and Pine Gate or that Novel performed under the contract. The only dispute is whether the contract required the Interconnection Refund to be paid to Novel and whether Novel suffered damages as a result of the nonpayment.  As Novel has plead, the contract clearly so provides.

Pine Gate's motion to dismiss rests on two false premises: (1) that the contract's silence about which party is entitled to the Interconnection Refund necessarily entitled Pine Gate to any refund, and (2) that Pine Gate is somehow excused from its obligations under the Agreement because it failed to plan for the receipt of a refund when it sold the projects to Green Street.  Both arguments are directly in conflict with well-settled New York law.

### A.  The Court Must Look to Extrinsic Evidence of the Parties' Intent Because the Contract is Silent with Respect to the Interconnection Refund.

First, Pine Gate asserts that the Agreement is silent with respect to the Interconnection Refund.  It then concludes that that silence somehow reflects an unambiguous agreement that Pine Gate, and not Novel, was entitled to the refund.  This is not the law.

In fact, "[w]hen a contract is silent, a Court 'must determine what the parties intended by considering the nature, purpose and particular circumstances of the contract known by the parties.'" *LaSalle Bank N.A. v. CIBC Inc*., 2011 U.S. Dist. LEXIS 119373, *8 (S.D.N.Y. Oct. 17, 2011) (quoting *Awards.com LLC v. Kinko's, Inc*., 834 N.Y.S.2d 147, 152 (1st Dep't. 2007)); *see also In re World Trade Ctr. Disaster Site Litig. (Cirino v. City of New York)*, 754 F.3d 114, 123 (2d Cir. 2014) ("[A] court may supply a missing term in a contract . . . if the contract is ambiguous and the term 'may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent.") (quoting *Haines v. City of New York,* 41 N.Y.2d 769, 772 (1977)).  In such circumstances, the court must look to extrinsic evidence of the parties' intent at the time contract was executed. *Scholastic Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) ("When the terms of a contract are ambiguous, reasonably subject to differing interpretations, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties."); *Hart v. Kinney Drugs, Inc*., 888 N.Y.S.2d 297, 300 (3d Dept 2009) ("[A]n omission as to a material issue can create an

ambiguity and allow the use of extrinsic evidence where the context within the document's four corners suggests that the parties intended a result not expressly stated.").

The intent of the parties is to be ascertained by a trier of fact and cannot be resolved on a motion to dismiss.  *See Superior Ice Rink, Inc. v. Nescon Contracting Corp.*, 861 N.Y.S.2d 362 , 365 (2d Dep't 2008) ("If there is an ambiguity . . . the parties [] may, as an aid in construction, submit extrinsic evidence of their intent at the time of the contract."); *Stamatopoulos v. Karasik*, 656 N.Y.S.2d 432, 433 (3d Dept 1997) ("Given that the written contract is silent as to the width of the right-of-way, the parties' intent is to be ascertained by the trier of fact . . .  by taking into consideration the surrounding circumstances that existed at the time the contract was entered into.") (internal citations omitted).

Here, it is undisputed that Novel paid the Interconnection Fee prior to executing the Agreement with Pine Gate.  The parties then agreed, as stated in Section 2.2 of the Agreement, that, for accounting purposes, Pine Gate would pay the full amount of the estimated Interconnection Fee to Novel at the time of execution of the Agreement.  Both parties understood, however, that the party ultimately responsible for the cost of the Interconnection Fee was Novel – not Pine Gate.  This is directly provided for in Section 1.1 of the Agreement, which reduces the Project Price by the amount of the Interconnection Reimbursement previously paid by Pine Gate to Novel at the time of Agreement execution.  Specifically, the Agreement provides that **"'Project Closing Payment'** means, with respect to each Project Company, an amount equal to the Project Price for such Project Company ***minus***", inter alia, "***the amount of (i) the Interconnection Reimbursement paid by Buyer to Seller***."

Thus, as clearly stated in the Agreement, Pine Gate subtracted the Interconnection Reimbursement from the final Project Price.  As a result, Novel was responsible for the full amount

of the Interconnection Fee in the form of a reduction of the Project Price.  In furtherance of this arrangement, the Agreement provides that "any additional interconnection costs . . . that are received from Xcel Energy and paid by Buyer following the Execution Date" shall be subtracted from the Project Price.  *See* Complaint, Ex. A. Section 1.1.  It does not explicitly state how any refund returned from Xcel should be distributed.  It was, however, as Novel alleges, the parties' express understanding that any refund would be returned to Novel.  Complaint, at ¶ 19.  This understanding is clearly illustrated by the fact that Pine Gate ***actually returned the refund issued for the Imholte Project to Novel.***  *Id.* at ¶ 23.   Such an understanding is likewise consistent with industry practice for the parties to true up the interconnection fees once the utility issues the final invoice.  And it is simply common sense – the parties explicitly agreed that Novel was responsible for the full cost of the Interconnection Fee.  It follows that any overage would be paid by Novel and any refund would issue to Novel.

Pine Gate acknowledges that the Agreement is silent regarding which party is entitled to a refund from Xcel.  But Pine Gate claims, without support, that that Pine Gate was entitled to the refund because "Plaintiff's risk assessment . . . accepted the risk of overestimation of [interconnection] costs."  Memorandum of Law in Support of Defendant Pine Gate Renewables, LLC's Motion to Dismiss Plaintiff's Amended Complaint, DE 41, ("Motion"), at 8.  This allegation is baseless and, critically, is directly contrary to the allegations in the Complaint, which must be accepted as true for purposes of a motion to dismiss.  *See ECA & Local 134 IBEW Joint Pension Trust Fund of Chi.,* 553 F.3d at 196.  There is no indication in the Agreement that Pine Gate bargained for the benefit of a refund issued by Xcel, or that Novel received any benefit in exchange for forgoing its right to the refund.  Pine Gate's claim that such "risk assessment" was a conscious decision by Plaintiff can therefore be assessed only through discovery regarding the

12

parties' intent (which will, as Pine Gate is well aware, show that Novel made no such risk assessment).  Accordingly, on that basis alone, Pine Gate's motion must be denied.

Pine Gate next argues that since the parties expressly allocated the risk of underpayment of the Interconnection Fee, they could have expressly allocated the benefit of overpayment as well. Pine Gate is correct on this point – but it draws the wrong conclusion therefrom.  In fact, that the parties expressly agreed that Pine Gate would be compensated for Novel's underpayment of the Interconnection Fee indicates that if the parties had also intended for Pine Gate to benefit from Novel's overpayment of the fee, the parties would have so contracted.  The failure to expressly allocate the refund to Pine Gate, therefore, is strong evidence that no such allocation was contemplated.

This interpretation is also consistent with the structure and context of the Agreement regarding the Interconnection Fee.  The text of the Agreement itself shows that the parties intended for Novel to cover the Interconnection Fee.  *See* §§ 1.1, 2.2.  It follows that Novel would reimburse Pine Gate if the Interconnection Fee increased, as the Agreement provides.  *See* § 1.1.  And it also follows that Novel would receive the benefit of any refund later issued by Xcel.  Thus, because the "context within the four corners" of the agreement indicates that the parties expected Novel to be fully responsible for the Interconnection Fee, the omission of a provision regarding which party would be entitled to the Interconnection Refund renders the Agreement ambiguous.  *See Hart*, 888 N.Y.S.2d at 300 (3d Dept 2009) ("[A]n omission as to a material issue can create an ambiguity and allow the use of extrinsic evidence where the context within the document's four corners suggests that the parties intended a result not expressly stated.").  That ambiguity, in turn, requires the court to look to extrinsic evidence to glean the parties' intent.  And, as Novel alleges in the

Complaint, and Pine Gate does not contest, extrinsic evidence will show that Pine Gate agreed to return any refund to Novel.[1]

It is indeed noteworthy that Pine Gate fails entirely to explain the fact that it provided Novel with the nearly $200,000 refund for the Imholte Project.  In its initial Motion to Dismiss, Pine Gate claimed that the return of the Imholte refund was simply voluntarily.[2]  This claim is– as Pine Gate appears to realize by omitting it from its rewritten motion – nonsensical.  It defies reason that a company would voluntarily give up nearly $200,000 to which it was otherwise entitled *for no reason at all*.  Pine Gate clearly understood the arrangement – and complied with the agreement with respect to the Imholte refund.  To the extent Pine Gate maintains that it did not share Novel's understanding at the time it executed the Agreement – and that the return of the Imholte refund was a random act of generosity –this is a factual dispute that cannot be resolved on a motion to dismiss.  *See Kaplan, Inc. v. Yun*, 16 F. Supp.3d at 347.

Finally, Pine Gate's framing of the issue as an attempt by Novel to "rewrite" the Agreement's provisions regarding the Interconnection Reimbursement is disingenuous.  *See* Motion at 11.  There is no dispute that the Agreement required Pine Gate to pay the amount of the estimated Interconnection Reimbursement at the time of execution of the Agreement.  There is also no dispute that that Pine Gate was then to subtract the amount of the Interconnection

---

[1] Pine Gate's argument that the parties drafted an analogous "true up" provision with respect to the PPA Adjustment is a red herring.  *See* Motion, at 12.  The PPA adjustment pertains to an adjustment in the Project Price based on the price for energy to be produced and the production yield of the project.  Accordingly, the PPA Adjustment reflects the assumptions made by the parties in calculating the Project Price.  The Interconnection Refund, by contrast, is wholly unrelated to the Project Price and has no effect whatsoever on its calculation.  It is simply a refund of moneys paid by Novel to a third party.

[2] Pine Gate acknowledges in its Motion that the Amended Complaint "added no new substantive factual allegations or claims." Motion, at 1.  However, rather than ask the court to rely on its initial Motion to Dismiss, DE 12, Pine Gate elected to fully revamp its motion, adding newly developed arguments and eliminating any explanation of the Imholte refund.  This change in position is telling – Pine Gate is well aware that the contract negotiations and the parties' subsequent actions support Novel's allegations.  Pine Gate thus had to invent a new understanding of the Agreement, regarding Novel's alleged risk assessment, in order to distract from these facts.

Reimbursement and any additional amount paid to Xcel for the interconnection fee from the final Project Price.  The only dispute in this case is which party is entitled to a refund from Xcel for moneys Novel had paid.

For similar reasons, Pine Gate's reliance on *Kaplan v. Cott Beverage Corp.,* 212 N.Y.S.2d 103, 104 (Sup. Ct. 1961) is unavailing.  In *Kaplan*, a 1961 New York County Supreme Court case, the plaintiff agreed to sell its business to defendant for a set price, though the defendant orally agreed to pay a few thousand dollars more if the inventory was ultimately worth more than Plaintiff initially calculated.  *Id.*  Notably, the case was not decided on a motion to dismiss, and the court permitted testimony regarding the parties' agreement at trial.  *Id.* at 105.  Ultimately, after hearing the parties' testimony, the court found that the contract itself set the purchase price and that the sale was a "distress sale" in which the "plaintiff was a suppliant and in no position to bargain."  *Id.*  Accordingly, the defendant's comments about potentially increasing the price were not enforceable in light of the language of the contract.  *Id.*

Here, by contrast, the dispute is not about an adjustment to the purchase price.  Novel is not asking Pine Gate to pay more than the price set for the Project.  Rather, the question before the court is which party is entitled to a refund of a fee ***paid by Novel to a third party.***  There is no provision in the Agreement resolving the issue as to entitlement to the refund, though the structure of the transaction implies that Novel would be entitled to a refund of any overpayment, as Novel was also liable for any underpayment.

As such, the ambiguity in the present case is more akin to ambiguity found by the Second Circuit in *In re World Trade Ctr. Disaster Site Litig. (Cirino v. City of New York)*, 754 F.3d 114, 123 (2d Cir. 2014).  There, the court found that a settlement agreement's omission regarding the treatment of a class of plaintiffs rendered it ambiguous, and therefore required the District Court

to assess "what the parties intended in this respect." *Id.* Specifically, the settlement agreement provided that "Plaintiffs who dismiss with prejudice . . . need not be included in the [Eligible Plaintiffs List]." *Id.* at 119. The Agreement was silent, however, as to whether plaintiffs whose claims were involuntarily dismissed should be included in the EPL. *Id.* at 123. The court thus held that "[o]n remand, if the district court determines that the parties had an understanding as to the treatment of plaintiffs whose claims were involuntarily dismissed, it must give effect to that understanding." *Id.* at 124. Likewise, here, the Agreement omits which party is entitled to a refund from Xcel of the fee paid by Novel. The context of the Agreement, however, treats the Interconnection Fee as a separate cost for which Novel is responsible, thereby indicating that Novel would be entitled to any refund. Because such a provision is not expressly stated, however, this court must look to extrinsic evidence to determine the parties' intent with respect to the refund.

In sum, Pine Gate's argument is disingenuous, facially implausible, and proves only that there is factual dispute that cannot be resolved on a motion to dismiss. Accordingly, Pine Gate's motion must be denied.

> **B.     That Pine Gate failed to Properly Structure its Contract with Green Street Does not Relieve it of its Obligations under the Agreement with Novel.**

Pine Gate next argues that the fact that it failed entirely to require Green Street to return the refund somehow excuses it from its obligations under its contract with Novel. This is absurd.

Novel did not consent to the sale of the project to Green Street, nor did it agree to relieve Pine Gate of any of its obligations under the Agreement. Pine Gate simply neglected to require Green Street to return the refund when it sold the project. Complaint, ¶ 20. That failure is unfortunate for Pine Gate, but there is no legal basis for Pine Gate to be excused from its obligations to Novel.

Therefore, Pine Gate's argument that its own negligence relieves it of its contractual obligations must be rejected.

## <u>CONCLUSION</u>

For these reasons, defendants Pine Gate's motion to dismiss the Complaint must be denied in its entirety.

DATED:       October 13, 2020
                New York, New York

**BUCHANAN INGERSOLL & ROONEY PC**


By:       <u>*s/ Stephen J. Riccardulli*</u>
           Stephen J. Riccardulli
           640 5th Avenue
           9th Floor
           New York, NY 10019-6102
           Tel. 212-440-4400

           *Attorneys for Plaintiff*

4835-3995-6174, v. 1